Slip Op. 17-166

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

SHENZHEN XINBODA INDUSTRIAL CO., LTD.,  :

                                *Plaintiff*,         :

                v.                     :

UNITED STATES,                   :

                              *Defendant*,     :     Court No. 11-00267

              and                  :

FRESH GARLIC PRODUCERS ASSOCIATION,  :
CHRISTOPHER RANCH, L.L.C., THE
GARLIC COMPANY, VALLEY GARLIC,    :
and VESSEY AND COMPANY, INC.,

                                       :

                    *Defendant-Intervenors.*

---

[Remanding on surrogate value for garlic and selection of financial statements; sustaining on labor wage rate and zeroing]

Dated:  December 15, 2017

    <u>Gregory S. Menegaz</u>, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff. With him on the briefs were <u>J. Kevin Horgan</u> and <u>Alexandra H. Salzman</u>.

    <u>Richard P. Schroeder</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for Defendant.  With him on the briefs were <u>Joyce R. Branda</u>, Acting Assistant Attorney General, Civil Division, and <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director, Commercial Litigation Branch.  Of counsel on the briefs were <u>Justin R. Becker</u> and <u>Khalil Gharbieh</u>, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

    <u>Michael J. Coursey</u>, Kelley Drye & Warren LLP, of Washington D.C., argued for Defendant-Intervenors.  With him on the brief was <u>John M. Herrmann</u>.

**OPINION**

RIDGWAY, Judge:

Plaintiff Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda")    a Chinese exporter of fresh

garlic    commenced this action to contest the Final Determination in the U.S. Department of

Commerce's fifteenth administrative review of the antidumping duty order covering fresh garlic

from the People's Republic of China.  The period of review is November 1, 2008 through October

31, 2009.  *See* Fresh Garlic from the People's Republic of China: Final Results and Final Rescission,

in Part, of the 2008-2009 Antidumping Duty Administrative Review, 76 Fed. Reg. 37,321 (Dep't

Commerce June 27, 2011) ("Final Determination"); Issues and Decision Memorandum for the Final

Results of the 15th Administrative Review of Fresh Garlic from the People's Republic of China

(June 20, 2011) (AR Pub. Doc. No. 176) ("Issues & Decision Memorandum"); *see generally*

Shenzhen Xinboda Industrial Co. v. United States, 38 CIT ____, 976 F. Supp. 2d 1333 (2014)

("Shenzhen Xinboda I").[1]

---

[1]Because this action has been remanded to Commerce, two administrative records have been filed with the court    the initial administrative record (comprised of the information on which the agency's Final Determination was based) ("AR") and the supplemental administrative record compiled during the course of the remand ("SAR").

Each of the two administrative records includes confidential (*i.e.*, business proprietary) information.  Therefore, two versions of each of the records    a public version and a confidential version    were filed with the court.  The public versions of the administrative record and the supplemental administrative record consist of copies of all public documents in the record, and public versions of confidential documents with all confidential information redacted. The confidential versions consist of complete, un-redacted copies of documents on the record that include confidential information.  The number of the public version of a document is different than the number of the confidential version of the same document.

All citations to the administrative record and the supplemental administrative record herein are to the public versions.  Citations to public documents in the administrative record and the supplemental record are cited as "AR Pub. Doc. No. ____" and "SAR Pub. Doc. No. ____," respectively.

In its Complaint, Xinboda challenged Commerce's decisions in its Final Determination as to the surrogate financial statements used to derive surrogate financial ratios, the surrogate value for labor (*i.e.*, the surrogate wage rate), and the surrogate value for whole raw garlic bulbs, as well as the agency's application of its "zeroing" methodology in calculating Xinboda's dumping margin. *See generally* Complaint; *see also* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1345-46.

Ruling on Xinboda's Motion for Judgment on the Agency Record, Shenzhen Xinboda I remanded this matter to Commerce for further consideration of all four issues, including a voluntary remand on the surrogate value for labor. *See generally* Shenzhen Xinboda I, 38 CIT at ____, ____, 976 F. Supp. 2d at 1338, 1388. Now pending are Commerce's Remand Results, filed pursuant to Shenzhen Xinboda I. *See generally* Final Results of Redetermination Pursuant to Remand (SAR Pub. Doc. No. 7) ("Remand Results").

Xinboda is satisfied with Commerce's Remand Results as to the surrogate value for labor, as well as Commerce's exclusion of certain transportation expenses in determining the surrogate value for whole raw garlic bulbs. *See* Remand Results at 3, 29, 57 (surrogate value for labor); *id*. at 3, 8-9, 47-48 (surrogate value for whole raw garlic bulbs); Plaintiff's Comments on Remand Redetermination ("Pl.'s Brief") at 1 n.1. However, Xinboda contends that the Remand Results are flawed in all other respects. *See generally* Pl.'s Brief; Plaintiff's Reply to Response Comments on Remand Redetermination ("Pl.'s Reply Brief").[2]

---

[2]In the Remand Results, Commerce made a minor adjustment to its surrogate financial ratio calculations. *See* Remand Results at 3, 23-24 & nn.64-66, 57. Xinboda has not taken a position on that adjustment. However, more generally, Xinboda continues to oppose the use of the surrogate financial statements that Commerce selected.

In contrast, the Government and the Defendant-Intervenors   the Fresh Garlic Producers

Association, Christopher Ranch, L.L.C., The Garlic Company, Valley Garlic, and Vessey and

Company, Inc. (collectively, the "Domestic Producers")   assert that the Remand Results are both

supported by substantial evidence and in accordance with law.  The Government and the Domestic

Producers maintain that the Remand Results therefore should be sustained.  *See generally*

Defendant's Response to Comments Regarding the Remand Redetermination ("Def.'s Brief");

Defendant-Intervenors' Response to Plaintiff's Comments on Remand Redetermination ("Def.-Ints.'

Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[3]  For the reasons set forth below, the

Remand Results are sustained as to the surrogate value for labor and Commerce's application of

zeroing in this administrative review.  The surrogate value for whole raw garlic bulbs and the

selection of surrogate financial statements are again remanded, for Commerce's further

consideration.

## I.  Background

Shenzhen Xinboda I laid out the relevant statutory scheme, including citations to the statute

and other pertinent authorities.  That explanation, together with other relevant background, is

summarized below, in the interests of convenience and completeness.

As Shenzhen Xinboda I explained, dumping occurs when goods are imported into the United

---

[3]All citations to statutes herein are to the 2006 edition of the United States Code.  Similarly, all references to regulations are to the 2008 edition of the Code of Federal Regulations.  The pertinent text of the statutes and regulations cited remained the same at all times relevant herein.

States and sold at a price lower than their "normal value," resulting in material injury (or the threat

of material injury) to the U.S. industry.  The difference between the normal value of the goods and

the U.S. price is the "dumping margin."  When normal value is compared to the U.S. price and

dumping is found, antidumping duties equal to the dumping margin are imposed to offset the

dumping.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1338 (and authorities cited

there).

When the exporting country is a market economy country, normal value generally is

calculated using either the price in the exporting market (*i.e.*, the price in the "home market" where

the goods are produced) or the cost of production of the goods.[4]  However, where   as here   the

exporting country has a non-market economy, there is often concern that the factors of production

(inputs) that are consumed in producing the goods at issue are under state control, and that home

market sales therefore may not be reliable indicators of normal value.  *See* Shenzhen Xinboda I, 38

CIT at ____, 976 F. Supp. 2d at 1338 (and authorities cited there).

In such cases, Commerce identifies one or more market economy countries to serve as a

"surrogate" and then "determine[s] the normal value of the subject merchandise on the basis of the

value of the factors of production" (*i.e.*, the value of the inputs) in the relevant surrogate country or

countries, including "an amount for general expenses and profit plus the cost of containers,

coverings, and other expenses."  This surrogate value analysis is designed to determine a producer's

costs of production as if the producer operated in a hypothetical market economy country.  *See*

---

[4]In addition, in certain market economy cases, Commerce may calculate normal value using
the price in a third country (*i.e.*, a country other than the exporting country or the United States).  *See*
Shenzhen Xinboda I, 38 CIT at ____ n.3, 976 F. Supp. 2d at 1338 n.3 (and authorities cited there).

Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1338-39 (and authorities cited there).

Under the statute, factors of production "include, but are not limited to   (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." *See* Shenzhen Xinboda I, 38 CIT at _____ n.4, 976 F. Supp. 2d at 1338 n.4; 19 U.S.C. § 1677b(c)(3).  However, valuing the factors of production (inputs) consumed in producing goods does not capture (1) manufacturing/factory overhead, (2) selling, general, and administrative expenses ("SG&A"), and (3) profit.  Commerce calculates those surrogate values using ratios   known as "surrogate financial ratios"   that the agency derives from the financial statements of one or more surrogate companies that produce identical (or at least comparable) merchandise in the relevant surrogate market economy country. *See* Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1343-44 (and authorities cited there).  As discussed in greater detail below, Commerce's selection of surrogate financial statements continues to be at issue here.

In certain circumstances, where Commerce finds that the available information on the value of factors of production is not adequate for purposes of determining the normal value of the goods at issue pursuant to the agency's standard "factors of production" methodology (described above), Commerce determines the surrogate value of an "intermediate input" instead.  Under Commerce's so-called "intermediate input methodology," rather than valuing the various individual "upstream" factors of production that are used to produce an intermediate input, Commerce directly values the "downstream" intermediate input itself. *See* Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1339 (and authorities cited there).  As discussed in greater detail below, Commerce has used its

intermediate input methodology to determine the surrogate value for whole raw garlic bulbs here. That value continues to be contested.

The underlying antidumping order in this case, which dates back to 1994, covers imports of fresh garlic from China, including whole garlic bulbs and peeled garlic cloves (the products exported by Xinboda). As noted above, this action involves the fifteenth administrative review of that antidumping order, covering the period November 1, 2008 through October 31, 2009. *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1340. Commerce selected India as the primary surrogate country for purposes of this review (as in prior reviews), and used data from India to calculate the surrogate values for all factors of production, with the sole exception of labor. *See id*., CIT at ____, 976 F. Supp. 2d at 1340 (and authorities cited there).

Surrogate Value for Whole Raw Garlic Bulbs. In the course of the administrative review, Commerce compiled voluminous information concerning Xinboda and its operations, particularly the company's exports of whole garlic bulbs and peeled garlic cloves to the U.S. from China. Commerce similarly compiled detailed information on Zhenzhou Dadi Garlic Industry Co., Ltd. ("Dadi"), the affiliated processor/producer that supplied Xinboda with garlic products produced from the whole raw garlic bulbs that Dadi purchased from local Chinese garlic farmers. Dadi processed the whole raw garlic bulbs that it purchased   which had diameters of between 50 mm and 65 mm   into whole garlic bulbs and peeled garlic cloves for Xinboda, using relatively simple procedures involving principally manual labor. *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1340-41 (and authorities cited there).

To produce whole fresh garlic, Chinese garlic farmers deliver to Dadi whole raw garlic bulbs,

sorted by size, in large mesh bags.  Dadi workers sitting at tables in a simple warehouse then rub off

the outer skins of the whole raw garlic bulbs (to give the garlic bulb a clean white appearance), cut

or trim the roots and stems, place the bulbs into small mesh bags (typically holding three to five

bulbs, depending on the customer), and affix the customer's labels to seal the bags.  Bags are then

packed into cartons, ready for shipping.  Like its process for production of whole fresh garlic, Dadi's

process for the production of peeled garlic cloves is also relatively simple and involves mostly

manual labor.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1341 (and authorities

cited there).

Xinboda's administrative operations are similarly modest, and its sales process is also basic

and straightforward.  Xinboda does not develop or market its own brands and sells only a handful

of products (*i.e.*, garlic, onion shoots, and ginger) to its established customer base.  Its advertising

and selling expenses are minimal.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1341

(and authorities cited there).

Early in the course of the instant administrative review, Commerce concluded (as it had since

the tenth review) that Chinese garlic farmers generally do not track the actual labor hours expended

in growing and harvesting garlic, and, thus, do not maintain the records that Commerce would need

to verify data reported for the expenses that Chinese farmers incur in growing and harvesting whole

raw garlic bulbs.  Commerce therefore used its intermediate input methodology to value "growing"

and "harvesting" factors of production, as it had since the tenth review.  As such, in lieu of separately

valuing each of the various individual growing and harvesting factors of production consumed in

growing and harvesting a whole raw garlic bulb (*i.e.*, the leased land, garlic seed, water, pesticides,

herbicides, fertilizer, plastic film, labor, and other "inputs" or commodities), Commerce instead

sought to capture those factors of production by determining the value of the "intermediate input"

*i.e.*, a whole raw garlic bulb.  *See* Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1341-

42 (and authorities cited there).

In valuing the whole raw garlic bulb input (*i.e.*, the intermediate input) , Commerce based

its calculations on size-specific prices for garlic bulbs sold at the Azadpur APMC Market (located

near Delhi and operated by the Azadpur Agricultural Produce Marketing Committee ("APMC")),

as published in the Azadpur APMC's Market Information Bulletin.  Commerce rejected the other

potential sources of data on the record, including the prices favored by Xinboda   *i.e.*, the prices for

whole raw garlic bulbs included in the financial statements of Garlico Industries Limited ("Garlico"),

an Indian purchaser, processor, and trader of garlic, onions, and other vegetables and related products

based on Commerce's determination that those other sources of data do not specify the physical

characteristics of the garlic bulbs that were priced.  *See* Shenzhen Xinboda I, 38 CIT at _____, 976

F. Supp. 2d at 1342-43 (citing Issues & Decision Memorandum at 12-13).[5]

To value the whole raw garlic bulbs delivered to Dadi that had a diameter of greater than 55

mm, Commerce relied on non-contemporaneous Azadpur Market prices for garlic bulbs classified

---

[5]In addition to the Azadpur Market prices and the Garlico prices, other potential sources of
data on the record which Commerce considered for use in calculating a surrogate value for whole
raw garlic bulbs include Indian World Trade Atlas ("WTA") import statistics, Indian export
statistics, Indian domestic market data from government sources (including data from India's
National Horticultural Board and data from the Indian Spices Board), and data from the Indian
Agricultural Marketing Information Network ("AGMARKNET"), a database maintained by India's
Ministry of Agriculture.  *See* Shenzhen Xinboda I, 38 CIT at _____ n.14, 976 F. Supp. 2d at 1347
n.14.

as "grade S.A." (or "Super-A"), which Commerce then indexed (inflated) to be contemporaneous

with the dates of the period of review.  Commerce used non-contemporaneous prices to value this

larger-bulbed garlic because the Azadpur Market ceased use of the "S.A."-grade classification in

February 2008 (before the period of review).  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp.

2d at 1343 (and authorities cited there, including Preliminary Surrogate Value Memorandum at 4

(AR Pub. Doc. No. 121) and Issues & Decision Memorandum at 13).

To value the whole raw garlic bulbs delivered to Dadi that were somewhat smaller (with a

diameter of between 50 mm and 55 mm), Commerce averaged the non-contemporaneous but

indexed Azadpur Market prices for grade "S.A." garlic (described above) together with

contemporaneous Azadpur Market prices for grade "A" garlic (*i.e.*, prices for "A"-grade garlic from

within the period of review).  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343

(citing, *inter alia*, Final Surrogate Value Memorandum at 1 (AR Pub. Doc. No. 177)).[6]

Surrogate Value for Labor (*i.e.*, Surrogate Wage Rate).  To calculate the surrogate value for

post-harvest labor costs for purposes of the Final Determination, Commerce averaged industry-

specific data on wages and earnings from a group of eight countries that Commerce deemed to be

both "significant producers" of comparable merchandise and "economically comparable" to China,

---

[6]To value garlic with a bulb diameter of between 50 and 55 mm, Commerce combined
Azadpur Market prices for grades "A" and "S.A." garlic bulbs, due to the seeming overlap in the
physical characteristics of the two grades    *i.e.*, because, depending on traits other than bulb size,
garlic bulbs with a diameter of between 40 and 55 mm could be classified as either grade "A" or
grade "S.A." (at least during the period from May 2006 to February 2008, when the Azadpur APMC
Market was using both of those grades).  *See* Shenzhen Xinboda I, 38 CIT at ____ n.12, 976 F. Supp.
2d at 1343 n.12 (citing Preliminary Surrogate Value Memorandum at 4); *see also* Remand Results
at 13 n.34.

and which had also reported data under one particular revision of an international standard. However, that group of eight countries did not include India, because although India reported contemporaneous data under the prior revision of the international standard India's reporting had not used the particular revision on which Commerce relied. Citing "concerns that the industry definitions may lack consistency between different . . . revisions" of the standard, Commerce declined to include the Indian data in its calculations in the Final Determination. *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343 (citing and quoting Issues & Decision Memorandum at 25, 27-28).

    Surrogate Financial Statements/Surrogate Financial Ratios. As noted above, valuing the various direct inputs that are used to produce goods does not capture certain costs that must also be factored into prices specifically, manufacturing/factory overhead, selling, general and administrative expenses ("SG&A"), and profit. Commerce calculates surrogate values for those three items using surrogate financial ratios that it derives from the financial statements of one or more companies that produce the same or comparable merchandise in the surrogate market economy country. In its Final Determination here, Commerce derived Xinboda's surrogate financial ratios from the unconsolidated financial statements of Tata Global Beverages Limited (specifically, Tata Tea"), an Indian company that grows, processes, and sells coffee and tea products. *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343-44.

    Commerce cited two reasons for selecting the financial statements of Tata Tea over the five

other sets of financial statements on the record.[7]  First, Commerce concluded, based on its review

of the other companies' financial statements, that all but one of the five had received subsidies that

the agency had previously determined to be countervailable.  Based on its policy of disregarding a

surrogate company's financial statements where the agency has "reason to believe or suspect" that

the company has received actionable subsidies  (*i.e.*, subsidies that Commerce has previously found

to be countervailable in a formal agency countervailing duty investigation), Commerce disregarded

the financial statements of four of the five companies**.**  Commerce rejected Xinboda's claim that

there is evidence on the record that gives "reason to believe or suspect" that Tata Teas "may"  have

received subsidies.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1344 (quoting

Issues & Decision Memorandum at 20-22).

Xinboda favors use of the financial statements of the remaining company, *i.e.*, the Indian

garlic processor and trader Garlico.  However, Commerce concluded that Garlico's operations were

not comparable to those of Xinboda, based on the agency's determination that "[Garlico's] primary

production is of downstream food products," which "are described as 'dehydrated' or 'powder,'" as

well as the agency's determination that Garlico "act[ed] as a trading company (rather than a food

processor) on nearly one quarter of its sales."  Commerce declined to rely on a combination of the

financial statements of Tata Tea and Garlico, even though the agency has a stated preference for the

use of multiple financial statements.  The Final Determination thus relied exclusively on the financial

---

[7]In addition to the financial statements of Tata Global/Tata Tea, other financial statements
on the record include the financial statements of Indian garlic processor and trader Garlico, Limtex
(India) Limited, LT Foods Ltd., ADF Foods Ltd., and REI Agro Limited.  *See* Shenzhen Xinboda
I, 38 CIT at ____, 976 F. Supp. 2d at 1369 n.41 (citing Issues & Decision Memorandum at 18 &
n.58).

statements of a tea company, Tata Tea, rather than Garlico (which, Xinboda emphasizes, purchased

and processed garlic).  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1344, 1385;

Issues & Decision Memorandum at 20-22.[8]

    <u>Application of "Zeroing" Methodology</u>.   Lastly,  in  its  Final Determination, Commerce

calculated Xinboda's dumping margin using the agency's "zeroing" methodology, which was the

subject of extensive litigation.  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1344

(and authorities  cited  there,  including  Issues  &  Decision  Memorandum  at  31-33).   Thus,  in

calculating  Xinboda's  dumping  margin,  Commerce  assigned  negative  dumping  margins  (*i.e.*,

margins of sales of merchandise found to have been sold at non-dumped prices) a value of zero, and

only positive dumping margins (*i.e.*, margins for sales of merchandise sold at dumped prices) were

aggregated.   In other words, sales that were not found to have involved dumping were not used to

offset sales that were found to have involved dumping.  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____,

976 F. Supp. 2d at 1344.

    <u>Issuance of Final Determination and Subsequent Proceedings</u>.  Based on the methodologies,

analyses, calculations, and data summarized above, Commerce assigned Xinboda a weighted-average

dumping margin of $0.06 per kilogram in the Final Determination.  *See* Final Determination, 76 Fed.

Reg. at 37,326; <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1344-45 .

    Xinboda appealed, challenging four aspects of Commerce's Final Determination.  The first

---

[8]*See also* Remand Results at 55 (acknowledging that Commerce "continues to maintain a policy of favoring multiple financial statements"); Issues &Decision Memorandum at 20 (noting "[Commerce's] preference to use financial data from more than one surrogate producer to reflect the broader experience of the surrogate industry").

count of Xinboda's Complaint disputes Commerce's selection of financial statements for use in

deriving the surrogate financial ratios used in calculating Xinboda's dumping margin.  *See*

Complaint ¶¶ 10, 15-16 (Count I).  Xinboda argues that Commerce's justification for choosing the

financial statements of Tata Teas is flawed and that Commerce's rejection of Garlico's financial

statements   which Xinboda favors   is groundless.  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976

F. Supp. 2d at 1367-85 (discussing Xinboda's surrogate financial statements claim as set forth in

greater detail in its Motion for Judgment on Agency Record).

        Xinboda's Complaint next challenges Commerce's calculation of the surrogate wage rate.

*See* Complaint ¶¶ 11, 17-18 (Count II).  Specifically, Xinboda contended that Commerce erred in

using labor data from multiple countries in the Final Determination and that Commerce  should have

relied on Indian data alone.  Xinboda further argued that   even if it was permissible for Commerce

to use data from multiple countries   Commerce failed to limit its "basket" of countries to those that

were "significant producers" of comparable merchandise and also improperly excluded India based

on the manner in which the country reported its data.  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976

F. Supp. 2d at 1356-67 (discussing Xinboda's surrogate wage rate claim as set forth in greater detail

in its Motion for Judgment on Agency Record).

        The third count of Xinboda's Complaint contests Commerce's calculation of the surrogate

value for whole raw garlic bulbs.  *See* Complaint ¶¶ 12, 19-20 (Count III).  Xinboda contends that

the Azadpur APMC Market prices (which are the basis for Commerce's calculations) do not reflect

prices for the "intermediate input"   whole raw garlic bulbs   that Commerce is supposed to value.

According to Xinboda, the Azadpur Market prices are for garlic bulbs at a more advanced, higher

level of trade   *i.e.*, garlic bulbs that have been subject to additional  processing and handling, above

and beyond the whole raw garlic bulbs purchased by and delivered to Dadi, Xinboda's affiliated

processor/producer.  Xinboda also maintains that the Azadpur Market prices include significant sums

paid to "middlemen" and "intermediaries."  In addition, Xinboda objects to Commerce's use of non-

contemporaneous Azadpur Market prices for "S.A."-grade garlic bulbs in calculating the surrogate

value for whole raw garlic bulbs.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1346-

56 (discussing Xinboda's claim concerning the surrogate value for whole raw garlic bulbs as set forth

in greater detail in its Motion for Judgment on Agency Record).

      The fourth and final count of Xinboda's Complaint protests Commerce's application of the

agency's "zeroing" methodology in calculating Xinboda's dumping margin.  *See* Complaint, ¶¶ 13,

21-22 (Count IV); Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1385-88 (discussing

Xinboda's zeroing claim as set forth in greater detail in its Motion for Judgment on Agency Record).

      Ruling on Xinboda's Motion for Judgment on the Agency Record, Shenzhen Xinboda I

remanded this matter to Commerce for further consideration of all four issues, including a voluntary

remand on the surrogate value for labor (*i.e.*, the surrogate wage rate) at Commerce's request.  *See*

*generally* Shenzhen Xinboda I, 38 CIT at ____, ____, 976 F. Supp. 2d at 1338, 1388; *see also id.*,

38 CIT at ____, ____, ____, 976 F. Supp. 2d at 1353, 1356, 1388 (surrogate value for whole raw

garlic bulbs); *id.*, 38 CIT at ____, ____, ____, ____, 976 F. Supp. 2d at 1363-64, 1365, 1367, 1388

(surrogate wage rate for labor); *id.*, 38 CIT at ____, ____, ____, 976 F. Supp. 2d at 1375-76, 1384-

85, 1388 (surrogate financial statements used to derive surrogate financial ratios); *id.*, 38 CIT at

____, 976 F. Supp. 2d at 1387-88 (application of "zeroing" methodology).

On remand, Commerce revised the surrogate value for labor to be consistent with the agency's Revised Labor Methodology and based that value exclusively on labor data for India.  *See* Remand Results at 3, 29, 57.  In addition, although the Remand Results continue to rely on Azadpur APMC Market prices in calculating the surrogate value for whole raw garlic bulbs, Commerce adjusted its calculations to deduct freight costs for transportation of garlic from Indian farms to the Azadpur APMC Market.  *See id*. at 3, 8-9, 47-48, 57.[9]  Similarly, the Remand Results continue to use the financial statements of Tata Tea to derive surrogate financial ratios, with a minor adjustment for the costs associated with tea leaf grown by Tata Tea for its own consumption.  *See id*. at 3, 23-24, 57.[10]  Lastly, on remand, Commerce has elucidated the bases for its "zeroing" methodology, but continues to apply that methodology in calculating Xinboda's dumping margin for purposes of the Remand Results.  *See id*. at 2, 29-44, 55-57.

---

[9]Commerce acknowledged in the Remand Results that the Azadpur Market prices likely already reflect the costs of transporting raw garlic from the farms where it is grown to garlic processing facilities.  Accordingly, Commerce's inclusion of such transportation costs elsewhere in its surrogate value calculations resulted in the "double-counting" of those costs.  Commerce addressed the issue in the Remand Results by excluding the costs of inland freight for the transportation of garlic from the Indian farmers to the Azadpur Market, which lowered the surrogate value for whole raw garlic bulbs.  *See* Remand Results at 3, 8-9, 47-48.

[10]The Remand Results reflect an adjustment to the surrogate financial ratios that Commerce derived from the financial statements of Tata Tea, the Indian company on which Commerce relies as a surrogate in determining financial ratios for Xinboda.  Specifically, to account for tea leaf grown on Tata Tea's own estate for its own consumption, Commerce excluded the costs of "self-produced and consumed" tea leaf from the numerator of the agency's surrogate financial ratio for "overhead" (and from the ratio calculations entirely), and recalculated the overhead and SG&A ratios for the Remand Results.  *See* Remand Results at 3, 23-24 & nn.64-66, 57.  Commerce characterizes this adjustment as "conservative" and "the most favorable adjustment from Xinboda's perspective," noting that "[b]ecause the SG&A ratio is applied to the recalculated overhead ratio, there is a cascading effect by which the SG&A ratio is lowered as well."  *See id*. at 24 & n.66.

As a result of Commerce's actions on remand, Xinboda's weighted-average dumping margin dropped from $0.06 per kilogram (in the Final Determination) to $0.02 per kilogram (in the Remand Results).  *See* Remand Results at 1, 3.

## II.  Standard of Review

In reviewing a remand determination in an action challenging an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. Nat'l Labor Relations Bd., 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938)); *see also* Dongtai Peak Honey Industry Co. v. United States, 777 F.3d 1343, 1349 (Fed. Cir. 2015) (same).

Moreover, any evaluation of the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); *see also* CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (same). That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence. Dongtai Peak Honey Industry Co., 777 F.3d at 1349 (citing Consolo v. Federal Maritime Comm'n, 383 U.S.

607, 620 (1966)).

In addition, a remand determination is reviewed for compliance with the court's remand instructions.  Yantai Xinke Steel Structure Co. v. United States, 38 CIT ____, ____, 2014 WL 13875259 * 2 (2014) (quoting Xinjiamei Furniture (Zhangzou) Co. v. United States, 38 CIT ____, ____, 968 F. Supp. 2d 1255, 1259 (2014) (internal quotation marks omitted)); Since Hardware (Guangzhou) Co. v. United States, 39 CIT ____, ____, 49 F. Supp. 3d 1268, 1272 (2015) (same); see also Changzhou Wujin Fine Chemical Factory Co. v. United States, 701 F.3d 1367, 1374 (Fed. Cir. 2012) (analyzing on review whether Commerce's remand results were "within the scope of the Court of International Trade's remand order" and sustaining the Court of International Trade's conclusion on that point).

Further, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore, 557 F.3d at 1319-20.  Commerce's rationale nevertheless must address the parties' principal arguments; and, more generally, "the path of Commerce's decision must be reasonably discernable," in order to support judicial review.  Id. (citing Motor Vehicle Mfrs. Ass'n of the U.S., Inc.  v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see generally 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties"); CS Wind Vietnam Co., 832  F.3d at 1375-81 (highlighting, and analyzing in depth and detail,  agency's "obligation to set forth a comprehensible and satisfactory justification for its [determination] . . . . as a reasonable implementation of statutory directives supported by substantial evidence"); Amerijet Int'l, Inc. v. Pistole, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014) (underscoring importance of agency's

obligation to "articulate an explanation for its action," stating that "a 'fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action") (citation omitted).[11]

Lastly, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50. An agency's determination thus cannot be sustained on the basis of a rationale supplied after the fact    whether by the agency's litigation counsel, by another party, or by the court. *See* Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962).

### III. Analysis

In commencing this action, Xinboda contested four aspects of Commerce's calculation of Xinboda's dumping margin in the agency's Final Determination    *i.e.*, Commerce's selection of surrogate financial statements used to derive surrogate financial ratios, Commerce's calculation of the surrogate value for labor (*i.e.*, the surrogate wage rate), and Commerce's calculation of the surrogate value for whole raw garlic bulbs, as well as Commerce's application of its "zeroing" methodology in calculating Xinboda's dumping margin. *See generally* Complaint; *see also* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1345-46.

All four issues were remanded to Commerce in Shenzhen Xinboda I, including a voluntary

---

[11]*See also* Amerijet Int'l, Inc., 753 F.3d at 1350-52 (observing that requirement that an agency adequately explain its decision is a "basic principle" that is "indispensable to sound judicial review"; emphasizing that "conclusory statements will not do; an 'agency's statement must be one of *reasoning*'" (quoting Butte County, Col. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010)) (emphasis in Amerijet); and remanding matter to agency where agency's determination failed to "address the main thrust" of a party's argument, such that court could not "discern if [the agency] considered the substance of [the party's] request, and, if so, what reasons it had for denying it").

remand  on the surrogate value for labor.  *See generally* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, ____,

976 F. Supp. 2d at 1338, 1388.  In the pending Remand Results, Commerce further explained its

decisions in the Final Determinations and revised its calculations in several respects.

Xinboda advises that it is satisfied with the Remand Results as to the surrogate value for

labor (*i.e.*, the surrogate wage rate), which Commerce has revised to be consistent with its Revised

Labor Methodology and which is now based solely on data from India.  *See* Remand Results at 3,

29, 57; Pl.'s Brief at 1 n.1.  The Domestic Producers do not object.  *See* Def.-Ints.' Brief at 2; *see*

*also* Def.'s Brief at 3.  The Remand Results on the surrogate value for labor are also generally in

accord with the remand instructions in <u>Shenzhen Xinboda I</u>, 38 CIT at ____, ____, 976 F. Supp. 2d

at 1356-67, 1388.  Accordingly, Commerce's Remand Results on the surrogate value for labor (*i.e.*,

the surrogate wage rate) are sustained.  There is no need for further consideration of the issue.

Xinboda similarly approves of Commerce's decision on remand to exclude the costs of inland

freight for the transportation of garlic from Indian farms to the Azadpur APMC Market, in order to

eliminate    from the surrogate value for whole raw garlic bulbs    any "double-counting."  *See*

Remand Results at 3, 8-9, 47-48, 57; Pl.'s Brief at 1 n.1.  Once again, the Domestic Producers do

not object.  *See* Def.-Ints.' Brief at 3 n.2; *see also* Def.'s Brief at 3, 13.

In all other respects, however, including other aspects of the surrogate value for whole raw

garlic bulbs, Xinboda maintains that the Remand Results are not supported by substantial evidence

and/or are not in accordance with law.  Xinboda contends that the Remand Results therefore cannot

be sustained.  *See* Pl.'s Brief at 1; Pl.'s Reply Brief at 1.

Each of Xinboda's arguments    challenging Commerce's determinations concerning the

surrogate value for whole raw garlic bulbs, the selection of surrogate financial statements for use in

calculating surrogate financial ratios, and the application of Commerce's "zeroing" methodology

is addressed in turn below.

A.  Surrogate Value for Whole Raw Garlic Bulbs

In calculating the surrogate value for whole raw garlic bulbs, the Remand Results continue

to rely on prices for garlic bulbs sold at the Azadpur APMC Market.  *See generally* Remand Results

at 3-14, 44-48.  In choosing the Azadpur Market prices over the other potential sources of data on

the record of this review (including the Garlico prices that Xinboda favors), Commerce has stated

that, compared to the other data sources, the Azadpur Market prices are "much more similar to the

inputs being valued."  In addition, Commerce emphasizes that the Azadpur Market prices are size-

specific, breaking out prices based on grades of garlic bulbs, including grades Super-A ("S.A.") and

"A."  *See* Issues & Decision Memorandum at 12-13; Remand Results at 14.

According to the record in this administrative review, "garlic bulb sizes that range from 55

mm and above are Grade Super-A, and garlic bulb sizes that range between 40 mm and 55 mm are

Grade A and Grade Super-A."  Preliminary Surrogate Value Memorandum at 4.  The Azadpur

APMC's Market Information Bulletin published prices for grade A garlic bulbs for the period of

review at issue here.  However, the Bulletin ceased reporting prices for grade S.A. garlic bulbs in

early February 2008    approximately nine months before the beginning of the period of review.  *See*

Issues & Decision Memorandum at 12-13.

The whole raw garlic bulbs that Dadi (Xinboda's processor/producer) purchased for its

production of whole garlic bulbs for Xinboda ranged from 50 to 65 mm in diameter, and from 50

to 55 mm for Dadi's production of peeled garlic.  To value garlic bulbs with a diameter of 55 mm

or more, Commerce relied on non-contemporaneous Azadpur Market prices for S.A.-grade garlic

for the period February 2007 through January 2008, which Commerce then indexed (inflated) to the

dates of the period of review using a garlic-specific wholesale price index.  *See* Preliminary

Surrogate Value Memorandum at 4; Issues & Decision Memorandum at 12.  To value garlic bulbs

with a diameter of between 50 mm and 55 mm, Commerce averaged the Azadpur Market prices for

grade S.A. garlic bulbs (as described above) together with contemporaneous Azadpur Market prices

for grade A bulbs (*i.e.*, prices for "A"-grade garlic from within the period of review).  *See* Final

Surrogate Value Memorandum at 1.

Xinboda challenges Commerce's calculation of the surrogate value for whole raw garlic

bulbs on three grounds.  Xinboda first argues that the Azadpur Market prices reflect garlic bulbs that

are more advanced (are at a higher "level of trade") compared to the whole raw garlic bulbs that

farmers deliver to Dadi, which is the "intermediate input" that Commerce assertedly seeks to value.

In addition, Xinboda maintains that the Azadpur Market prices include substantial "intermediary

expenses" that Dadi did not incur.  Lastly, Xinboda contests Commerce's use of indexed non-

contemporaneous Azadpur Market prices for S.A.-grade garlic bulbs, arguing that garlic bulbs of the

size and quality previously designated as grade S.A. were subsumed into grade A garlic bulbs as of

early February 2008, before the period of review.  In other words, Xinboda contends that the

contemporaneous Azadpur Market prices for A-grade garlic bulbs that Commerce is using already

reflect prices for garlic bulbs that previously would have been classified as grade S.A.  Xinboda thus

concludes that Commerce's use of prices for grade S.A. garlic bulbs from outside the period of

review improperly inflates Commerce's calculated surrogate value for whole raw garlic bulbs.

Xinboda argues that, in lieu of the Azadpur Market prices, Commerce should calculate the surrogate value for the whole raw garlic bulbs that farmers delivered to Dadi using averaged garlic price data from the financial statements of the Indian garlic processor and trader Garlico, which Xinboda placed on the administrative record. Xinboda contends that Garlico's experience more closely matches Xinboda's experience in the purchase of garlic.

Alternatively, if Commerce is permitted to continue to rely on Azadpur Market prices in calculating the surrogate value for whole raw garlic bulbs, Xinboda argues that Commerce must make an appropriate level of trade adjustment (to account for the fact that the garlic bulbs delivered to Dadi are less processed and handled than the garlic bulbs sold at the Azadpur Market) and must make any related adjustments to preclude "double-counting"; that Commerce must deduct 70% from the Azadpur Market prices to account for expenses attributable to intermediaries which are reflected in those prices and which Dadi did not incur; and that Commerce must use only the contemporaneous prices for grade A garlic bulbs, excluding the prices for grade S.A.

1. The Respective Conditions of
Dadi's Garlic Bulbs and Garlic Bulbs Sold at the Azadpur APMC Market
& Xinboda's Claim of "Double-Counting"

As it did in the Final Determination, Commerce continues to (in effect) equate the condition of the whole raw garlic bulbs that farmers delivered to Dadi with the condition of the garlic bulbs sold at the Azadpur APMC Market. *See*, *e.g.*, Remand Results at 11-12 (stating that, on remand, Commerce "continues to find . . . [that] the Azadpur [Market] garlic prices . . . are reasonably reflective of the raw garlic inputs [that were delivered to Dadi]"); *id*. at 11 (arguing that the Azadpur

Market prices and the prices that Dadi paid to farmers "are reasonably similar in nature"); *id*.

(asserting that there is no evidence that "the prices paid by [Dadi] and the Azadpur [Market] net

prices . . . are fundamentally different"); *see generally* Def.'s Brief at 10, 15; Def.-Ints.' Brief at 5-

6.[12]  But Commerce's determination is squarely at odds with the existing record.

---

[12]As discussed above, Commerce's calculation of the surrogate value for whole raw garlic bulbs is based on its conclusion that the condition of the garlic bulbs purchased by and delivered to Dadi and the condition of garlic bulbs sold at the Azadpur APMC Market are essentially the same. However, at several points in the Remand Results, Commerce candidly admits that it actually does not know important specifics concerning the condition of the garlic bulbs at the Azadur Market, much less the condition of the garlic bulbs that Dadi purchased.  For example, the Remand Results assert that, "in many cases, such as this one, [Commerce] does not have reliable information describing in detail the physical characteristics of the surrogate product [*i.e.*, here, the garlic bulbs sold at the Azadpur Market].  Thus, [Commerce] cannot know exactly how the actual input [*i.e.*, the garlic bulbs purchased by Dadi] and the surrogate input [*i.e.*, the garlic bulbs sold at the Azadpur Market] differ.  In this case, [Commerce] finds that both the actual input and the surrogate input for raw garlic are processed beyond the 'farm gate' to some extent: . . . .  As for the garlic produced by Indian farmers captured in the Azadpur data, we do not know what, if any, additional processing is undertaken."  *See* Remand Results at 46; *see also id.* at 46-47 (asserting that Commerce has "no reliable information on the record indicating the exact nature of the Azadpur surrogate input").

As a threshold matter, Commerce's admission that it does not know the actual condition of the garlic bulbs purchased by Dadi or the actual condition of the garlic bulbs sold at the Azadpur APMC Market is difficult to square with the agency's conclusion that the two are fundamentally the same.

Moreover, Commerce's statement that it does not know the condition of the garlic bulbs at the Azadpur APMC Market strains credulity.  It is virtually inconceivable that Commerce does not know the basic nature of the product that is the basis for the Azadpur Market prices, which Commerce has relied on as the surrogate value for Chinese garlic in numerous proceedings in addition to this one, including the twelfth, thirteenth, fourteenth, and sixteenth reviews, as well as a number of New Shipper Reviews.

Accepting Commerce's statement at face value, it is a very troubling admission, particularly as to the condition of the garlic bulbs at the Azadpur Market.  It is difficult to understand how Commerce can rely on a surrogate value if it does not know what that surrogate value fundamentally represents.  Moreover, it is not clear that such use can be sustained as reasonable.

The Condition of Garlic Bulbs at the Azadpur APMC Market.  The sole record evidence that speaks directly to the condition of the garlic bulbs sold at the Azadpur APMC Market is a declaration under oath, proffered by Xinboda, in which a researcher/consultant based in India attests to his first-hand findings and observations based on a visit that he made to the Azadpur Market.  *See generally* Declaration of Xinboda Research Consultant, "Survey of Garlic Offerings    Azadpur Market, New Delhi" ("Researcher Declaration") (Pub. Doc. No. 138); *see also* Pl.'s Brief at 8-11; Pl.'s Reply Brief at 4.  The Researcher Declaration addresses a handful of basic    but pivotal points.[13]

---

[13]The Researcher Declaration was executed in Mumbai, in the Indian state of Mahrashtra.  *See* Researcher Declaration.  As to certain information relating to the identity of the Indian Researcher and the notary public's seal, Commerce has determined that there is "a clear and compelling need" to withhold the information from disclosure, even under an administrative protective order.  That information is thus designated as "double-bracketed" and is known to Commerce, but not the Domestic Producers.  *See generally* 19 C.F.R. § 351.304(a)(1)(ii)-(iii) *et seq.*; Administrative Order Protective Handbook at 10 (U.S. Dept. of  Commerce, International Trade Administration, Rev. 3/10/2015); *see also infra* n.18 (explaining, *inter alia*, that, in this matter, Commerce has also granted "double-bracket" protection for similar information vis-a-vis the Domestic Producers' market research reports).  With those limited exceptions, the text of the Researcher Declaration is public information and reads, in full:

1.     My name is [[redacted]].  I work under the supervision of [[redacted]], of [[redacted]], which has been doing import/export trade for over 20 years.  This firm's primary function is to identify raw materials for various domestic producers or foreign producers and traders.

2.     I spent the day of January 31, 2011 at the Azadpur Market and interviewed the eight vendors selling garlic in the Azadpur Market that day.  Based on research and my discussions with those vendors, I offer the following observations for the Department of Commerce's consideration.

3.     The Azadpur Market does not publish or otherwise publicly make available a standardized grading system for the garlic sold in the market.

As to the condition of the garlic bulbs at the Azadpur APMC Market, the Researcher

4. The mechanism at the market for grading the garlic is size as well as quality. However, visual inspection of the garlic offered in the market indicated that the size is what primarily distinguishes the garlic by grade in the Azadpur Market.

5. There are 3 grades of garlic in the Indian Market.
   Grade A: All Garlics above 40 mm are classified as Grade A.  The sample obtained is approx. 50 mm.  *See* Exhibit 1.
   Grade B: Garlics between 25-40 mm (+/- 5) are classified as Grade B.  The sample obtained is approx. 40 mm.  *See* Exhibit 2.
   Grade C: Garlics below 25 mm (+/- 5) would be Grade C.  The sample is approx. 30 mm (but still was grade C) in the marketplace.  *See* Exhibit 3.

6. There is no "Super A" Grade sold in the Azadpur Market since the first quarter of 2008.  No vendor in the Azadpur Market had any recent experience selling "Super A" variety garlics.  However, several vendors confirmed that garlic of sizes 55mm-65mm is sold under "Grade A" from the month of March and stays till the November-December period each season.

7. Some vendors claimed that the 55mm-65mm size range is from China and is not readily available any more in the Indian markets.

8. The traders here do not classify the garlics according to different grades as it already comes classified by the suppliers in a mesh bag.

9. The garlic sold in the Azadpur Market is ready for retail consumption and is already fully processed when it arrives there, as in: (1) taking off the outside dirty layers so the garlic has a fresh white appearance; (2) cutting any long stems; and (3) packaged in a mesh bag.  The Azadpur Market simply re-sells this cargo downstream.  In fact, the bags are pre-graded; the market does not even decide this.  The garlic is ready to be consumed in the state it is sold in the Azadpur Market.

Confidentiality

[Text concerning request for confidential treatment]

So Sworn.

Declaration states, in relevant part, that "[t]he garlic sold in the Azadpur Market is ready for retail

consumption and is already fully processed when it arrives there, as in: (1) taking off the outside

dirty layers so the garlic has a fresh white appearance; (2) cutting any long stems; and (3) packaged

in a mesh bag."  Researcher Declaration ¶ 9.  The Researcher Declaration further states that "[t]he

garlic is ready to be consumed in the state it is sold in the Azadpur Market."  *Id*.[14]

Significantly, neither Commerce nor the Domestic Producers point to any record evidence

to controvert the facts set forth in the Researcher Declaration.[15]  Instead, they attempt to discredit it

---

[14]The Researcher Declaration bears on two critical factual matters in controversy:  (1) the condition of the garlic bulbs sold at the Azadpur APMC Market, and (2) whether garlic bulbs of a certain size (which would have previously been designated as grade "S.A." or "Super-A") were being sold as "grade A" during the period of review here.  *See generally* Researcher Declaration.  This second point is the subject of section III.A.3, below.

[15]This point is crucial and bears repeating:  Apart from the Researcher Declaration, neither Commerce nor the Domestic Producers points to any record evidence whatsoever to establish the basic condition of the garlic bulbs at the Azadpur AMPC Market.  Neither Commerce nor the Domestic Producers has placed any such evidence on the record.  *See generally supra* n.12 (analyzing, *inter alia*, Commerce's statements as to its lack of knowledge of the basic condition of the garlic bulbs at the Azadpur Market).

The party advocating for the use of a particular surrogate value bears the burden of establishing what that value represents.  Here, Commerce and the Domestic Producers argue for the use of the Azadpur Market prices.  The Domestic Producers thus have a legal obligation to adduce affirmative evidence to adequately establish the basic nature of the garlic bulbs sold at the Azadpur Market, as an integral element of their case advocating for Commerce's use of the Azadpur Market prices.  However, no affirmative evidence of the basic nature of the product has been placed on the record (other than the Researcher Declaration).

In addition to its legal obligation as the proponent of the Azadpur Market, as a matter of common sense, it is the Domestic Producers that have the incentive to rebut the statements in the Researcher Declaration concerning the condition of the garlic bulbs sold at the Azadpur Market.  Yet the Domestic Producers also have failed to present any rebuttal evidence.

Presumably, if the Researcher Declaration's statements attesting to the condition of the garlic

and reject it in its entirety.  *See* Remand Results at 11 (asserting a lack of "credible evidence" to refute Commerce's conclusion that the price paid by Dadi and the Azadpur APMC Market prices are "reasonably similar"); *id*. at 46-47 (characterizing Researcher Declaration as "not reliable" and asserting that "there is no reliable information on the record indicating the exact nature of the Azadpur surrogate input or the exact steps Indian farmers might take before sending their products to [the Azadpur Market]"); *see also* Def.'s Brief at 16-17; Def.-Ints.' Brief at 15-19.[16]

_____

bulbs sold at the Azadpur Market are factually inaccurate, the Domestic Producers would be the first to say so.  In fact, however, the Domestic Producers actually *never* dispute the *substantive accuracy* of the statements in the Declaration.  Instead, the Domestic Producers content themselves with challenging (on less than solid grounds) the "reliability" of the Researcher Declaration that Xinboda has placed on the administrative record    the only record evidence on point.  *See generally* Jinan Yipin Corp. v. United States, 35 CIT at ____ n.71, 800 F. Supp. 2d 1226, 1287 n.71 (2011) (observing, *inter alia*, that the domestic producers there had incentive to submit evidence to rebut evidence adduced by the foreign producers, but failed to do so; and noting that it was telling that the domestic producers never actually disputed the substantive accuracy of the foreign producers' evidence) ("Jinan Yipin II"); *id*., 35 CIT at ____ n.101, 800 F. Supp. 2d at 1310 n.101 (same); Pl.'s Brief at 10-11 (arguing that "it was in [the Domestic Producers' interest to prove that the statements included in . . . [the] Researcher Declaration did not reflect the actual situation at the Azadpur Market.  At the very least, to provide more convincing evidence, [the Domestic Producers] could have sent two researchers on two days to the Azadpur Market to interview vendors. [The Domestic Producers] did not provide this or any other rebuttal evidence.").

     [16]Xinboda maintains that, to the extent that Commerce had questions or concerns about the Researcher Declaration and the information set forth in that document, Commerce should have issued a "deficiency questionnaire" to Xinboda, seeking clarification.  *See generally* Pl.'s Brief at 9-10, 16-17; Plaintiff's Motion for Leave to File Record and Other Impeachment Documents Issued by the U.S. Department of Commerce, International Trade Administration at 1-3 *et seq*. ("Pl.'s Motion to File Additional Documents").  Commerce concluded that it had no such obligation.  According to Commerce, it "is required to issue deficiency questionnaires only when [the agency] requested the specific information" as to which the agency has questions; and, here, according to Commerce, the agency did not request the Researcher Declaration    "rather, Xinboda chose to provide it."  *See* Remand Results at 45 (citing 19 U.S.C. §1677m(d) ("Deficient submissions")); *see also* Def.'s Brief at 17-18; Def.-Ints.' Brief at 15, 19-21; Defendant's Response to Xinboda's Motion to File Additional Documents at 4-5.  *But see* Pl.'s Brief at 16-17 (arguing that, as a practical matter, the Researcher Declaration was an integral part of Xinboda's response to Commerce's standard

_____

("Section D") questionnaire on factors of production for non-market economy countries); Pl.'s Motion to File Additional Documents at 1-4, 5, 7-8 (same).

Whether or not Commerce was obligated by statute to issue a deficiency questionnaire under these facts, Xinboda contrasts Commerce's position here with its treatment of market research submitted by the Domestic Producers. Xinboda points to the Domestic Producers' Market Research Report, stating that Commerce affirmatively sought clarification of certain matters in a supplemental questionnaire issued to the Domestic Producers. *See* Pl.'s Brief at 10; Pl.'s Motion to File Additional Documents at 6. *But see* Remand Results at 50 n.126 (disputing Xinboda's argument).

Xinboda now has moved to supplement the existing administrative record with several documents, seeking to demonstrate that information on the surrogate valuation of the factors of production, such as the Researcher Declaration, is submitted in response to Commerce's factors of production questionnaire, and that   in other similar situations, where Commerce has had questions or concerns   Commerce has sought clarification from parties, affording them an opportunity to address alleged deficiencies in their submissions. Xinboda thus contends that, as a matter of both law and agency practice, Commerce was required to alert Xinboda to any agency concerns about the Researcher Declaration and to give Xinboda an opportunity to respond to them. *See generally* Pl.'s Motion to File Additional Documents.

Opposing Xinboda's Motion, the Government cites Mukand and Marvin Furniture in support of Commerce's position that the Researcher Declaration was not submitted in response to any agency questionnaire or other "request for information," rendering 19 U.S.C. §1677m(d) inapplicable, and, further argues that Commerce's conclusion that the Researcher Declaration is not reliable is not the equivalent of an agency conclusion that (in the words of the statute) the Declaration "d[id] not comply" with an agency request for information. *See* Marvin Furniture (Shanghai) Co. v. United States, 744 F.3d 1319, 1325 (Fed. Cir. 2014) (affirming holding that 19 U.S.C. §1677m(d)) was not applicable where interested party's defective request for a new shipper review was filed on that party's own initiative, and not in "response to a request for information" from the agency); Mukand, Ltd. v. United States, 767 F.3d 1300, 1304-06 (Fed. Cir. 2014) (summarizing application of 19 U.S.C. §1677m(d) where Commerce requested information from respondent, alerted respondent to deficiencies in respondent's submissions, and gave respondent the opportunity to remedy the deficiencies, before Commerce resorted to "facts otherwise available"). In addition, the Government argues that judicial review in international trade litigation is confined to the record compiled before the agency, and Xinboda's proposed supplemental documents are not part of (and could not have been part of) the record in this administrative review; that the proposed supplemental documents do not fall within any of the established exceptions permitting expansion of the record compiled before the agency; and that, in any event, the proposed supplemental documents do not support Xinboda's claim that Commerce's actions here are inconsistent with agency practice in other cases. *See* Defendant's Response to Xinboda's Motion to File Additional Documents; Essar Steel Ltd. v.

Quoting *verbatim* from Commerce's Issues and Decision Memorandum in the sixteenth

administrative review (*i.e.*, the review following the administrative review at issue here), the Remand

Results state:

> As an initial matter, it is not clear whether Xinboda's "Indian researcher" was a
> market researcher or field expert; the individual reports having worked in
> "import/export trade for over 20 years." Moreover, the individual who provided this
> Researcher Declaration made a number of observations based on a single visit to the
> Azadpur Market on January 31, 2011 during which eight vendors were interviewed.
> These observations [documented in the Researcher Declaration] included discussions
> of the sizes of the garlic sold, the grading system for the garlic, and the market
> readiness of the garlic sold in Azadpur. While the researcher states that all
> observations are "[b]ased on research and my discussions with vendors,"
> [Commerce] has not been presented with any research conducted by this individual,
> nor has any information regarding the vendors (*i.e.*, name, time selling at the market,
> etc.) been provided to corroborate what the Researcher Declaration actually reports.
> Finally, the signature date (February 2, 2011) does not match the date of the notary
> public's signature. While this may not be a primary concern, the discrepancy
> between the date the document was signed and the date the notary public signed,

_____

United States, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012) (noting that courts "have carved out a small
number of exceptions . . . [to] allow supplementation of an agency record").

Notwithstanding the general principle that review of an agency determination is confined to
the administrative record that was compiled before the agency, it stands to reason   as a matter of
principle and in the interests of fundamental fairness and process, as well as the integrity of judicial
proceedings   that parties must have some means of documenting alleged inconsistent practices and
confronting an agency with them. Here, Xinboda is not seeking to place additional documents on
the record "for the truth of the matter stated," but, instead, for what are essentially "impeachment"
purposes (to establish the existence of an agency practice). And it is worth noting that the
Government has not objected that Xinboda waived any rights that it may have had by not proffering
the proposed supplemental documents earlier in this litigation.

In any event, in light of the analysis herein concerning the Researcher Declaration and
Commerce's criticisms of it, there is no need to rule on the merits of Plaintiff's Motion to File
Additional Documents. The Motion is therefore denied as moot, without prejudice to re-filing,
should circumstances warrant.

> nonetheless, raises additional questions about the Researcher Declaration.  Although
> the affidavit appears to have been drafted and notarized in 2011, it is unclear why it
> also contains a stamp date of 2010.  The lack of supporting documentation and, for
> that matter, even information on the "researcher" as well as the discrepancy in when
> the document was signed, make it impossible for [Commerce] to consider the
> Researcher Declaration a reliable source of information upon which we may base our
> conclusions.

Remand Results at 5-6 (quoting Issues and Decision Memorandum for Fresh Garlic from the

People's Republic of China:  Final Results of the 2009-2010 Administrative Review at 20 ("Issues

& Decision Memorandum for 16th Review")).

Commerce further states that "the Researcher Declaration is a two-page set of statements

with no documentation provided to supports its conclusions and no details provided by the

'researcher' regarding the methods or steps he took to reach his conclusions beyond noting that he

interviewed 'every' merchant of garlic on the day he visited."  Remand Results at 6.  Commerce

continues: "The researcher provides no indication of having met with those responsible for gathering

and publishing [the Azadpur APMC prices] (which is an especially relevant problem . . . related to

the issue . . . concerning why the [Azadpur APMC's Market Information Bulletin] no longer

publishes prices for grade Super-A raw garlic bulbs."  *Id*.; *see generally* Def.'s Brief at 16-17

(arguing that Researcher Declaration was properly found to be unreliable); Def.-Ints.' Brief at 2-3,

15-19 (same).  *But see* Pl.'s Brief at 8-13 (defending reliability of Researcher Declaration); Pl.'s

Reply Brief at 4-6 (same).

Commerce concedes that, "in certain contexts, [the Researcher Declaration] would be

sufficient for [Commerce's] purposes."  Remand Results at 6.  Nevertheless, Commerce ultimately

rejects the Declaration as "not reliable."  *Id.*[17]

A clear-eyed, objective, and dispassionate examination of the Researcher Declaration and

---

[17]The Remand Results contrast the Researcher Declaration with the Domestic Producers' Market Research Report and the related October 2006 Clarification, which Commerce states it "found to be . . . reliable, detailed and well-documented source[s] of information regarding the Azadpur market."  Remand Results at 5; *see also* Market Research Report on Fresh Whole Garlic in India (June 2003) ("Market Research Report") (AR Pub. Doc. No. 131); Clarifications on Garlic Study (Oct. 2006) at 6  ("Clarification of Market Research Report") (AR Pub. Doc. No. 133).

Whether or not Commerce's assessment of the Domestic Producers' Market Research Report and the related Clarification as "reliable, detailed and well-documented source[s] of information regarding the Azadpur market" is accurate, it is beyond cavil that the nature, length, and purposes of the Domestic Producers' reports are very different from those of the Researcher Declaration. For example, unlike the Researcher Declaration, much (if not most) of the factual information in the Market Research Report and the Clarification cannot be attributed to personal observation by the Domestic Producers' market research consultants.  As such, the Market Research Report and the Clarification require references, citations to sources, and, in many instances, back-up data and documentation, in a way that the Researcher Declaration does not.  The Remand Results ignore this significant distinction.

More importantly, however, whether or not the Domestic Producers' Market Research Report and the related Clarification are   as Commerce states   "reliable, detailed and well-documented source[s] of information" as to *some* aspects of the Azadpur APMC Market, those reports are silent on two key matters concerning that Market which are at the very heart of this dispute and which *are* addressed in the Researcher Declaration:  (1) the condition of the garlic bulbs sold at the Azadpur Market, and (2) whether garlic bulbs of a certain size (which would have previously been designated as grade "S.A." or "Super-A") were being sold at the Azadpur Market as "grade A" garlic bulbs during the relevant period of review.  *Compare* Researcher Declaration *with* Market Research Report *and* 2006 Clarification.

In other words, this is not a situation where Commerce is confronted with two authorities that address the same point but take positions that are diametrically opposite, thus requiring Commerce to determine which of the two authorities is accurate or correct or more reliable. Moreover, not only is it the case that the Market Research Report and the Clarification do not contradict the Researcher Declaration on the two key points above; but, in addition, the fact is that there is nothing *anywhere* in the administrative record that contradicts the Researcher Declaration's statements on those points. *See supra* n.17 (noting that neither Commerce nor the Domestic Producers placed on the record evidence concerning the basic condition of the garlic bulbs sold at the Azadpur Market, and discussing the implications of the absence of such evidence).

each of Commerce's criticisms leads to a different conclusion.  As summarized below, Commerce's

critique of the Declaration is wide of the mark.[18]

For example, the length of the Researcher Declaration    whether two pages or two hundred

has no bearing on the veracity of the statements made in the Declaration.  Such declarations and

similar reports and other documents need not be any longer than is necessary to fulfill their purpose.

There is no magic number of pages.  Here, the two-page Declaration is confined to a few basic

factual matters at issue in this administrative review and addresses them at an adequate level of

detail.  Commerce's criticism of the length of the Researcher Declaration thus lacks a rational basis.

Similarly lacking in merit is Commerce's complaint that the Researcher Declaration does not

---

[18]Market studies    such as the Researcher Declaration, as well as the Market Research Report and the related Clarification (both of which were commissioned by the Domestic Producers)    are relatively common in international trade proceedings such as the instant administrative review.  *See generally* Researcher Declaration; Market Research Report; Clarification of Market Research Report; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1355 (noting that the Market Research Report "was commissioned and placed on the record by the Domestic Producers"); Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1261 (discussing the Domestic Producers' Market Research Report, citing examples of other market studies submitted in other international trade proceedings, and explaining that "various types of market studies, generally commissioned by the parties, are not unusual in international trade proceedings").

Further, Commerce has in place standard procedures in order to withhold from disclosure, even under an administrative protective order, highly sensitive information (such as the identities of a party's customers or market research consultants) where Commerce finds that "there is a compelling need" to do so.  *See generally* 19 C.F.R. § 351.304(a)(1)(ii)-(iii) *et seq*.; Administrative Order Protective Handbook at 10  (U.S. Dept. of Commerce, International Trade Administration, Rev. 3/10/2015); *see also supra* n.13 (explaining restrictions on disclosure of information as to the identity of the consultant who prepared the Researcher Declaration and the notary public's seal).  In this review, Commerce made such a finding as to the research consultants of both parties    the market research consultants that the Domestic Producers commissioned to prepare the Market Research Report and the related Clarification, and the researcher who prepared the Declaration submitted by Xinboda.

indicate whether the researcher is "a market researcher or [a] field expert," as well as Commerce's broadbrush complaint that the Declaration lacks "information on the 'researcher.'"  *See* Remand Results at 4.  Given the straightforward nature of the facts set forth in the Declaration, the Researcher's background    whether he is a "market researcher" or a "field expert" or has some other title and sub-specialty    is of no moment.[19]  The Researcher is not being proffered as an "expert witness" and the statements made in the Declaration do not require any special expertise.[20]  Given the nature of the information provided in the document, the credence to be accorded the Researcher Declaration is the same, without regard to whether the Researcher had (or did not have) any particular background or expertise.

Commerce's observation that the Researcher Declaration is based on a "single visit" to the Azadpur APMC Market also is lacking in substance.  *See* Remand Results at 4.  The record is devoid of any evidence indicating that additional visits to the Market would have affected the facts set forth in the Researcher Declaration in any way, as Commerce seems to suggest.

In like manner, Commerce appears to fault the Researcher Declaration because it is based in part on interviews of eight garlic vendors.  *See* Remand Results at 4.  As Commerce

---

[19]The Domestic Producers assert that the Researcher has "no apparent experience in the sale of fresh garlic."  *See* Def.-Ints. Brief at 2.  As noted here, however, given the nature of the information set forth in the Researcher Declaration, no such experience is necessary.  The Domestic Producers' brief does not indicate whether the consultants who prepared the Domestic Producers' Market Research Report (a fairly substantial publication) had been previously employed as garlic vendors.

[20]The Declaration does specify that the Researcher's firm has more than two decades of experience in the "import/export trade" and that the firm is primarily engaged in "identify[ing] raw materials for various domestic producers or foreign producers and traders."  *See* Researcher Declaration ¶ 1.

acknowledges, however, the Declaration attests that the Researcher "interviewed 'every' merchant

of garlic" present at the Azadpur APMC Market on the day of his visit — not a survey of a sample

of garlic vendors, but, rather, interviews with 100% of the garlic vendors at the Market.  *See id*. at

5; Researcher Declaration ¶ 2.  There is no record basis for any implication that additional visits to

the Market, which might (or might not) have included interviews of additional vendors,[21] would have

altered the statements set forth in the Researcher Declaration.

Commerce further discounts the Researcher Declaration, asserting that it provides "no details

. . . regarding the methods or steps [the Researcher] took to reach his conclusions."  *See* Remand

Results at 5.  Commerce's point here is, again, misguided.  The text of the Declaration itself

discloses that the Researcher personally visited the Azadpur APMC Market, interviewed all eight

of the garlic vendors at the Market, personally observed the garlic bulbs that were offered for sale,

and took six photographs of those garlic bulbs (Grades A, B, and C).  *See generally* Researcher

Declaration & Exhs. 1-3 (photos of garlic bulbs, measured against ruler in order to establish scale)

---

[21]The Domestic Producers question — in the abstract — "how representative [the] eight vendors
are relative to all entities that sell fresh garlic at the Azadpur APMC market."  Def.-Ints.' Brief at
17.  Although it is neither here nor there, it is not clear how many vendors were selling garlic bulbs
at the Azadpur APMC Market but were not present at the Market on the day of the Researcher's
visit.  Moreover, in explaining Commerce's decision not to rely on the Researcher Declaration, the
Remand Results do not cite concerns about the "representativeness" of the eight vendors and the
information that they provided.  The Domestic Producers' argument thus constitutes impermissible
*post hoc* rationale.  It is well-established that an agency determination cannot be sustained on the
strength of a rationale supplied after the fact by counsel in the course of litigation.  *See*, *e.g.*,
Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962).  As the Supreme Court
has explained, "an agency's action must be upheld, if at all, on the basis articulated by the agency
itself."  Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50.  In any event, and perhaps most importantly, the
information provided by the eight vendors is not the type of information where "representativeness"
is typically a concern.

(AR Pub. Doc. Nos. 138-39).  The Researcher's simple, basic "methodology," as evidenced by the Declaration, was appropriate and proportional to the purpose and nature of his inquiry and to the facts in question.

In addition, Commerce seeks to make much of the Researcher's statement that the observations documented in the Declaration are "[b]ased on research and . . . discussions with vendors."  *See* Remand Results at 5 (quoting Researcher Declaration ¶ 2).  Underscoring that statement, Commerce indicates that the agency has not been provided with "any research conducted by [the Researcher]" and that the agency has received "[n]o documentation . . . to support [the Declaration's] conclusions."  *See* Remand Results at 4; *see also id*. (criticizing Researcher Declaration for "lack of supporting documentation"); *id*. at 5 (stating that "no documentation [is] provided to support" the Declaration's statements).  However, it appears that Commerce simply reads too much into the Declaration's generalized reference to "research" (which, in context, seems to refer broadly to the Researcher's visit to the Market).  There is nothing to indicate that "research" and "supporting documentation" exist but were not provided to the agency.  Even more to the point, in light of the basic nature of the content of the Researcher Declaration and the straightforward facts set forth therein, there was no need for "research" beyond the inquiry described in the Declaration.  Nor is there any need for back-up "documentation."

In particular, Commerce disparages the Researcher Declaration because it does not provide certain information   *i.e.*, their names and how long they have worked at the Azadpur APMC Market   for the eight garlic vendors who were interviewed.  Remand Results at 5.  Like the other criticisms that Commerce has leveled at the Declaration, this point initially may have a certain superficial

appeal, but it does not bear up under close scrutiny.  The vendors' names are of no moment in this

context, and the duration of their employment is not important here, provided that the vendors have

knowledge of the very basic information that they provided to the Researcher    and the record is

devoid of any evidence to suggest that, in fact, they lacked such knowledge.

Moreover, realistically, there can be no serious claim that, if their names and other

information about the vendors were provided, Commerce or the Domestic Producers would

undertake to investigate the vendors in an effort to impeach the Declaration's credibility.  Speaking

practically, given the nature of the very basic factual information provided in the Researcher

Declaration, it would be not only inefficient but largely pointless to probe the educational

backgrounds and work experience of the vendors, and to run background checks on them.  Even if

an investigation were to identify some anomaly as to one or more of the vendors, any showing of

minimal formal education, limited work experience, and/or a criminal record (for example) would

have no real effect as to the statements in the Researcher Declaration and would be collateral to the

central issues at hand.

In other words, the fact remains that it is either true or false that the garlic arriving for sale

at the Azadpur APMC Market has had all "long stems" cut and  "the outside dirty layers" removed,

"so the garlic has a fresh white appearance" (*see* Researcher Declaration ¶ 9), without regard to the

individual credibility of any or all of the eight garlic vendors.  To adequately and effectively refute

the straightforward statements in the Researcher Declaration, evidence to that effect must be placed

on the record.  In the specific circumstances of this case, and in light of the wholly factual nature of

the points made in the Researcher Declaration, it is of little practical consequence that the Researcher

Declaration does not specify the names and employment histories of the eight garlic vendors who were interviewed.[22]

Lastly, Commerce points to what it refers to as "date inaccuracies" in the Declaration.  *See* Remand Results at 5.  In particular, Commerce focuses on an asserted "discrepancy in when the [Researcher Declaration] was signed," noting that "the signature date (February 2, 2011) does not match the date of the notary public's signature."  *See id*. at 4; *see also id*. at 5 n.11.  In addition, Commerce states that, "[a]lthough the [Declaration] appears to have been drafted and notarized in 2011, it is unclear why it also contains a stamp date of 2010."  *See id*. at 4.

Commerce does not even acknowledge   much less attempt to refute   Xinboda's explanation of the 2010 date that appears on the face of the Declaration ("Certified Stamp L.S.V. No. 694 20

---

[22]As noted above, Commerce also critiques the Researcher Declaration on the ground that it "provides no indication [that the Researcher] met with those responsible for gathering and publishing [the Azadpur APMC prices] (which is an especially relevant problem . . . related to the issue . . . concerning *why* the publication no longer publishes prices for grade Super-A raw garlic bulbs)."  *See* Remand Results at 5 (emphasis added).

In the case at bar, however, it does not matter *why* the Azadpur Market no longer sells garlic bulbs that are designated as grade "Super-A."  The real point at issue is a straightforward  factual question:  Were garlic bulbs that were for a time (*i.e.*, beginning in May 2006) classified and sold at the Azadpur Market as grade "Super-A" (or "S.A.") subsequently classified and sold as grade "A" garlic bulbs as of early February 2008 (when publication of prices for "Super-A" or "S.A." grade garlic bulbs ceased)?  Presumably vendors are as knowledgeable as anyone about the essential characteristics of the produce that they sell (as well as other matters addressed in the Researcher Declaration).  Certainly there is no record evidence here to the contrary.  *See infra* section III.A.3 (analyzing parties' arguments concerning Commerce's use of prices for "Super A"- (or "S.A."-) grade garlic bulbs in calculating surrogate value for Dadi's garlic bulbs).

In short, the mere fact that the Researcher Declaration could have provided additional information (for example, to address the "why" question) in no way diminishes the relevance, the significance, or the reliability of the information that is provided.

April 2010 Proper Officer"), even though that explanation appeared in Xinboda's comments on the

Draft Remand Results.  Xinboda advises that the 2010 date is the date on which the Licensed Stamp

Vendor ("L.S.V.") in India sold the official "non-judicial stamp paper" on which the Declaration is

printed.  *Compare* Xinboda Comments on Draft Remand Determination at 4 n.3 (explaining April

2010 date) (SAR Pub. Doc. No. 6) *and* Pl.'s Brief at 10 n.4 (same) *with* Remand Results at 4

(contrasting 2010 stamp date on Declaration with 2011 date of signature and notarization).  And, as

to the slight difference between the Declaration's signature date and the date of the notary's

signature, Commerce concedes that the difference is "not . . . a primary concern" for the agency.  *See*

Remand Results at 4.[23]

In sum, Commerce's criticisms of the Researcher Declaration are largely without merit, and

---

[23]There is no indication on the record here as to whether or not notarization practices in India parallel those in the U.S.    for example, whether it would normally be expected that an affidavit would be executed in the presence of the notary public such that the signature date and the date of notarization would be the same.

Further, as a practical matter, any such differences in dates is not necessarily proof of a lack of probity or reliability.  There is a solid case to be made that, if anything, minor discrepancies are evidence of the authenticity and/or reliability of a document.  *See*, *e.g.*, Jinan Yipin Corp. v. United States, 38 CIT at _____n.39, _____n.51, 971 F. Supp. 2d at 1323 n.39, 1330 n.51 (explaining that, "[i]f one were inclined to forge or manipulate price data, presumably one would produce data that were more clearly decisive    in other words, one would generate a greater number of price quotes, and those price quotes would span the full duration of the period of review") ("Jinan Yipin III"); Taian Ziyang Food Co. v. United States, 37 CIT _____, _____ n.24, _____ n.36, 918 F. Supp. 1345, 1367 n.24, 1375 n.36 (2013) (same).  As such, the difference in dates here could reasonably be read as (in effect) supporting the authenticity and reliability of the Declaration.  *See* Jinan Yipin II, 35 CIT at _____ n.101, 800 F. Supp. 2d at 1310 n.101 (observing that, "[v]iewed through this lens, the problems that Commerce sees in the[] price quotes are actually indicia of authenticity").

Commerce's conclusion that the differences in dates are "not . . . a primary concern" for the agency is thus a sound one.  *See* Remand Results at 4.

the agency's sweeping, wholesale dismissal of the Declaration is unwarranted. Under the "substantial evidence" standard and the circumstances of this case, Commerce here is not free to disregard the only specific, relevant, concrete record evidence concerning the condition of the garlic bulbs sold at the Azadpur APMC Market — *i.e.*, the evidence that "[t]he garlic sold in the Azadpur Market is ready for retail consumption and is already fully processed when it arrives there, as in: (1) taking off the outside dirty layers so the garlic has a fresh white appearance; (2) cutting any long stems; and (3) packaged in a mesh bag" and the evidence that the garlic bulbs sold at the Market are "ready to be consumed in the state [in which they are] sold." *See* Researcher Declaration ¶ 9.[24]

The Condition of Garlic Bulbs Delivered to Dadi. Much as Commerce has stated that it does not know key specifics concerning the basic condition of the garlic bulbs sold at the Azadpur APMC Market, so too Commerce states that it does not know the basic condition of the garlic bulbs that purchased by and delivered to Dadi. *See* Remand Results at 46 (stating that Commerce "does not have reliable information describing in detail the physical characteristics of the surrogate product [*i.e.*, here, the garlic bulbs sold at the Azadpur Market]. Thus, [Commerce] cannot know exactly how the actual input [*i.e.*, the garlic bulbs purchased by Dadi] and the surrogate input [*i.e.*, the garlic bulbs sold at the Azadpur Market] differ."); *see also supra* n.12. The Remand Results nevertheless essentially equate the two, asserting that both have undergone post-harvest processing. *See* Remand

_____

[24]Significantly, even if Commerce's disregard of the Researcher Declaration were to be sustained, it is doubtful that the agency's use of the Azadpur APMC Market prices could be sustained as a surrogate value for the garlic bulbs delivered to Dadi in the absence of any affirmative evidence establishing what the Azadpur Market prices fundamentally represent (*i.e.*, in the absence of evidence documenting the basic condition of the garlic bulbs sold at the Azadpur Market). *See supra* n.17 (analyzing absence of record evidence on the condition of the garlic bulbs sold at the Azadpur APMC Market and its implications).

Results at 47 (stating that Commerce finds that both the actual input [*i.e.*, the garlic bulbs delivered

to Dadi] and the surrogate input for raw garlic [*i.e.*, the garlic bulbs sold at the Azadpur APMC

Market] are processed beyond the 'farm gate' to some extent").[25]   In particular, Commerce

---

[25]The parties spill much ink debating whether or not the garlic bulbs that Dadi purchased were at the "farm gate" level of trade. *See*, *e.g.*, Remand Results at 6-8, 11 n.31, 46; Pl.'s Brief at 2-8; Def.'s Brief at 10-13, 15; Def.-Ints.' Brief at 2-15; Pl.'s Reply Brief at 2-4. However, that issue is nothing more than a semantics sideshow. The term "farm gate" is shorthand, but, as the Remand Results and the parties' briefs amply illustrate, there is no well-settled, established definition of the term.

As Commerce correctly points out, the real issue presented is whether, as the Remand Results conclude, the condition of the garlic bulbs delivered to Dadi is essentially the same as that of the garlic bulbs sold at the Azadpur APMC Market. *See* Remand Results at 46 (explaining that "what is important is finding a reasonable match between the input the producer uses and the [surrogate values] placed on the record, not the definition of the term 'farm gate'"); *see also* Def.-Ints.' Brief at 5 (noting that "at bottom it is the physical condition of the input bulbs purchased by Dadi . . . that determines the appropriate surrogate value").

It is nonetheless worth noting that Commerce's pinched definition of the term "farm gate" apparently contemplates buyers driving directly into farmers' garlic fields and loading into the buyers' trucks garlic bulbs exactly as they are plucked from the ground   leaves, stems, roots, clods of dirt and all.  Thus, according to Commerce:

> Were the respondents to have purchased raw garlic inputs at farmgate prices, they would have purchased raw garlic fresh at the field during the harvest. That garlic that they purchased would not [have] been cleaned, sorted by size, bagged, transported or otherwise handled. Upon taking possession of the garlic, [the] respondents would have (1) sorted the garlic (by size, quality, etc.); (2) cleaned it of all stems, root plates, etc.; (3) transported it; and (4) stored it.

Remand Results at 6 (quoting Issues & Decision Memorandum for 16th Review). This definition of "farm gate" is so narrow that it seems highly unlikely   as a practical matter   that Commerce could ever make a finding that garlic bulbs had been sold at the "farm gate." *See*, *e.g.*, Pl.'s Brief at 3 (observing that Commerce "appears to suggest that in order for . . . purchases to be at farm gate prices, the garlic must be pulled from the ground unidentified as to type and size and handed to a purchaser 'as is'"   a practice that "would . . . not allow either party to the transaction to have any basis for agreeing on a purchase price"); *id*. at 3-4 (arguing generally that, "around the world," all newly-harvested garlic bulbs are the subject of at least some very basic processes, such as an "initial

emphasizes that   prior to delivery to Dadi for processing   the garlic bulbs that Dadi purchased had

been "sorted by grade/size, cleaned, bagged, [and] stored," sometimes in cold or controlled

atmosphere storage.  *See* Remand Results at 6-7 (quoting Issues & Decision Memorandum for 16th

Review).  *See id*.[26]

---

cleaning," etc., such that Commerce's definition of "farm gate" to mean "produce immediately
following harvest that has not been sorted, cleaned, or transported is not a reasonable
characterization" of the operations of real-life farmers); Def.'s Brief at 12-13 (conceding that, if
Xinboda's description of the real-life operations of garlic farmers is accurate, "Commerce would find
very few garlic farmers to be selling their product at farmgate").

Indeed, according to the Remand Results, Commerce has never made a finding that garlic
bulbs were sold at the "farm gate," in any administrative review.  *See* Remand Results at 11 n.31
(stating that, "[i]n prior reviews, [Commerce] applied the facts before it in each review, and
determined that, during those reviews, no record evidence demonstrated that respondents purchased
raw garlic inputs at farmgate prices").  That statement is in error.  It is true that Commerce has never
found that *Dadi* purchased garlic bulbs at farm gate prices.  However, as the Government and the
Domestic Producers acknowledge, Commerce in fact did find, in the tenth administrative review,
that the respondents there had purchased garlic bulbs at "farm gate" prices.  *See* Def.'s Brief at 12;
Def.-Ints.' Brief at 13; Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1256-57 (quoting results
of first remand in litigation concerning the 10th review, where Commerce explained that, in selecting
a surrogate value for the garlic bulbs consumed by the respondents at issue there, the agency sought
(and selected) "a price that . . . represents the 'intermediate input' at issue   *i.e.*, raw garlic bulb as
it is harvested, *at the '*farm gate*'*") (emphasis added)).  Yet there was no record evidence in that case
to indicate that the garlic bulbs there at issue were left in the field following harvest, in the exact
state in which the bulbs were pulled from the ground, until they were picked up by buyers   leaves,
stems, roots, clods of dirt and all   in the fields where the garlic was grown.

[26]At one point in the Remand Results, Commerce states that the bags of garlic bulbs arriving
at Dadi's processing facilities were "either immediately opened for processing or stored in one of
Dadi's refrigerated or dry storage spaces"   thus referring to the possibility of storage *at Dadi's
processing facilities*.  *See* Remand Results at 8.  As noted above, the Remand Results also state that
the garlic bulbs delivered to Dadi had been "stored *by farmer suppliers* in cold storage" prior to their
delivery.  *Id*. at 7-8 (emphasis added).  Yet, elsewhere in the Remand Results, Commerce
equivocates on that point.  *See id*. at 46-47 (stating that "the farmers supplying . . . Dadi[] sort, bag,
and *possibly store* the raw garlic bulbs they supply to Dadi") (emphasis added).

There are several salient points to be made.  First, Xinboda does not dispute that some of the

garlic bulbs that farmers delivered to Dadi had been held in cold storage prior to delivery. *See*, *e.g.*, Pl.'s Brief at 7 (stating that "it is normal . . . for a farmer to store (whether by cold storage or otherwise) his produce," for sale outside of harvest season); *id*. at 6 (stating that "it would not be unusual for the farmer[s] to store their produce throughout the year so that the produce can generate stead y income and attract a premium as fresh garlic becomes scarce at the end of the cycle"). However, to the extent that the Remand Results highlight the possibility that garlic bulbs may have been held in cold storage at Dadi's processing facilities, such storage has no bearing on the matter that is in dispute   *i.e.*, the condition of the garlic bulbs *at the time they were delivered to Dadi*. The Remand Results' analysis thus reflects some measure of confusion on this issue.

More generally, the Remand Results include a lengthy excerpt on the subject of cold storage (and, more generally, the handling of garlic bulbs after harvest), which Commerce cut-and-pasted *verbatim* from the Issues & Decision Memorandum for the 16th Review. *See generally* Remand Results at 6-7 (quoting Issues & Decision Memorandum for 16th Review at 20-21); *see also* Def.-Ints.' Brief at 5, 6, 7-8, 9 (discussing cold storage); Pl.'s Brief at 6, 7 (same). Although it is not entirely clear, the gravamen of the excerpt quoted in the Remand Results seems to be that Commerce views cold storage by farmers as a form of "post-harvest processing," and, as such, as evidence that the garlic bulbs delivered to Dadi are comparable to the garlic bulbs sold at the Azadpur APMC Market (in the sense that, according to Commerce, both have been subject to some post-harvest processing). *See generally*, *e.g.*, Remand Results at 6-7, 46; *see also* Def.-Ints.' Brief at 7 (characterizing "cold or controlled atmosphere storage" as "a further, substantial post-harvest handling operation"); *id*. at 3 (arguing that the garlic bulbs delivered to Dadi had been "subjected to significant post-harvest processing"; *id*. at 6 (same); *id*. at 6-7 (same); *id*. at 14-15 (same).

There are a number of problems with Commerce's emphasis on the use of cold storage. First, although the administrative record in the sixteenth administrative review may have supported the quoted findings concerning cold storage, the subject of cold storage   including any implications of its use   has not been a focus in the record of this review. Nor has the subject been adequately briefed in this litigation. Thus, for example, the extended discussion of cold storage at pages six to seven of the Remand Results (lifted from the Issues & Decision Memorandum in the 16th Review) is not supported by any citations to the administrative record in the instant review. *See* Remand Results at 6-7. As another example, that discussion in the Remand Results includes multiple references to "Golden Bird" and relies on "Golden Bird's statements." *Id*. Golden Bird Trading Co., Ltd. participated in the sixteenth review. But Golden Bird made no shipments during the period of review at issue here. Commerce therefore rescinded the instant review as to the company. *See* Final Determination, 76 Fed. Reg. at 37,323 (rescinding 15th administrative review as to various companies, including Golden Bird). Accordingly, by definition, there is no evidence or argument from Golden Bird in the record of this review. The excerpt quoted in the Remand Results similarly incorporates numerous other statements and findings of fact, including statements that Commerce attributes to Xinboda, which have not been tied to anything in the record here. Remand Results at

6-7.

In principle, there is nothing to prohibit Commerce from "importing" into this proceeding (quoting and relying on) its findings in the sixteenth review, particularly if that is the most efficient means of communicating the agency's determination. *See* Def.'s Brief at 19 n.2 (explaining, *inter alia*, that "Commerce cited and quoted [the Issues & Decision Memorandum for the 16th Review] because it found this to be a convenient means of articulating its reasoning in [the instant review]"). However, the analysis in the Remand Results states    without reservation    that "the information provided by Xinboda in [the sixteenth administrative review] . . . is the same information submitted in [the fifteenth review]."  *See* Remand Results at 6 n.16; *see also* Def.'s Brief at 19 n.2 (asserting that, although "Commerce cites to and quotes from" the Issues & Decision Memorandum for the 16th Review, "the explanations and findings in the . . . Remand Results were based on and in accordance with the facts and record of [the administrative review at issue here]"); *id*. at 17-18 (arguing that the Remand Results' quotation of the Issues & Decision Memorandum for the 16th review "does not draw any 'facts' from the 16th administrative review onto the record of the [administrative review at issue here]").

Even assuming *arguendo* that it is true that    as Commerce states    the information that Xinboda submitted (and the arguments that Xinboda made) in the sixteenth review are, in fact, identical in every meaningful respect to those of Xinboda in this fifteenth review (which seems improbable), Commerce's statement stops short of saying that all other evidence and argument in the administrative record of the sixteenth review (such as that of the Domestic Producers) is essentially identical to that in this review. In other words, significantly, Commerce does not say that that (as to this issue) the administrative records in the two reviews are essentially identical. Nor could Commerce truthfully make such a statement. At the very least, as noted above, the record in the sixteenth review included the evidence and argument of Golden Bird, which is not included in the record of this review.

Further, the mere fact that Xinboda participated in the sixteenth review does not mean that Xinboda is in any way precluded from disputing findings and conclusions from that review, or that Xinboda is foreclosed from offering more or different evidence and arguments, in this review (and, as appropriate, in this litigation). As Commerce frequently reminds parties in international trade proceedings, and as the agency reiterated here, Commerce "reviews each record and applies the facts accordingly, for 'each administrative review is a separate segment of the proceedings with its own unique facts.'" Remand Results at 11 n.31 (quotation omitted). As a matter of fundamental fairness, Xinboda here is entitled to an opportunity to present its own evidence and to respond to all arguments and to other record evidence *for purposes of this review*, without regard to the evidence, arguments, findings, conclusions, and determinations in the sixteenth review. By the same token, Commerce cannot make findings, conclusions, and determinations in this matter that are not grounded in the record of this review, even if they are supported by the record in another review

Contrary to Commerce's implication, however, Xinboda has never denied that farmers

supplying garlic bulbs to Dadi "provide[d] rudimentary services such as cleaning, removing stems

and root parts, sorting, and bagging for transport," and that, in some instances, bulbs were held in

cold storage prior to delivery.  Pl.'s Brief at 3, 6, 7-8.[27]  But, more to the point, the record evidence

_____

involving Xinboda.  Lastly, to the extent that the parties wish to argue cold storage (or any other issue) in this litigation, they must cite to specific and substantial evidence on the record at issue here.

From what can be gleaned from the Remand Results and the parties' briefs, it seems a virtual certainty that at least some of the garlic bulbs delivered to Dadi, and some of the garlic bulbs sold at the Azadpur APMC Market, had been previously held in cold storage.  Ultimately, however, the issue of cold storage is a proverbial "red herring."  The fundamental issue at stake is whether the condition of the garlic bulbs purchased by Dadi and the condition of the garlic bulbs sold at the Azadpur Market are essentially the same, as Commerce contends they are.  As explained herein, the bottom line is that    whatever may be the case as to cold storage    the existing record makes it clear that the garlic bulbs sold at the Azadpur Market were "processed" to a degree significantly beyond the garlic bulbs that were delivered to Dadi.

[27]As an aside, the record evidence indicates that sorting garlic bulbs by size is not as time-consuming an operation as Commerce and the Domestic Producers seem to suggest.  *See generally*, *e.g.*, Verification of the Sales and Factors Responses of Shenzhen Xinboda Industrial Co., Ltd. in the Administrative Review of Fresh Garlic from the People's Republic of China at 10 (explaining that those in the garlic bulb industry "can identify garlic size by sight") ("Verification Report") (AR Pub. Doc. No. 151).

Similarly, at one point in the Remand Results, Commerce states that the garlic bulbs sold to Dadi have not only been sorted by size by Dadi's farmer suppliers, but also have been "measured." *See* Remand Results at 7-8; *see also* Verification Report at 16 (stating that "[Dadi] officials explained that suppliers provide bulbs . . . based on Dadi's requirements, so the garlic bulbs received [by Dadi] . . . have already been measured and sorted by size").  Everywhere else, however, Commerce states only that the garlic bulbs delivered to Dadi were already "sorted by size." *See*, *e.g.*, Remand Results at 6 (quoting Issues & Decision Memorandum for 16th Review, stating that "all the raw garlic inputs purchased by the respondents . . . were sorted by grade/size, cleaned, bagged, stored, and then transported"); *id*. at 7 (same, stating that "local farms had to clean, sort and bag the harvested raw garlic"); *id*. (same, stating that "the farmer selling the garlic . . . [must] have gone through the raw harvested garlic, cleaned it up, sorted it based on size and type, placed it into large

on the condition of the garlic bulbs delivered to Dadi belies any suggestion that their condition and

the condition of the garlic bulbs sold at the Azadpur APMC Market were essentially the same.

As detailed above, the Researcher Declaration    the only record evidence on point    states

that the garlic bulbs at the Azadpur APMC Market have already had the "long stems" and "outside

dirty layers" removed, leaving the bulbs with "a fresh white appearance."  Researcher Declaration

¶ 9.  However, the record evidence establishes that these same  processes   peeling away the outside

layers of the garlic bulbs, cutting their roots and long stems, and so on    are processes that Dadi's

workers performed at Dadi's own processing facilities.  *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____,

976 F. Supp. 2d at 1349.  In the Verification Report, Commerce staffers noted their own first-hand,

eyewitness observations to that effect:  "[Dadi's] production process includes peeling off outer skins,

cutting root and stem, the utilization of mesh bags when required by order, buckling the bag, and

then placing it in a cardboard box."  *See* Verification of the Sales and Factors Responses of

Shenzhen Xinboda Industrial Co., Ltd. in the Administrative Review of Fresh Garlic from the

People's Republic of China at 9 ("Verification Report") (AR Pub. Doc. No. 151).

Logically, the processing that was performed at Dadi's facilities was    by definition    over

and above any operations that may have occurred before the garlic bulbs were delivered to Dadi.

Moreover, as a matter of logic, because Dadi's workers  peeled off the outer skins of the garlic bulbs

---

mesh bags, and, finally, delivered it to . . . Dadi"); *id*. at 8 (stating that, "[p]rior to delivery, . . farmers themselves sorted and packaged the garlic based on size and type"); *id*. (stating that the garlic delivered to Dai was "presorted"); *id*. (referring to "the pre-sorted and packaged garlic purchased by Dadi"); *id*. at 46 (stating that "the farmers supplying . . . Dadi[] sort, bag, and possibly store" the garlic bulbs before they are delivered to Dadi).  It is thus somewhat unclear whether or not the garlic farmers supplying Dadi literally "measured" garlic bulbs in order to size them, and   if so   whether that is a fairly time-consuming operation.

and cut their roots and stems, the garlic bulbs that were delivered to Dadi could not possibly have

been in the same condition as those sold at the Azadpur APMC Market.  At the Azadpur Market, the

"long stems" of the garlic bulbs already had been cut off and the "outside dirty layers" of the bulbs

already had been removed, leaving the garlic bulbs with "a fresh white appearance."  *Compare*

Verification Report at 9 *with* Researcher Declaration ¶ 9.

The Consequences for Commerce's Analyses.  If the garlic bulbs sold at the Azadpur APMC

Market were at a more advanced level of trade (*i.e.*, had been subjected to more processing) than the

garlic bulbs that were delivered to Dadi (as all existing record evidence indicates), the Azadpur

Market prices cannot reasonably be used as a surrogate value for the garlic bulbs that were delivered

to Dadi   at least not without further adjustment.

As one example, Xinboda has explained that it was required to report to Commerce the labor

hours and the electricity that Dadi workers consumed in tasks such as stripping off the outside layers

of the garlic bulbs and cutting the roots and stems, and that Commerce then added the value of that

labor and electricity   together with a proportional figure for overhead (specifically, selling, general,

and administrative expenses or "SG&A" )     to Commerce's calculated surrogate value for whole

raw garlic bulbs, *i.e.*, the Azadpur Market prices.  Because Commerce separately accounted for such

expenses, and because the expense of such processes is already effectively "embedded" in the

Azadpur Market prices, Commerce's calculations reflect impermissible double-counting.  *See*

Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1349.

This matter therefore must be remanded to Commerce for a second time, to allow the agency

to once again reconsider its selection of a surrogate value for the "intermediate input" in question

*i.e.*, the whole raw garlic bulbs that were purchased by and delivered to Dadi    taking into account the analysis herein, as well as all arguments and all record evidence.   In its reconsideration, Commerce shall make any adjustments to the surrogate value that Commerce selects which may be necessary in order to avoid the double-counting of expenses and to otherwise calculate Dadi's dumping margin as accurately as possible.  *See also infra* sections III.A.2 & III.A.3 (analyzing, respectively, Xinboda's related claim that the Azadpur Market prices reflect expenses associated with intermediaries that are not incurred by Dadi, and Xinboda's related claim that Commerce's use of Azadpur Market prices for grade S.A. garlic bulbs skewed the agency's surrogate value).[28]

---

[28]At one point, the Remand Results take an "all or nothing" approach to the Azadpur APMC Market prices, asserting that if they are the best available information for use as a surrogate value for Dadi's whole raw garlic bulbs, Commerce is entitled to rely on those prices "as is" (or, more precisely, without any adjustments other than the two adjustments that Commerce has already made). *See* Remand Results at 11 (stating that Commerce has determined that the Azadpur Market prices are the best available data, and that, "[w]ith that decision, [the agency] is not required to adjust or modify the Azadpur data" any further).   However, if Commerce continues to rely on the Azadpur Market prices on remand, Commerce must make such further adjustments to those prices as may be necessary.

For its part, as noted above, Xinboda argues that    in light of the problems with the Azadpur Market prices    Commerce should instead base the surrogate value for whole raw garlic bulbs on the prices that are reflected in Garlico's financial statements.  *See generally* Pl.'s Brief at 14-16 (advocating for use of Garlico prices).  *But see* Remand Results at 13-14 (highlighting asserted deficiencies in Garlico prices and concluding that Azadpur Market prices are best available information); Def.'s Brief at 8-10, 15 (arguing that Commerce properly rejected  Garlico prices); Def.-Ints.' Brief at 22-24 (same).  On remand, Commerce will go back to the drawing board to reconsider its selection of a surrogate value, re-examining the record evidence and re-evaluating the strengths and weaknesses of the data sources on the record (including both the Garlico prices and the Azadpur APMC Market prices, as well as any other data that Commerce may deem appropriate).

It is at least possible that, on remand, Commerce will select the Garlico prices as the basis for the surrogate value for whole raw garlic bulbs.  At a minimum, Commerce's analysis of the relative merits of the two data sources will be affected.  And it is conceivable that Xinboda may be satisfied with the surrogate value that Commerce calculates on remand.  There is therefore no need

## 2.  Expenses Associated With "Intermediaries"

Apart from Xinboda's challenge to Commerce's determination that the condition of the garlic bulbs delivered to Dadi and the condition of those sold at the Azadpur APMC Market are essentially the same and Xinboda's "double-counting" claim (discussed above), Xinboda also contends that the Azadpur Market prices reflect substantial "intermediary" expenses   that is, fees and downstream expenses, such as sums paid to "middlemen" and "intermediaries" including "commission agents, wholesalers, and retailers"   which are expenses that Dadi did not incur and which impermissibly inflate the surrogate value that Commerce has calculated for the intermediate input at issue here (*i.e.*, the garlic bulbs that were delivered to Dadi).  Pl.'s Brief at 6; *see generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1350-53 (addressing Xinboda's claims concerning sums paid to "middle men" and "intermediaries," including "commission agents, wholesalers and retailers to cover transportation, loading, unloading, storage, overhead, profits, etc.," which, according to Xinboda, are associated with sales at markets such as the Azadpur Market).[29]

The Remand Results make the point that Commerce has already deducted 7% from the Azadpur Market prices "in order to account for commissions," including "middleman type expenses"

---

to further consider at this time other aspects of Xinboda's claim that Commerce should base the surrogate value on the Garlico prices, including Xinboda's argument that the Garlico prices more accurately reflect Xinboda's level of trade.

[29]*See also*, *e.g.*, Jinan Yipin II, 35 CIT at ____, 800 F. Supp. 2d at 1270-71 (stating that "the apparent involvement of intermediaries" in sales at the Azadpur APMC Market both "substantiates the Chinese Producers' concerns that the prices included in the Azadpur APMC data may include costs, fees, and commissions that hike up the prices" and also "undermines Commerce's claims that the Azadpur APMC data . . . are representative of the value of the 'intermediate input' at issue").

associated with "services typically rendered by a sales agent."  Remand Results at 47; *see also id*.

at 6 n.16.[30]  However, Xinboda claims that the actual expenses attributable to middlemen and

intermediaries dwarf Commerce's 7% adjustment.  According to Xinboda, the Azadpur APMC

Market prices include "a 60-80% mark-up, as reported by studies conducted by the government of

India."  *See* Pl.'s Brief at 14-15.[31]

      The Issues and Decision Memorandum that accompanied Commerce's Final Determination

inexplicably stated that Xinboda failed to "place[] information on the record" to prove its claims

concerning intermediary expenses.  Issues & Decision Memorandum at 15.  Quite to the contrary,

as  Shenzhen Xinboda I observed, "Xinboda mustered significant documentation to substantiate its

claims," which Commerce's Final Determination failed to consider.  Shenzhen Xinboda I, 38 CIT

at ____, 976 F. Supp. 2d at 1350-51.  Shenzhen Xinboda I catalogued some of the record evidence

on which Xinboda relies.  *See* Shenzhen Xinboda I, 38 CIT at ____ , 976 F. Supp. 2d at 1351-52.[32]

---

[30]*See also* Shenzhen Xinboda I, 38 CIT at ____ n.23, 976 F. Supp. 2d at 1353 n.23 (quoting Preliminary Surrogate Value Memorandum at 4 (AR Pub. Doc. No. 133), which notes that Commerce "subtracted a 7% fee (6% commission fee plus 1% market fee) charged on transactions at the Azadpur APMC [Market]" from the Azadpur APMC Market prices).

[31]Xinboda attached to its brief several articles to support its case, including a June 2014 news article published in the *Times of India*, reporting that the Azadpur APMC Market was being closed for the sale of fruits and vegetables because "deregulation would help get rid of the middlemen because of whom prices of food items often rose by more than 100% from the time the produce left the field till it landed up in one's home."  *See* Pl.'s Brief at 14 n.7 (quoting *Times of India* (June 19, 2014)) & Exh. 4.  However, as the Domestic Producers correctly note, those documents are not part of the administrative record here and therefore must be disregarded.  *See* Def.-Ints.' Brief at 26.

[32]For example, Shenzhen Xinboda I noted Xinboda's reliance on the 2009-2010 Annual Report of the Indian Ministry of Agriculture's Department of Agriculture & Cooperation ("AgriCoop"), "which advises that the country's market system has become increasingly 'restrictive and monopolistic' over time, such that 'produce is required to be channeled through regulated

markets and licensed traders' (*i.e.*, the 'intermediaries' to which Xinboda refers), resulting in 'an enormous increase in the cost of marketing.'" *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1351 (quoting Xinboda Surrogate Value Submission at Exh. 35 (AR Pub. Doc. No. 133)).

Shenzhen Xinboda I also took note of other record evidence to the same general effect, including a December 29, 2010 article published in *The Economic Times*, " authored by the Director of India's National Academy of Agricultural Research Management ('NAARM') stating that the supply chains for agricultural products such as onions, tomatoes, and garlic are 'inefficient, dominated by intermediaries.'" *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1351 (citing, *inter alia*, Xinboda Surrogate Value Submission at Exh. 34 (AR Pub. Doc. No. 133)). In addition, Shenzhen Xinboda I observed that "[t]he Director of NAARM further explained that '[s]tudies have shown that nearly 60-80% of the price consumers pay goes to commission agents, wholesalers and retailers to cover transportation, loading, unloading, storage, overheads, profits, etc.'" *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1351 (citing, *inter alia*, Xinboda Surrogate Value Submission at Exh. 34 (AR Pub. Doc. No. 133)).

Shenzhen Xinboda I observed that Xinboda cited to another similar article from *The Economic Times*, dated December 29, 2010 and authored by a senior agricultural economist from Credit Rating and Information Services of India ("Crisil"), which "'underscores [t]he difference between the farm gate and retail prices'" of onions and other similar vegetables in India and attributes that mark-up to "'exploit[ation] by intermediaries.'" *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1351 (citing, *inter alia*, Xinboda Surrogate Value Submission at Exh. 34 (AR Pub. Doc. No. 133)).

In addition, Shenzhen Xinboda I noted that Xinboda argues that "the involvement of intermediaries in sales at facilities such as the Azadpur APMC Market and the existence of associated additional fees and expenses are borne out by the Domestic Producers' own Market Research Report." *See generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1351-52 (citing Market Research Report). Shenzhen Xinboda I explained that Xinboda also points to the Clarification of the Market Research Report, which "states that an individual transporting produce out of a local APMC jurisdiction to a market such as the Azadpur APMC Market must pay a market fee to the local market at the local district's exit checkpoint." *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1352 (citing, *inter alia*, Clarification of Market Research Report at 6).

Shenzhen Xinboda I further indicated that Xinboda similarly cites the Garlico price data as corroboration of Xinboda's claims. *See generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1352 (citing Garlico pricing data). Shenzhen Xinboda I explained: "According to Xinboda, '[d]educting the average 70% markup reported by [India's National Academy of Agricultural Research Management] from the Grade A prices of garlic sold on the Azadpur [APMC] market

Commerce now concedes, as it must, that "the articles cited by Xinboda . . . [prove] the existence of intermediary expenses added to the cost of raw garlic between farmgate and the Azadpur market." Remand Results at 10.[33]  The Remand Results nevertheless take the position that there is no need for further adjustments to the Azadpur Market prices to account for intermediary expenses, advancing four reasons.  *See id.* at 9-11.  As summarized below, Commerce yet again fails to give Xinboda's claims concerning intermediary expenses the consideration that those claims merit.

The Remand Results first state, in essence, that it is unnecessary for Commerce to make any further deductions for intermediary expenses in calculating the surrogate value for Dadi's raw garlic bulbs because, according to Commerce, Dadi's garlic bulbs incorporated the services of (and thus the costs of) intermediaries.  In the words of the Remand Results: "Xinboda's argument for subtracting alleged 'intermediary expenses' from the Azadpur APMC prices is based entirely on the assumption that its garlic is purchased at . . . prices[] which are free from any intermediary price mark-ups."  Remand Results at 9; *see also* Def.'s Brief at 13-14.  Commerce reasons that, because the garlic bulbs delivered to Dadi had already been sorted by size, bagged, and, in some instances, stored, the price that Dadi paid "may include such intermediary or 'downstream expenses.'"  *Id.*

---

during the [period of review] amounts to a farm gate price of 7.055 Rs/kg.' . . . . Xinboda argues that this figure 'comes very close to the average prices for raw garlic that Garlico paid' during the period of review," and thus constitutes further proof that the Azadpur Market prices reflect costs above and beyond those that Dadi incurred.  *Id.*, 38 CIT at ____, 976 F. Supp. 2d at 1352.

[33]*But see* Remand Results at 9 (referring to "alleged 'intermediary expenses'").

(emphasis added).[34]

Even in the excerpt from the Remand Results that is quoted above, Commerce does not state definitively that the prices that Dadi paid for garlic bulbs reflected expenses associated with intermediaries. Instead, Commerce states only that the prices paid by Dadi "may" have included such expenses. *See* Remand Results at 9. More importantly, Commerce's position here is premised on the Remand Results' conclusion that the condition of the garlic bulbs delivered to Dadi and the condition of the garlic bulbs sold at the Azadpur APMC Market are basically the same. That conclusion has now been debunked, at least for the present and on the existing record. *See generally supra* section III.A.1 (at "The Condition of Garlic Bulbs at the Azadpur APMC Market" and "The Condition of Garlic Bulbs Purchased by Dadi").[35]

There is therefore no evidentiary basis for Commerce's attempt to dismiss Xinboda's claims concerning intermediary expenses by broadly equating the condition of the garlic bulbs delivered to Dadi and the condition of those sold at the Azadpur Market. The intermediary expenses that are the subject of Xinboda's claim are fees, commissions, and other costs incurred for processing and

---

[34]Apparently Commerce is here referring to any costs associated with operations such as the sorting, bagging, and storage of garlic bulbs prior to delivery to Dadi as "intermediary expenses."

[35]In addition, there is a fundamental flaw in Commerce's reasoning. In essence, even assuming that the prices that Dadi paid included "intermediary expenses" (as Commerce is defining the term) and that the Azadpur Market prices also included such "intermediary expenses," one nevertheless could not dismiss the issue of intermediary expenses as a "wash," as Commerce does in the Remand Results. *See* Remand Results at 9. Commerce's reasoning fails to consider the magnitude of the intermediary expenses. In other words, intermediary expenses could not be considered a "wash" if, for example, the prices that Dadi paid for whole raw garlic bulbs included a modest sum for intermediary expenses, while the prices for garlic bulbs sold at the Azadpur Market included very significant sums for such expenses.

handling of the garlic bulbs sold at the Azadpur APMC Market above and beyond the very basic

processing and handling to which the garlic bulbs delivered to Dadi had been subject    in other

words, the fees, commissions, and other expenses that are documented in the evidence that

Commerce now acknowledges Xinboda has placed on the record.

The Remand Results also seek to dismiss Xinboda's claims concerning intermediary

expenses by brushing aside the evidence that Xinboda has mustered.  *See* Remand Results at 10.  But

this second point is no more effective than the first.

Rather than carefully reviewing and evaluating each of the numerous articles and other pieces

of evidence that Xinboda cites in support of its claims, the Remand Results attempt to sweep it all

away by cherry-picking several of the articles for comment, giving those articles treatment that is

superficial at best, and turning a blind eye to everything else.  However, Commerce is not permitted

to reach its determinations by selectively citing some evidence while ignoring all the rest.

For example, the Remand Results state:  "[W]hile the articles cited by Xinboda [establish]

the existence of intermediary expenses added to the cost of raw garlic between farmgate and the

Azadpur market, they also acknowledge other sources for such costs, such as 'changing dietary

habits due to rising incomes.'"  *See* Remand Results at 10; *see also* Def.'s Brief at 14.  Although the

Remand Results refer to "articles" and "they" (both plural), Commerce cites and quotes only one

authority as support for its statement    an article by a senior agricultural economist from Credit

Rating and Information Services of India ("Crisil") which was published in *The Economic Times*

(and is discussed in note 32 above).  Further, although Commerce's meaning is not entirely clear,

it seems likely that the reference in Commerce's sentence to "other sources for such costs" was

intended to be "other sources for [such?] price increases."

More importantly, the Remand Results do not accurately depict the content of the Crisil article. The focus of the article is a "demand-supply" mismatch in, among other things, fruits and vegetables. The article notes increased demand as a result of factors including "changing dietary habits due to rising incomes," and indicates that production has not yet caught up. However, the article underscores the role of intermediaries, stating, for example, that "[t]he difference between the farm gate and retail prices of onion, as also of other vegetables is an indication that the situation is being *exploited by intermediaries*." (Emphasis added.) The article further states that "[e]ven a minor gap between demand and supply is being *exploited by intermediaries* to aggravate the [demand-supply mismatch] situation many-fold." (Emphasis added.) The article closes by emphasizing that the short-term solution to the demand-supply mismatch "has to be on removing supplyside bottlenecks," with the article singling out "*increased intermediation costs*" as a key problem to be addressed. (Emphasis added.)

Whatever point the Remand Results were trying to make, whether as to prices or costs, the Crisil article cannot fairly be read as equating the effects of "changing dietary habits" with those of intermediary expenses, as the Remand Results suggest. The Remand Results plainly seek to downplay the article's emphasis on the high costs attributable to intermediaries. As illustrated below, this is a pattern, not an isolated instance.[36]

---

[36]There is also a logical fallacy inherent in Commerce's rationale. Contrary to Commerce's implication, the presence of "other sources" (presumably other contributing factors) that may be at play would not negate the existence and effect of intermediary expenses. It would mean only that Commerce should take into account the evidence of any such "other sources" (or other factors) in determining the amount of any adjustment for intermediary expenses.

The Remand Results further state that "APMC reforms have benefitted free movement of agricultural products." *See* Remand Results at 10.  Although no authority is cited for this broad assertion, the Remand Results appear to be referring to another article published in *The Economic Times*, which was authored by the Director of India's National Academy of Agricultural Research Management ("NAARM") (and is also discussed in note 32 above).

According to the Remand Results, the Director of NAARM "recognized the potential positive effects of APMC Act implementation and the generally increasing efficacy of farm-to-market supply chains." Remand Results at 10.  As support for that proposition, the Remand Results quote an excerpt from the Director's article: "[T]he country is witnessing a revolution of innovative institutions that are effectively linking producers with markets.  Such arrangements not only improve market efficiency but also augment production of food to meet changing demands." *Id*.; *see also* Def.'s Brief at 14.

Again, the Remand Results not only lift an excerpt out of context, but also obfuscate the fundamental thrust of the article.  The title of the article itself makes this obvious      "Why are margins high in food items?  Inefficient supply chain is a key reason."  Much like the Crisil article (discussed above), this article too analyzes the reasons behind increased prices for onions, tomatoes, and garlic.  As Xinboda has previously noted, the article highlights problems in agricultural supply chains in India, which the article describes as "inefficient" and "dominated by intermediaries."  The article further states that "[s]tudies have shown that nearly 60%-80% of [the] price consumers pay goes to commission agents, wholesalers and retailers to cover transportation, loading, unloading, storage, overheads, profits, etc."  The Remand Results conspicuously omit any mention of these

points.

In referring to "a revolution of innovative institutions that are effectively linking producers with markets," the article is merely making the point that the trend is in the right direction and that this "revolution" may remedy some existing problems in the future.  Even the Remand Results correctly note that, at the time the article was published, any "positive effects of APMC Act implementation" were still only "potential."  The article thus indicates that "[e]ffective and speedy implementation of the model Agricultural Produce and Marketing Committee Act would [be]"   not "will be," and certainly not "was"    a step in the right direction.

Not only does this article not undermine Xinboda's case on intermediary expenses; to the contrary, the article substantiates the fact of such expenses and even goes so far as to quantify their effect on produce prices.  It simply is not possible to read the article as Commerce attempts to do.  The article is clear:  Notwithstanding the then-not-yet-adopted APMC Act and the referenced "revolution of innovative institutions . . . effectively linking producers with markets," "nearly 60%-80% of [the] price consumers pay" was (at the time of publication) attributable to intermediary expenses.  Again, the Remand Results seek to downplay the article's emphasis on the high costs attributable to intermediaries.  If anything, the Remand Results' treatment of this article is even more egregious than the Remand Results' treatment of the Crisil article, discussed above.

As a third point, the Remand Results state that "Xinboda's arguments fail to establish that the sales prices at the APMC markets are distorted.  In fact, a report on the APMC market system conducted and issued by the Government of India merely states that Indian farmers *may* earn less for their produce."  Remand Results at 10 (emphasis in the original).  However, the authority cited in

the  Remand Results does not stand for this proposition.  The Remand Results cite Exhibit 2 to

Xinboda's Surrogate Value Submission, which is captioned "DAMB, Azadpur Market Garlic Prices

& Quantity, Seasonal Graphs."  It consists of two pages (specifically, two graphs) and is not "a report

on the APMC market system conducted and issued by the Government of India," despite what the

Remand Results say.  Moreover, Xinboda has not relied on Exhibit 2 to its Surrogate Value

Submission as support for its intermediary expenses claim.

It appears that the Remand Results' assertion that the referenced "report on the APMC

market system . . . merely states that Indian farmers *may* earn less for their produce" has been lifted

by Commerce virtually *verbatim* from the agency's Issues & Decision Memorandum in the 16th

Review (*i.e.*, the review following the review at issue here), although the Remand Results do not so

indicate.  *See* Issues & Decision Memorandum for 16th Review at 23 (asserting that "the report does

not, in any way, state that the sales prices at the APMC markets, including Azadpur, are distorted.

. . . [I]t only states that Indian farmers may earn less for their produce.").

As part of the third point, the Remand Results again quote the Issues & Decision

Memorandum for the 16th Review (this time accurately attributing the quote):  "[T]he Department,

when identifying the [surrogate value] at issue, is not focused on the price the farmer receives but

is instead focused on the price a processor would pay.  The amount of the Azadpur sales price

apportioned to Indian farmers is not material to this analysis."  Remand Results at 10 (quoting Issues

& Decision Memorandum for the 16th Review at 23).

Apart from the mis-citation, the Remand Results' third point is a bit of a *non sequitur* here,

where (perhaps in contrast to the subsequent review) the parties' arguments have not been framed

in terms of the prices that are paid to farmers.  The effect of the Remand Results' third point is thus

to muddle the issue of intermediary expenses that is presented here.

Still, it is worth noting that the two excerpts from the Issues & Decision Memorandum in the

16th Review seem to be Commerce's response to the 2009-2010 Annual Report of the Indian

Ministry of Agriculture's Department of Agriculture & Cooperation ("AgriCoop"), which is (on this

record) Exhibit 35 to Xinboda's Surrogate Value Submission     not Exhibit 2 (and which is listed in

note 32 above).  The AgriCoop publication     which the Remand Results tout as "a report on the

APMC market system conducted and issued by the Government of India"     states, *inter alia*, that

the APMC market system in India (of which the Azadpur APMC Market is a part) has become

increasingly "restrictive and monopolistic" over time, and that "produce is required to be channeled

through regulated markets and licensed traders" (the intermediaries to which Xinboda refers),

resulting in "an enormous increase in the cost of marketing."  *See* Xinboda Surrogate Value

Submission at Exh. 35, p.58; *see also* Issues & Decision Memorandum in 16th Review at 22-23

(summarizing relevant points from the AgriCoop report).

As with the Crisil article and the article by the Director of NAARM, the Remand Results fail

to accurately reflect the relevant parts of the AgriCoop report.  For example, the Remand Results

omit any reference to the "restrictive and monopolistic" structure of the APMC market system.  Nor

do the Remand Results acknowledge the AgriCoop report's observations concerning the role of

intermediaries and their effect on prices.  *See* Remand Results at 10.  Contrary to the representations

in the Remand Results, the AgriCoop report cannot be read as anything other than support for

Xinboda's claim that intermediary expenses are embedded in the Azadpur Market prices.  The

Remand Results' conclusion that "Xinboda's arguments fail to establish that the sales prices at the

AMPC markets are distorted" (*id*.) is not supported by the evidence that the Remand Results discuss.

Even assuming that the excerpts from the publications referenced in the Remand Results

were not taken out of context and read in isolation without regard to the remainder of the text (as

they are), the Remand Results do not address all of the evidence that Xinboda has placed on the

record as proof of its claim concerning intermediary expenses. *See*, *e.g.*, Xinboda Surrogate Value

Submission at Exh. 52 ("Global Market Articles") (articles referring to, *inter alia*, "the long chain

of middlemen and commission agents," "intermediary exploitation," the "exploitative element in the

trade," the desire to "eliminat[e] middlemen, transportation costs and delayed delivery," and "the

stranglehold of markets"); *see also supra* n. 33.

Commerce's conclusions concerning intermediary expenses can be sustained only if they are

based on thorough, independent, objective, and reasoned analyses of all of the evidence on which

Xinboda relies.  Moreover, any evaluation of the substantiality of the evidence "must take into

account whatever in the record fairly detracts from its weight," including "contradictory evidence

or evidence from which conflicting inferences could be drawn." Suramerica, 44 F.3d at 985 (quoting

Universal Camera Corp., 340 U.S. at 487-88).

The Remand Results' fourth and final point addressed to Xinboda's claims concerning

intermediary expenses is a makeweight.  Falling back on one of Commerce's oft-repeated

shibboleths, relying on Longkou (and reiterating the position that the agency took in the Final

Determination),[37] the Remand Results state that Commerce is not required to "tailor its choice of

[surrogate values] to a respondent's exact experiences." *See* Remand Results at 10 (citing Longkou

Haimeng Machinery Co. v. United States, 33 CIT 603, 613, 617 F. Supp. 2d 1363, 1372-73 (2009)).

As the Remand Results note, however, the overarching principle   which Longkou repeats

is that "a surrogate value must be as representative of the production process in the [non-market

economy] country as is practicable, if it is to achieve the statutory objective of assigning dumping

margins as accurately as possible." *See* Remand Results at 10 (quoting Longkou, 33 CIT at 613, 617

F. Supp. 2d at 1372); *see also*, *e.g.*, Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d

1370, 1379 (Fed. Cir. 2013) (stating that "[a]n overriding purpose of Commerce's administration of

antidumping laws is to calculate dumping margins as accurately as possible"); Zhaoqing Tifo New

Fibre Co. v. United States, 37 CIT ____, ____ n.6, 60 F. Supp. 3d 1328, 1333 n.6 (2013) (collecting

cases).  That is precisely the point of Xinboda's claims concerning intermediary expenses.  Xinboda

seeks to establish what adjustments (if any) must be made to the Azadpur Market prices (or whatever

other surrogate value Commerce may choose) in order to approximate Xinboda's experience *as

closely as practicable*.[38]

---

[37] *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1352 (quoting Issues & Decision Memorandum at 14 and stating that the Final Determination "dismissively brush[es] off Xinboda's concerns about additional fees and expenses embedded in the Azadpur APMC prices with the general proposition that Commerce "is not required to duplicate the exact experience of an exporter when calculating surrogate values").

[38] The Remand Results reiterate Commerce's conclusion in the Final Determination that "the Azadpur data most broadly reflect the costs of raw garlic in India and are the best option for use in calculating [a surrogate value] meant to broadly reflect what Xinboda's costs would be if it were operating in a market economy (ME) country."  Remand Results at 11.  The Remand Results continue:  "With that decision, [Commerce] is not required to adjust or modify the Azadpur data,

As outlined above, the Remand Results fail to give adequate consideration to the evidence that Xinboda has proffered as proof of intermediary expenses embedded in the Azadpur Market prices which Xinboda asserts Dadi did not incur.  Commerce's use of the Azadpur Market prices as a surrogate value for the intermediate input in question   *i.e.*, the whole raw garlic bulbs delivered to Dadi    cannot be sustained (at least not without appropriate adjustments) if those prices incorporate intermediary expenses (as Commerce now acknowledges they do) to the extent that such expenses were not incurred by Dadi.

Accordingly, this matter must be remanded for a second time on this point as well.  On remand, Commerce shall rigorously review the proof of intermediary expenses that Xinboda has proffered and shall give full, fair, and balanced consideration to all relevant arguments and record

---

or any data for that matter, to precisely replicate Xinboda's circumstances."  *Id*.  True enough.  As discussed above, there is no requirement that Commerce "*precisely* replicate" the experience of Xinboda or any other respondent (which would, in any event, be an impossible task).  It is nevertheless also true that    whatever surrogate value Commerce selects    Commerce must make any necessary adjustments to that value, based on the record evidence, in order to calculate Xinboda's antidumping margin "as accurately as possible."  *See*, *e.g.*, <u>Yangzhou Bestpak Gifts & Crafts</u>, 716 F.3d at 1379; *see also supra* n.28 (discussing same statements from Remand Results at 11).

Similarly, Commerce elsewhere asserts that any further adjustments beyond those that the agency has already made "would be guess work."  *See* Remand Results at 47.  As discussed above, however, there is a significant body of evidence already on the record, much of which Commerce apparently has not closely analyzed and all of which is largely uncontroverted.  *Cf.* Pl.'s Reply Brief at 2 (stating that neither Commerce nor the Domestic Producer have adduced "one iota of evidence . . . that [Xinboda/Dadi] used the services of middlemen in its purchases of raw garlic").  To the extent that Commerce is making the point that it may be challenging to calculate an adjustment for intermediary expenses, that does not relieve Commerce of its obligation to do so based on the entirety of the record.  If the evidence demonstrates that intermediary expenses that Dadi does not incur are reflected in the Azadpur Market prices, Commerce must make an appropriate adjustment or select a different data source as the basis for calculating the surrogate value for the garlic bulbs delivered to Dadi.

evidence.  Commerce shall make any necessary adjustments to the Azadpur Market prices (or whatever other surrogate value Commerce may choose) so as to exclude all intermediary expenses that do not reflect the experience of Xinboda (including that of Dadi) and thus to calculate Xinboda's dumping margin as accurately as possible.

### 3.  Use of Azadpur APMC Market Prices for Grade "S.A." Garlic

As explained above, to value the garlic bulbs delivered to Dadi that had a diameter of 55 mm or more, Commerce used Azadpur APMC Market prices for grade "S.A." garlic bulbs for the period February 2007 through January 2008 (*i.e.*, prices from outside the period of review), which Commerce then indexed to the dates of the period of review.  Similarly, to value the garlic bulbs delivered to Dadi that had a diameter of between 50 mm and 55 mm, Commerce used a combination of the non-contemporaneous but indexed Azadpur Market prices for grade "S.A." garlic bulbs (described above) and contemporaneous Azadpur Market prices for grade "A" garlic bulbs (*i.e.*, prices for grade "A" garlic bulbs from within the period of review).  *See generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343.[39]

---

[39]In concluding discussion of Xinboda's challenge to Commerce's use of prices for grade S.A. garlic bulbs in calculating the surrogate value for whole raw garlic bulbs, the Remand Results state that Commerce "continue[s] to find [that the agency] correctly averaged grades Super-A and A values for raw garlic ranging from 40 mm to 55 mm."  Remand Results at 14.  There are two problems with that statement.  The first problem, a relatively minor point, is that Dadi did not use any 40 mm garlic bulbs in its production of garlic products for Xinboda.  The garlic bulbs that Dadi used in producing garlic products for Xinboda ranged in diameter from 50 mm to 65 mm.  The more significant point is that, contrary to the statement from the Remand Results quoted above, Commerce's use of prices for grade S.A. garlic bulbs is not confined to averaging those prices with prices for grade A bulbs to calculate a surrogate value for the garlic bulbs delivered to Dadi that had a diameter of 50 mm to 55 mm.  To the contrary, Commerce also uses prices for S.A. grade garlic alone    to value the garlic bulbs delivered to Dadi that had a diameter of 55 mm to 65 mm.  *See*

There is no dispute that the Azadpur Market prices for S.A.-grade garlic bulbs that Commerce used are not contemporaneous with the period of review; and the fact that those prices are not contemporaneous (and thus were indexed to the period of review) is not challenged. There also is no dispute as to the fact that the Azadpur APMC's Market Information Bulletin has not published prices for S.A.-grade garlic bulbs since early February 2008, which is why Commerce used indexed prices for S.A.-grade garlic bulbs from outside the period of review.

What is in dispute is whether, as Xinboda maintains, the Azadpur Market prices for grade A garlic bulbs for the period of review *i.e.*, the contemporaneous prices include not only garlic bulbs with a diameter of between 40 mm and 55 mm, but also garlic bulbs with a diameter of 55 mm or more. In other words, what is in dispute is whether garlic bulbs that once would have been designated as grade S.A. were, as Xinboda puts it, in effect "subsumed" into grade A garlic bulbs as of February 2008, before the period of review. Thus, the issue here is whether Commerce's use of non-contemporaneous but indexed Azadpur Market prices for S.A.-grade garlic bulbs not only was unnecessary, but, in fact, significantly distorted Commerce's calculation of the surrogate value for whole raw garlic bulbs. *See generally* Pl.'s Brief at 8-14; Pl.'s Reply Brief at 4-6.

Shenzhen Xinboda I noted that the Researcher Declaration is the only record evidence that is directly on point and that the Declaration supports Xinboda's claim. Specifically, the Researcher Declaration attests that garlic bulbs with diameters of 55 mm to 65 mm in fact were being sold as grade A bulbs after the Azadpur APMC's Market Bulletin ceased publication of prices for grade S.A. garlic bulbs. *See* Researcher Declaration ¶¶ 6-7. Summarizing the state of the record evidence on

_____

Final Surrogate Value Memorandum at 1.

this issue (which is the same now as it was then), <u>Shenzhen Xinboda I</u> stated:

> In short, the existing evidence of record supports only one conclusion    that grade "S.A." garlic was subsumed into grade "A" garlic as of February 2008.  As such, Commerce's use of the non-contemporaneous prices for "S.A."-grade garlic would have been both unnecessary and distortive.  Specifically, if (as all record evidence indicates) the data for grade "A" garlic that were contemporaneous with the period of review included garlic with bulb diameters of up to 65 mm, there was no need for Commerce to use indexed non-contemporaneous data for grade "S.A." garlic to value larger-bulbed garlic; the value of such larger-bulbed garlic would be already accounted for in the contemporaneous data for grade "A" garlic.
>
> But, more importantly, if (as all record evidence indicates) the contemporaneous data for grade "A" garlic include garlic with bulb diameters of up to 65 mm, then it stands to reason that the Final Determination must be distorted.  For example, by valuing Dadi's garlic with a bulb diameter of 50 mm to 55 mm using a combination of the indexed, non-contemporaneous data for "S.A."-grade garlic together with the contemporaneous data for "A"-grade garlic (which, it now appears, already reflected values for garlic with a bulb diameter of up to 65 mm), Commerce presumably skewed the surrogate value toward larger-bulb (typically higher-value) garlic.

<u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1355-56.[40]

The Remand Results dismiss the Researcher Declaration as "unreliable" and dispute Xinboda's claim that garlic bulbs with a diameter of up to 65 mm were being sold as grade A bulbs during the period of review.  *See* Remand Results at 12-14, 44-45; *see also* Def.'s Brief at 14-20; Def.-Ints.' Brief at 15-19.  In an effort to account for the absence of published prices for grade S.A. garlic bulbs for the period of review, the Remand Results again borrow from Commerce's Issues &

---

[40]Although the Researcher Declaration is the only evidence that speaks directly to whether garlic bulbs with a diameter of up to 65 mm were being sold as grade A bulbs after February 2008, Xinboda argues that there is other corroborating evidence on the record.  *See* Pl.'s Brief at 11-13; Pl.'s Reply Brief at 4-6; *see generally* <u>Shenzhen Xinboda I</u>, 38 CIT at ____ n.26, 976 F. Supp. 2d at 1354 n.26 (noting some of the evidence cited by Xinboda).  *But see* Remand Results at 12-13 (addressing Xinboda's reliance on Alibaba advertisements as corroboration); Def.'s Brief at 16-19 (responding to Xinboda's assertions concerning corroborating evidence); Def.-Ints.' Brief at 18-19 (similar); Issues & Decision Memorandum at 11, 13 (similar).

Decision Memorandum in the 16th Review (*i.e.*, the administrative review after the review at issue

here).  There, Commerce adopted the Domestic Producers' theory that, at the time of the period of

review, large-bulb garlic was "in high demand" and was being "directly exported [from India]

instead of moving through domestic wholesale [markets]," such as the Azadpur Market.  *See*

Remand Results at 13 (quoting Issues & Decision Memorandum in 16th Review ) (bracketing in the

Remand Results); *see also* Def.'s Brief at 19.

As detailed above, Commerce's grounds for dismissing the Researcher Declaration are not

well taken.  Moreover, as to the Domestic Producers' explanation for the absence of Azadpur Market

prices for S.A.-grade garlic during the period of review, the Remand Results candidly concede that

"there is no evidence on the record of this review [or, for that matter, the record of the sixteenth

review] to prove the domestic industry's theory."  Remand Results at 13.[41]

Commerce's determinations must be based on actual evidence.  Theory will not suffice.  The

Court of Appeals has underscored this principle, explaining that "[i]t is well established that

speculation does not constitute 'substantial evidence.'"  <u>Novosteel SA v. United States</u>, 284 F.3d

1261, 1276 (Fed. Cir. 2002).  The Court of Appeals continued: "As the Supreme Court noted in

---

[41]As such, it is not at all clear that the use of the non-contemporaneous, indexed prices for grade S.A. garlic bulbs could be sustained even if the Researcher Declaration were to be discarded. There is no affirmative record evidence establishing the correctness of the use of such prices (*e.g.*, no evidence of the correctness of the Domestic Producers' theory).  The fact of the absence of published prices for S.A.-grade garlic bulbs during the period of review alone does not suffice.  *Cf. supra* n.24 (questioning whether use of Azadpur Market prices as surrogate value for whole raw garlic bulbs could be sustained, even if the Researcher Declaration were to be disregarded, absent affirmative evidence establishing what the Azadpur Market prices fundamentally represent (*i.e.*, in the absence of evidence documenting the basic condition of the garlic bulbs sold at the Azadpur Market and a demonstration of comparability to the condition of the whole raw garlic bulbs delivered to Dadi)).

Bowen v. American Hospital Ass'n, agency deference has not come so far that agency action is

upheld whenever it is possible to conceive a basis for administrative action." *Id.*; *see also*, *e.g.*,

Yangzhou Bestpak Gifts & Crafts, 716 F.3d at 1378 (noting that Commerce determinations cannot

be based on "mere conjecture or supposition").

The sole record evidence that is on point substantiates Xinboda's claim that garlic bulbs with

a diameter of 55 mm to 65 mm     garlic bulbs that once would have been classified as grade S.A.

 were classified and sold as grade A bulbs during the period of review.  Accordingly, if Commerce,

on the existing record, continues on remand to rely on the Azadpur Market prices in calculating the

surrogate value for whole raw garlic bulbs, Commerce shall base its calculations exclusively on the

contemporaneous prices for bulbs classified as grade A.

## B.  Selection of Surrogate Financial Statements

Xinboda contends that Commerce has erred in using the financial statements of Tata Tea to

derive the surrogate financial ratios that the agency used in calculating Xinboda's dumping margin.

Xinboda has placed on the record certain evidence that, according to Xinboda, gives "reason to

believe or suspect" that Tata Tea may have received countervailable subsidies.  Based on that

evidence, Xinboda maintains that Tata Tea's financial statements must be disregarded, in favor of

the financial statements of Garlico.[42]  Xinboda argues that the standard that Commerce has applied

in evaluating Xinboda's evidence and Tata Tea's financial statements is too stringent and is not

consistent with Congress' intent.  *See generally* Xinboda Surrogate Value Submission at Exh. 44

---

[42]Xinboda argues, in the alternative, that Commerce should use an average of the financial
statements of both Tata Tea and Garlico.  *See*, *e.g.*, Pl.'s Brief at 34.

(Tata Global Beverages Annual Report and Financial Statements for 2009-2010) (AR Pub. Doc. No. 133); Pl.'s Brief at 20-29; Pl.'s Reply Brief at 6-9; *see also* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1367-76.

As <u>Shenzhen Xinboda I</u> explained, Congress has instructed that, in using the factors of production methodology (the methodology used in this administrative review), Commerce is to "avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." In doing so, Congress emphasized that Commerce is not expected "to conduct a formal investigation to ensure that such prices are not dumped or subsidized," but, instead, is to "base its decision [as to whether there is 'reason to believe or suspect'] on information generally available to it at that time." Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No. 100-576 at 590-91 (1998) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24; <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1373-74. On its face, Congress' language includes two related but distinct expressions of attenuation   "reason to believe or *suspect*" (not merely "reason to *believe*") and "*may be* dumped or subsidized prices" (not "*are* dumped or subsidized prices").

In its Final Determination, Commerce rejected Xinboda's assertions that Tata Tea's financial statements included evidence of a potential subsidies: "Although Xinboda has placed 'loan agreements' which it contends indicate that Tata Tea has received financial subsidies [Commerce] has found countervailable, . . . we did not find evidence of these loans. We note that it is [Commerce's] practice to rely on information in financial statements on an 'as is' basis when calculating surrogate financial ratios." Issues & Decision Memorandum at 20.

Shenzhen Xinboda I remanded this issue with instructions for Commerce to reconsider and explain in detail the agency's practice in evaluating surrogate financial statements for possible use in deriving surrogate financial ratios, focusing particularly on the agency's interpretation and application of the "reason to believe or suspect" standard (including its consistency with Congress' intent) and on the nature of the evidence that the agency considers in applying that standard. Commerce also was directed to review anew the evidence of alleged subsidies placed on the record by Xinboda, if appropriate. In addition, Commerce was directed to clearly explain the rationale for whatever determination it reached on remand. Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1375-76.

In the Remand Results, Commerce summarizes its practice in the application of the "reason to believe or suspect" standard and reviews the evidence that Xinboda has proffered, concluding once again that in the words of the Remand Results "there is no reason to believe or *suspect* that Tata Tea *may have received* countervailable subsidies." Remand Results at 21 (emphases added); *see generally id.* at 14-21, 48-52 (addressing Xinboda's claim that there is "reason to believe or suspect" that Tata Tea may have received subsidies, reviewing Xinboda's evidence of alleged subsidies, and summarizing Commerce policy and practice on application of the standard); *see also* Def.'s Brief at 20-29 (arguing that Commerce correctly applied "reason to believe or suspect" standard and properly concluded that evidence of alleged subsidies proffered by Xinboda was insufficient); Def.-Ints.' Brief at 26-29 (same).[43]   Commerce's conclusion in the Remand Results

---

[43]Specifically, according to one statement in the Remand Results, Commerce has "concluded that [the evidence submitted by Xinboda] indicated that Tata Tea was *eligible* to eventually receive [certain] subsidies but did not indicate that Tata Tea *received* subsidies during the [period of

quoted above is an accurate recitation (or at least a near accurate recitation) of the relevant standard,

as set forth in the legislative history.[44]  However, it is not clear that the quoted conclusion accurately

reflects either the standard that Commerce has actually applied in this case or the standard that

---

review].”  *See* Remand Results at 49-50 (emphasis added).  This particular statement indicates that Commerce recognizes that the documentation supplied by Xinboda in fact relates to Tata Tea's receipt of subsidies, but that     under the agency's interpretation and application of the "reason to believe or suspect" standard     Commerce declines to exclude Tata Tea's financial statements because Commerce views the documentation as "mere" evidence of Tata Tea's "eligibility" for subsidies and/or because Commerce believes that Tata Tea did not actually "receive" subsidies.  As explained here, however, Commerce's *belief* as to whether Tata Tea actually "received" subsidies may not be reconcilable with Congress' "*reason to* believe or *suspect*" standard, which is intended to capture cases whether there is mere room to "suspect" that a company "may be" the beneficiary of subsidies.  Similarly, as also explained here, Commerce's dismissal of evidence of a company's "eligibility" for subsidies is arguably at odds with the position that Commerce has taken elsewhere     *i.e.*, the position that a company that is eligible for a subsidy will take advantage of that subsidy and "will not leave money on the table."

[44]Commerce's formulation of the "reason to believe or suspect" standard refers to "countervailable" subsidies.  The legislative history does not.  In discussing the standard elsewhere, Commerce has emphasized that the United States' countervailing duty statute allows duties to be imposed "only upon a finding that a *countervailable* subsidy is being provided."  *See* Defendant's Response to Order for Supplemental Briefing (filed by Government in Itochu Building Prods. Co. v. United States, Consol Court No. 12-000065, on January 6, 2014) (citing 19 U.S.C. § 1671(a)).  However, as explained in greater detail below, Commerce     in this context     is not deciding whether or not to impose duties.  Commerce here is determining only whether there is "reason to believe or suspect" that a potential surrogate company (here, Tata Tea) "may" have received subsidies, for purposes of deciding whether to consider that company's financial statements for possible use in deriving surrogate financial ratios for use in calculating the dumping margin for a non-market economy producer/exporter (here, Xinboda).  If Commerce decides that there is such "reason to believe or suspect," Commerce disregards the financial statement.  There are no consequences whatsoever for the potential surrogate company, which has no stake at all in the underlying administrative review (or this litigation)     and, indeed, may not be aware that its financial statements have been placed on the record and have been the subject of discussion by Commerce and the parties.

Commerce generally applies in other similar cases.[45]

As outlined below, the Remand Results do not adequately explain Commerce's practice in the interpretation and application of the "reason to believe or suspect" standard in the selection of financial statements for Commerce's use in deriving surrogate financial ratios in this case, and more generally, in other cases as well. Specifically, it is not clear that Commerce is attaching any meaning to the words "suspect" and "may be" in the relevant standard. *See*, *e.g.*, 2A N. Singer & S. Singer, Sutherland on Statutory Construction § 46.6 (7th ed. 2014) (explaining that "[i]t is an elementary

---

[45]At some points in the Remand Results, Commerce articulates the "reason to believe or suspect" standard in a way that is consistent with Congress' language. *See*, *e.g.*, Remand Results at 18 (stating that Xinboda's evidence of alleged subsidies "is not sufficient to undermine [Commerce's] initial conclusion . . . that there is no *reason to believe or suspect* that Tata Tea *may have* received countervailable subsidies") (emphases added). Elsewhere, however, the standard is formulated differently   most often, indicating that the standard requires proof of the actual receipt of a subsidy during the period of review. *See*, *e.g.*, Remand Results at 19 (stating that "[e]ven if [the documents that Xinboda has presented as evidence] could be viewed as the completion of an application for credit or for additional credit, they do not indicate if or when credits *were ever disbursed*") (emphasis added); *id.* at 20 (stating that "the fact that Tata Tea signed . . . hypothecation agreements . . . does not mean that it *was approved for or received* any packing credits during the [period of review]" (emphasis added); *id.* (stating that "none of the documents submitted by Xinboda provide a reason to believe or suspect that Tata Tea *was approved to receive or did receive* . . . countervailable subsidies during the [period of review]") (emphasis added); *id.* (stating that "[w]ith respect to Xinboda's argument that Tata Tea's financial statements . . . include evidence that Tata Tea *received* countervailable subsidies during the [period of review], [Commerce] finds no information in the financial statements to support this conclusion") (emphasis added); *id.* (stating that "[Commerce's] conclusion that there is not a sufficient basis to believe or suspect that Tata Tea *received* countervailable subsidies during the [period of review] is not altered by a review of Schedule 3 found in Tata Tea's financial statements") (emphasis added); *id.* at 21 (stating that "no item in Schedule 3 mentions 'packing credits,' 'export credit,' 'pre-shipment financing,' or anything else indicating *the receipt* of countervailable subsidies") (emphasis added); *id.* at 50 (stating that "the lack of any identification of . . . subsidies in Tata Tea's financial statements was consistent with the conclusion that the subsidies were likely *not disbursed* during the [period of review]" (emphasis added); *id.* at 51 (stating that "the words and phrases Xinboda finds in the consolidated financial statements do not indicate that the consolidated companies . . . *benefited from* subsidy programs") (emphasis added).

rule of construction that effect must be given, if possible, to every word, clause and sentence of a

statute"; that "[c]ourts construe a statute to give effect to all its provisions, so that no part is

inoperative or superfluous, void, or insignificant"; and that "[c]ourts assume that every word, phrase,

and clause . . . is intended and has some meaning") (footnotes omitted).[46]

As a threshold matter, the Remand Results clarify that, contrary to some statements that

Commerce has made in this case and elsewhere, Commerce in fact does not limit its evaluation of

potential surrogate financial statements to the "four corners" of the statements themselves.[47]  Instead,

---

[46]The Remand Results state that "financial statements are, *for many types of subsidies*, valuable evidence of whether a company has been subsidized."  Remand Results at 16 (emphasis added).  The Remand Results further state that "[s]ubsidies *frequently* constitute revenue that must be accounted for in a company's books and records and acknowledged as subsidy or non-operational income, counterbalanced through offsetting accounts."  *Id*. (emphasis added); *see also id*. at 17 (stating that "aside from a full subsidy investigation, a company's financial statements will *often* be the best source of information regarding its receipt of subsidies") (emphasis added).  It may be true that a company's financial statements must necessarily reflect subsidies that are in the form of grants.  However, Commerce has not explained whether (and, if so, how) financial statements reflect subsidies that are in the form of exemptions (*e.g.*, tax exemptions).  Similarly, and more generally, Commerce has not identified and explained the types of subsidies as to which financial statements are not "valuable evidence."  Nor has Commerce explained the circumstances in which subsidies do not need to be "accounted for in a company's books and records."  *See, e.g.*, Shenzhen Xinboda I, 38 CIT at _____ n.49, 976 F. Supp. 2d at 1375 n.49 (discussing, *inter alia*, Itochu plaintiffs' argument that "[c]ertain subsidies (*e.g.*, receipt of grants) often are reported as line items in financial statements," but "[o]ther subsidies (*e.g.*, reductions in costs, such as exemptions from taxes, duties, etc.) are not normally reported as line items").  Commerce has not explained how it applies the "reason to believe or suspect" standard in cases such as these.

[47]Even in the Remand Results here, Commerce continues to state that "it is [Commerce's] policy to limit its search for evidence to the 'four corners' of the financial statements (and accompanying notes)."  *See* Remand Results at 16; *see also id*. at 17 (referring to "[Commerce's] focus on the four corners of a set of financial statements").  That statement, which appears in one form or another in many agency determinations, might reasonably be read as indicating that Commerce does not consider evidence of subsidies beyond the "four corners" of financial statements themselves.  *See* Shenzhen Xinboda I, 38 CIT at _____ n.49, 976 F. Supp. 2d at 1375 n.49.  As noted above, however, Commerce has clarified here that other record evidence will be considered.  Thus,

in applying the "reason to believe or suspect" standard, Commerce "reviews the record, as a whole."

Remand Results at 15.  Endorsing Commerce's statement made in another proceeding, the Remand

Results note that: "Commerce bases its determination on the totality of the circumstances, from

information generally available to it at that time [*i.e.*, when it is reviewing possible surrogate

financial statements for use in deriving surrogate financial ratios] . . . .  When Commerce does rely

on the financial statement to make its determination, this does not mean Commerce is precluded

from reviewing other evidence.  If other evidence were to exist that is . . . [the] opposite of or

conflicts with a financial statement, Commerce would account for this information in its

determination."  *Id.* (quoting Defendant's Response to Order for Supplemental Briefing (filed by

Government in <u>Itochu Building Prods. Co. v. United States</u>, Consol Court No. 12-000065, on

January 6, 2014) ("Def.'s Supp. Brief in <u>Itochu</u>) at 10)); *see also* Remand Results at 16 (stating that

"it is [Commerce's] policy to limit its search for evidence to the 'four corners' of the financial

statements (and accompanying notes) and any other information placed on the record.  In other

words, [Commerce] does not seek out additional information in evaluating the presence or absence

of countervailable subsidies.  Instead, [Commerce] rel[ies] solely on that which is placed on the

record of the proceeding, which, in most proceedings, is generally limited to financial statements.").

The Remand Results also explain that    when reviewing a set of financial statements for

evidence of countervailable subsidies    Commerce "employs a couple of general guideposts" : "(1)

the meaning of Commerce's statement concerning the "four corners" of financial statements is
apparently that, in applying the "reason to believe or suspect" standard to a set of potential surrogate
financial statements, the agency does not itself seek out additional information beyond that which
the parties place on the record and/or that the agency does not undertake a formal countervailing duty
investigation.

If a financial statement contains a *reference* to a *specific subsidy program* [which has previously been] found to be countervailable *in a formal CVD* [*countervailing duty*] *determination*, [Commerce] will exclude that financial statement from consideration.  (2) If a financial statement contains only a *mere mention* that a subsidy *was received*, and for which there is no additional information as to *the specific nature of the subsidy*, [Commerce] will not exclude the financial statement from consideration."  Remand Results at 17-18 (emphases added); *see also*, *e.g.*, <u>Clearon Corp. v. United States</u>, 35 CIT ____, ____, 800 F. Supp. 2d 1355, 1359 (2011) (quoting same "general guideposts" set forth in the Remand Results); Def.'s Supp. Brief in <u>Itochu</u> at 8 (quoting <u>Clearon</u>).

The Remand Results elaborate further: "[I]f *a specific subsidy program* is mentioned or identified within a company's financial statements, *with a dollar amount received*, and that subsidy program *has been determined to be countervailable*, [Commerce] will exclude the financial statements from consideration. . . . However, *mere mention of a subsidy*, without information that the company *actually received the subsidy*, or further information as to *the specific nature of the subsidy*, is not enough for [Commerce] to exclude the statements.  Such evidence would not rise to the level of a 'reason to believe or suspect.'"  Remand Results at 18 (emphases added).[48]

---

[48]At two points in the Remand Results, Commerce makes the point that "the 'believe or suspect' standard is also the standard for making a preliminary affirmative determination of countervailable subsidies in a countervailing duty investigation" and emphasizes that the agency "does not make an affirmative preliminary countervailing duty determination in an investigation based merely upon a company's *eligibility* for a subsidy."  Remand Results at 20 n.53 (emphasis added); *see also id*. at 52 (similar).  But this comparison lacks the potency that Commerce suggests.  An affirmative preliminary determination in a countervailing duty investigation carries with it major consequences for companies (*e.g.*, foreign producers and exporters).  In stark contrast, there are no consequences whatsoever for a potential surrogate company if Commerce elects not to consider that company's financial statements for purposes of deriving surrogate financial ratios because Commerce is concerned that there is "reason to . . . suspect" (or even "reason to believe") that the

As the quotations above indicate, in reviewing a set of financial statements for evidence of countervailable subsidies, Commerce does not exclude the financial statements unless, *inter alia*, the statements include "a reference to a specific subsidy program." *See* Remand Results at 17-18. According to Commerce, a "mere mention of a subsidy" in the financial statements does not "rise to the level of a 'reason to believe or suspect." *See id*. at 18 (emphasis added). Thus, to exclude a set of financial statements from consideration for possible use in deriving surrogate financial ratios, Commerce requires, in essence, that the financial statements identify a subsidy program precisely, by its exact title. *See*, *e.g.*, Clearon Corp. and Occidental Chemical Corp., et al. v. United States Final Results of Redetermination Pursuant to Remand (filed by Commerce in Court No. 13-00073 on March 22, 2016) ("Clearon Remand Results") at 43 (stating that Commerce would not disregard a company's financial statements where "the tax incentive references" (*i.e.*, the references to subsidies) "are . . . too vague to tie to a previously countervailed subsidy"); *id*. at 23-24 (similar).

No matter how close the comparison of the verbiage used in financial statements to the official title of a subsidy program, Commerce does not accept it as a basis for excluding financial statements. In that sense, it seems that Commerce excludes financial statements only if there is a rock-solid, conclusive "reason to believe" vis-a-vis the subsidy program. Commerce's position appears to afford no allowance for evidence that gives "reason to . . . suspect" by, for example,

---

company "may" have received subsidies. (Indeed, companies in a surrogate country often do not even know when their financial statements are being considered — or have been selected — for use by Commerce in deriving surrogate financial ratios.) There is thus an obvious reason for a demanding standard of proof in a countervailing duty investigation that simply does not exist when Commerce is making a "reason to believe or suspect" determination in a case such as this. The two contexts are entirely different.

listing a subsidy using terminology that differs somewhat from the official name of the subsidy

program.   Similarly, Commerce's position appears to give no effect to the words "may be."

Commerce's position means, logically, that the agency is (at least occasionally, if not frequently)

relying on the financial statements of companies that are, in fact, recipients of subsidies   all because

Commerce requires that the name of the subsidy program as listed in the financial statements

precisely match the official title of the program.

Similarly, as the quotations above indicate, even if a potential surrogate company's financial

statements list a subsidy by its exact, official title, Commerce will not exclude the financial

statements unless, *inter alia*, the financial statements also specify the precise "*dollar amount

received*."  *See* Remand Results at 18 (emphasis added).[49]  Thus, again, it seems that Commerce

excludes financial statements only if there is actual, irrefutable proof that the company in fact

received the named subsidy and only if the precise amount of that subsidy is specified in the financial

statements   which would seem to constitute "reason to believe."  Commerce gives no indication that

anything short of that proof would serve to exclude a surrogate company's financial statements.

Commerce's position appears to be clear   *i.e.*, that Commerce will not exclude financial statements

on the strength of evidence that gives rise to "reason to . . . suspect" that the company "may be" the

recipient of subsidies.

---

[49]*See also*, *e.g.*, DuPont Teijin Films v. United States, 37 CIT ____, ____, 896 F. Supp. 2d
1302, 1312-13 (2013) (Commerce required "actual dollar amount") (relied on by Commerce in
Clearon Remand Results at 43 n.100); Def.'s Supp. Brief in Itochu at 8 (stating that Commerce will
exclude a company's financial statements "if a specific subsidy program is mentioned or identified
within . . . [the] financial statement, *with a dollar amount received*, and that subsidy program has
been determined to be countervailable") (emphasis added).

Further, and even more to that point (immediately above), Commerce expressly states that

it will disregard a company's financial statements only if evidence establishes that a subsidy, in fact,

"*was received*" by the company at issue.  *See* Remand Results at 17-18 (emphasis added).  "[M]ere

mention of a subsidy [in a company's financial statements], without information that the company

*actually received the subsidy* . . . is not enough for [Commerce] to exclude the statements."  *Id*. at

18 (emphasis added).[50]  In other words, Commerce requires definitive proof that the subsidy at issue

indeed actually was received by the surrogate company.[51]  That sounds like "reason to believe" that

_____

[50]*See also*, *e.g.*, Def.'s Supp. Brief in Itochu at 8-9 (stating that "mere mention of a subsidy, without information that the company actually received the subsidy, . . . is not enough for Commerce to exclude the statement"); Clearon Remand Results at 43 (stating that Commerce would not disregard a company's financial statements absent proof "that the company actually received" the subsidies at issue); Final Results of Redetermination Pursuant to Stanley Works (Langfang) Fastening Systems Co., Ltd. and the Stanley Works/Stanley Fastening Systems, LP v. United States, Slip Op. 13-118 (filed by Commerce in Consol. Court No. 11-00102 on April 16, 2015) ("Stanley Remand Results") at 2-3 (stating that Commerce "will not normally rely on financial statements where there is evidence that the company received countervailable subsidies," with no reference to "reason to . . . suspect" or "may" have received countervailable subsidies); *id*. at 3 (stating that companies' financial statements "do not show receipt of countervailable subsidies nor is there reason to believe that they received countervailable subsidies," with no reference to "reason to . . . suspect" or "may" have received countervailable subsidies).

[51]Commerce has stated (in this case and elsewhere) that it will exclude a surrogate company's financial statements from consideration under the "reason to believe or suspect" standard only if Commerce concludes that the surrogate company actually received subsidies    and only if those subsidies were received during the period of review.  *See*, *e.g.*, Remand Results at 20 (referring to "[Commerce's] conclusion that there is not a sufficient basis to believe or suspect that Tata Tea received countervailable subsidies *during the POR* [period of review]") (emphasis added); *id.* at 49-50 (referring to Commerce's conclusion that the evidence submitted by Xinboda "did not indicate that Tata Tea received subsidies *during the POR*") (emphasis added).  Elsewhere, however, Commerce has taken the position that a company that has previously been determined to have received subsidies may be assumed to be a continuing beneficiary.  *See*, *e.g.*, Jiaxing Brother Fastener Co. v. United States, 34 CIT 1455, 1458-59, 751 F. Supp. 2d 1345, 1350 (2010) (discussing Commerce's decision to disregard financial statements of company where statements indicated company's receipt of subsidy in prior year, but not in period of review; noting Government's

a company has received a subsidy   *not* "reason to . . . suspect" that the company "may" have

received a subsidy.[52]

Lastly, as the quotations above indicate, Commerce will disregard financial statements that

evidence receipt of subsidies only if Commerce itself has previously "found [the exact same subsidy

program] to be countervailable *in a formal CVD determination*."  *See*, *e.g.*, Remand Results at 18

(referring to the requirement for identification of "a specific subsidy program found to be

countervailable in a formal CVD determination"); *id*. (referring to requirement "that the subsidy

---

argument that "what matters is whether a company received or may have received a countervailable subsidy at any point, . . . regardless of the year in which the funds were received").  Commerce has not explained the basis for here focusing solely on the period of review.

[52]The fact that Commerce will not disregard financial statements absent  concrete proof that a subsidy in fact actually "was received," including a specification of the precise "*dollar amount received*," would appear to be at least somewhat at odds with the agency's pragmatic presumption (in a related context) that a company that is eligible for a subsidy will take advantage of that subsidy  *i.e.*, that a company in a competitive market economy "will not leave money on the table."  *See*, *e.g.*, China Nat'l Machinery Import & Export Corp. v. United States, 27 CIT 255, 259, 264 F. Supp. 2d 1229, 1233 (2003) (noting Government's position that "as a matter of common sense, we can assume that no one is going to leave money on the table. [Companies] are going to take advantage of a program that's out there and exists."); Gold East Paper (Jiangsu) Co. v. United States, Court No. 10-00371; Slip Op. 15-37 (CIT 2015) Final Results of Redetermination Pursuant to Court Remand (filed by Commerce in Court No. 10-00371 on July 10, 2015) ("Gold East Remand Results") at 17 (in case challenging Commerce decision concerning use of market prices *versus* surrogate prices in determining a foreign exporter's dumping margin, invoking Commerce's presumption that a company that is eligible for subsidies will "take advantage" of them).

The Remand Results do not explain why such a presumption would not be reasonable in cases such as this and give no indication why evidence of a company's eligibility for a subsidy does not constitute at least "reason to . . . suspect" (if not "reason to believe") that the company "may" have received subsidies.  *Compare*, *e.g.*, Clearon Remand Results at 43 (where Commerce acknowledges that programs at issue "are all tax programs [*i.e.*, subsidies] to which [the company] is entitled," but Commerce nevertheless declines to exclude the company's financial statements, citing an absence of evidence "that the company actually received any of these tax incentives").

program has been determined to be countervailable").[53]  In short, it appears that Commerce requires

"reason to believe"  or something even stronger  that a subsidy is countervailable.  Evidence that

gives "reason to . . . *suspect*" that a subsidy *may* be countervailable does not suffice.[54]  Logically,

---

[53]*See also*, *e.g.*, Stanley Remand Results at 10 (declining to disregard financial statements in absence of prior formal determination of countervailability by Commerce; emphasizing that, "because [Commerce] never found [the subsidy program at issue] to be countervailable, [Commerce] finds that this evidence [i.e., financial statements reflecting receipt of a subsidy] is insufficient to satisfy the reason to believe or suspect standard," and, similarly, that Commerce "never found [the subsidy program at issue] to be a countervailable subsidy"); Clearon Remand Results at 23 (stating the "[Commerce's] practice is to only exclude financial statements that contain a subsidy that [Commerce] has found countervailable in the past"); *id*. at 43 (dismissing party's argument that tax incentives in the financial statements of company at issue are countervailable, Commerce stated that "the tax incentive references . . . are for disbursements [Commerce] has not previously countervailed as a subsidy"); *id*. at 43 (similar).

In the same vein, Commerce has not been receptive to arguments that a set of financial statements should be excluded because the company at issue has received subsidies under a program that is very similar (even identical) to a program that Commerce has previously found to be countervailable.  *See*, *e.g.*, Clearon Remand Results at 42-43 (where party sought to have Commerce disregard a company's financial statements based on the company's receipt of subsidies which the party emphasized "very closely match programs [Commerce] found are countervailable" in formal countervailing duty determinations, and where the party explained that "the same types of programs have been found countervailable," Commerce rejected the party's argument, stating that "[Commerce's practice is only to exclude financial statements that contain a subsidy that [Commerce] has found countervailable in the past"); Stanley Remand Results at 10 (where Commerce had previously found "Interest Free Tax Loans from the Government of Maharashtra [India]" to be countervailable, and where a party was arguing that a company's financial statements should be disregarded because that company received "Interest Free Tax Loans from the Government of Tamil Nadu [India]," Commerce dismissed the party's argument, stating that "the countervailability of a [subsidy] program in Maharashtra is not relevant to a program established and administered in another state [in India] such as Tamil Nadu").

[54]*See supra* n.44 (noting that the legislative history refers only to "subsidies" and makes no mention of "*countervailable* subsidies").  An argument can be made that, based on the legislative history, Congress' intent is that Commerce exclude financial statements whenever there is "reason to believe or suspect" a subsidy, without regard to whether or not that subsidy is (or even may be) countervailable.

Commerce's position here means, once again, that    seemingly contrary to Congress' expressed

intent    the agency is (at least occasionally, if not routinely) relying on the financial statements of

companies that are, in fact, recipients of subsidies    and, indeed, subsidies that are countervailable

 but which have not been the subject of a formal Commerce countervailing duty investigation,[55] and

thus, by definition, could not have been ruled to be countervailable by Commerce in a formal

countervailing duty determination.[56]

---

[55]There are a number of reasons why a subsidy might not have been the subject of a formal countervailing duty investigation by Commerce. *Cf.* Gold East Paper (Jiangsu) Co. v. United States, 39 CIT ____, ____, 121 F. Supp. 3d 1304, 1308-09 (2015) (noting that revocation of a countervailing duty order does not necessarily mean that a subsidy program has been terminated and that the flow of benefits instead, but may instead result from, for example, "a lack of interest by the domestic industry").

[56]To further illustrate this point with a hypothetical that is somewhat metaphysical, consider a subsidy that is evidenced on the face of a set of financial statements but which has never been the subject of an official Commerce countervailing duty proceeding and thus could not have been found to be countervailable by Commerce. Under Commerce's existing practice, Commerce would not exclude that set of financial statements    no matter how clear the countervailability of the subsidy might be (*i.e.*, even if there were "reason to believe" or even if it were a certainty that the subsidy was countervailable)    because there had been no formal determination of countervailability by Commerce. Commerce thus would rely on those financial statements, if they satisfied all other applicable agency criteria and were determined to be the best available information on the record. Assume further that, subsequently, in a formal countervailing duty proceeding, Commerce made an official determination of countervailability as to the very same subsidy program that was evidenced in the financial statements earlier (as hypothesized above). In this second situation, Commerce would exclude the financial statements. The two scenarios involve the exact same grant or exemption (subsidy) by a foreign government; but there are two completely different outcomes, based solely on the absence or existence of a formal countervailing duty determination of countervailability by Commerce. Nothing about the subsidy changed. By its nature, the subsidy was *always* "countervailable," even when it had not yet been officially pronounced "countervailable" by Commerce.

As another example, assume that a subsidy that is evidenced on the face of a set of financial statements has been found to be countervailable by Commerce in a *preliminary* determination in a formal countervailing duty proceeding, but the subsidy is not yet the subject of a *final* countervailing

Commerce casts its requirement that a subsidy have been previously determined to be countervailable in a formal Commerce countervailing duty investigation as a matter of "[e]xpediency" that is consistent with "Congress' intent as recognizing the need to filter information quickly without initiating a countervailing duty investigation."  Remand Results at 17.  Commerce argues that "the legislative history reveals that Congress was concerned about [Commerce's] ability to determine quickly whether there is reason to believe or suspect that a company received subsidies. [Commerce] therefore looks to past determinations of countervailable subsidies."  *Id*.  Commerce continues: "Given Congress' evident concern with expediency and the ability of [Commerce] to make these decisions quickly in an antidumping duty proceeding, [Commerce's] practice is reconcilable with the 'reason to believe or suspect' standard in the legislative history."  *Id*.[57]

---

duty determination (and thus has not been definitively declared to be countervailable).  In such circumstances, it appears that Commerce would not exclude the financial statements.  Commerce apparently would not credit a preliminary determination of countervailability by the agency itself even as "reason to . . . suspect," much less "reason to believe."

Similarly, Commerce apparently would not credit a determination of countervailability by another official international trade authority, such as Commerce's EU counterpart.

[57]The Remand Results further state that "the 'reason to believe or suspect' standard allows [Commerce] to exclude information in an antidumping proceeding even though [Commerce] [is] not making the formal finding of a countervailable subsidy (*i.e.*, financial contribution, benefit and specificity) that would be required if the case were a countervailing duty proceeding."  *See* Remand Results at 17.  However, that is not the issue presented here.  Xinboda is not concerned that Commerce is, under the "reason to believe or suspect" standard, *excluding* financial statements that Xinboda contends should be considered.  Xinboda's concern is the exact opposite:  Xinboda is concerned that Commerce is *refusing to exclude* financial statements which, according to Xinboda, should be excluded.  As discussed herein, Commerce's *modus operandi* seems to be to err on the side of *using* potentially tainted surrogate financial statements, absent evidence that proves conclusively that, during the period of review, the company received subsidies that Commerce previously determined to be countervailable in a countervailing duty investigation.

However, if Congress had intended Commerce to base its decision as to whether to use potential surrogate financial statements on whether Commerce had previously found the alleged subsidy to be countervailable in a formal Commerce countervailing duty investigation, Congress easily could have said exactly that.  But Congress did not do so.  *See*, *e.g.*, Tulips Investments, LLC v. Colorado, 340 P.3d 1126, 1135 (Col. 2015) (*en banc*) (explaining that "[i]f the legislature intended that such proceeding was to be handled as just another civil proceeding, it could have said so.  But it did not.") (citation omitted); *see also*, *e.g.*, Michigan v. EPA, ____ U.S. ____, ____, 135 S. Ct. 2699, 2710 (2015) (noting "if uncertainty about the need for regulation were the *only* reason to treat power plants differently, Congress would have required the [EPA] to decide only whether regulation remains 'necessary,' not whether regulation is 'appropriate *and* necessary'").

Commerce's rationale also reflects a big leap in logic.  Commerce assumes that, to the extent that Congress was concerned about Commerce's ability to quickly make determinations concerning the use of potentially tainted surrogate financial statements (or other surrogate values), Congress intended for Commerce to err on the side of *using* the potentially tainted data.  However, based on the language of Congress' instructions, it seems at least more likely (if not certain) that Congress intended Commerce to err on the side of *disregarding* such data   an approach that would serve both of Congress' goals:  (1) avoiding the use of tainted values and (2) allowing Commerce to make quick determinations without initiating a formal countervailing duty investigation.

Further, although Congress did express concern for Commerce's administrative convenience, Commerce's administrative convenience was not Congress' principal concern.  Congress' principal concern was ensuring that Commerce avoids the use of surrogate values (including surrogate

financial ratios derived from surrogate financial statements) where there is any "reason to . . . suspect" that those values "may be" subsidized.**[58]**

In light of points such as those outlined above, as well as discussions with counsel in the course of oral argument, this matter must be remanded to Commerce once again, to afford the agency a second opportunity to do what Shenzhen Xinboda I requested    *i.e.*, "to reconsider and fully explain its stated practice (in light of, *inter alia*, the legislative history of the 'reason to believe or suspect' standard, as well as the agency's fundamental obligation to base its determinations on substantial evidence on the record as a whole), to review and consider the evidence of alleged subsidies placed on the record by Xinboda (if appropriate), and to explain in detail the rationale for the agency's determination on remand."   Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1375-76; *see also id*., 38 CIT at ____ n.49, 976 F. Supp. 2d at 1375 n.49 (encouraging Commerce "to undertake a comprehensive review of its interpretation and application of the 'reason to believe or suspect' standard, . . . to ensure the consistency and coherency of its determination on remand and

---

[58]Commerce makes another similar argument based on a claim of administrative convenience. Specifically, Commerce asserts that "Congress cannot have intended that information indicating that a company is eligible to receive subsidies is sufficient to meet the 'reason to believe or suspect' standard because many companies are eligible for subsidies and such a standard would significantly limit the data available for [Commerce's] use." *See* Remand Results at 20.

For the reasons discussed above, like Commerce's other administrative convenience claim, this argument also holds little water.  And, to the extent that Commerce seeks to attribute to Congress a specific concern that an interpretation other than that which Commerce is now applying would "significantly limit the data available for [Commerce's] use," Congress' language evidences no such concern.

agency practice as a whole," and identifying various issues for consideration).[59]

## C. Zeroing

Xinboda's final remaining claim challenges Commerce's application of the agency's practice of "zeroing" in cases such as this, involving an administrative review of an exporter in a non-market economy country.   Xinboda contends that, rather than assigning a value of zero to sales where goods were sold at prices above the calculated normal value (*i.e.*, "zeroing"), Commerce instead should have used such sales to offset other sales where goods were sold at prices below normal value (*i.e.*, "offsetting").   *See generally* Complaint ¶¶ 13, 21-22 (Count IV); Pl.'s Brief at 34-44; Pl.'s Reply Brief at 10-14;  Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1385-88.[60]

---

[59]In the Remand Results, Commerce reaffirms the Final Determination's analysis of the relative comparability of Garlico, Tata Tea, and Xinboda, as well as the Final Determination's decision, based on that analysis, to rely on the financial statements of Tata Tea (to the exclusion of those of Garlico) in deriving surrogate financial ratios.  *See generally* Remand Results at 3, 21-28, 53-55; *see also* Issues & Decision Memorandum at 20-22; Shenzhen Xinboda I, 38 CIT at _____, 976 F. Supp. 2d at 1376-85.  Xinboda continues to contest Commerce's analysis and to dispute the agency's decision.  *See, e.g.*, Pl.'s Brief at 20, 29-34; Pl.'s Reply Brief at 9-10.  *But see* Def.'s Brief at 29-33; Def.-Ints.' Brief at 26-27, 30-34.  If, on remand, Commerce concludes that   in light of any changes, refinements, or clarifications to its interpretation and application of the "reason to believe or suspect" standard    Tata Tea's financial statements must be disregarded because there is (at a minimum) *reason to suspect* that those statements *may be* tainted by subsidies, Garlico's financial statements will be the only set of financial statements remaining for Commerce's use in deriving surrogate financial ratios.   Because such an outcome presumably would moot the issue of comparability, further consideration of the parties' arguments on the matter is not necessary at this time.

[60]The practice of "zeroing" is explained in greater detail in Union Steel.  *See generally* Union Steel v. United States, 36 CIT _____, _____, 823 F. Supp. 2d 1346, 1348-50 (2012), *aff'd*, 713 F.3d 1101, 1103-04 (Fed. Cir. 2013); *see also* JTEKT Corp. v. United States, 642 F.3d 1378, 1383-84 (Fed. Cir. 2011); Dongbu Steel Co. v. United States, 635 F.3d 1363, 1365-66 (Fed. Cir. 2011).

After the conclusion of the administrative review at issue here,  Commerce changed its policy

Acknowledging that Commerce's Final Determination "did not provide a full explanation

about its interpretation of the statute permitting offsetting . . . in certain proceedings but not in

others," the Government sought a voluntary remand to permit Commerce to "revisit the zeroing

issue," and, as appropriate, to further explain its decision. *See* Shenzhen Xinboda I, 38 CIT at ____,

976 F. Supp. 2d at 1387 (quoting Government's pre-remand brief); *see also* Issues & Decision

Memorandum at 31-33 (addressing Xinboda's challenge to use of zeroing).  Over the objections of

Xinboda, Shenzhen Xinboda I granted the Government's request.  *See* Shenzhen Xinboda I, 38 CIT

at ____, 976 F. Supp. 2d at 1388.

In the Remand Results, Commerce has continued to use zeroing in calculating Xinboda's

dumping margin.  *See generally* Remand Results at 29-44, 55-57.  The Remand Results rely heavily

on the Court of Appeals' decision in Union Steel, which affirmed Commerce's rationale for using

zeroing in administrative reviews   but not in investigations   as a reasonable interpretation of an

ambiguous statute.  *See* Remand Results at 35-36, 41-42, 55; Union Steel v. United States, 713 F.3d

1101 (Fed. Cir. 2013).

---

on zeroing in administrative reviews. *See* Antidumping Proceedings: Calculation of the Weighted-
Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final
Modification, 77 Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) (announcing Commerce's
adoption of the average-to-average methodology (without zeroing) as its default comparison method
for all administrative reviews, including both market economy and non-market economy
proceedings).  Commerce's change in policy did not entirely abandon the practice of zeroing in
administrative reviews; there is a caveat.  Under the new policy, Commerce compares "monthly
weighted-average export prices with monthly weighted-average normal values *and grants an offset*,
"except where [Commerce] determines that application of a different comparison method is more
appropriate."  Final Modification, 77 Fed. Reg. at 8102; *see, e.g.*, Fine Furniture (Shanghai) Ltd. v.
United States, 40 CIT ____, ____, 182 F. Supp. 3d 1350, 1367 (2016).

Xinboda contests Commerce's reliance on <u>Union Steel</u>, asserting that the Remand Results misrepresent the facts and implications of that case and arguing that Commerce's use of zeroing in administrative reviews involving non-market economy countries is unreasonable. *See generally* Pl.'s Brief at 35-43; Pl.'s Reply Brief at 10-14.

For example, much like the plaintiff in <u>Since Hardware</u> (where the same zeroing issue was raised),[61] Xinboda argues that <u>Union Steel</u> sustained Commerce's practice of zeroing in proceedings involving  market economy countries because of the "greater specificity" that zeroing provided in administrative reviews (where Commerce made "average-to-transaction" comparisons) relative to the "average-to-average" comparisons made in investigations.  *See* Pl.'s Brief at 42; *see also id.* at 40-41; Pl.'s Reply Brief at 11; <u>Since Hardware (Guangzhou) Co. v. United States</u>, 38 CIT ____, ____, 37 F. Supp. 3d 1354, 1361 (2014), *aff'd sub nom.* <u>Since Hardware (Guangzhou) Co. v. Home Prods. Int'l., Inc.</u>, 636 F. App'x 800 (Fed. Cir. 2016) (*per curiam*).  Like the plaintiff in <u>Since Hardware</u>, Xinboda asserts that <u>Union Steel</u>'s approval of Commerce's use of zeroing in administrative reviews    but not in investigations    "was only justified by the greater accuracy resulting from the use of monthly normal values (calculated from actual invoiced sales prices)."  *See* <u>Since Hardware</u>, 38 CIT at ____, 37 F. Supp. 3d at 1361-62*;* Pl.'s Brief at 40-41, 42-43; Pl.'s Reply Brief at 11-14.  Like the plaintiff in <u>Since Hardware</u>, Xinboda contends that, due to  Commerce's use of a yearly average normal value in the instant non-market economy administrative review

---

[61]In the course of oral argument on the Remand Results, Xinboda's counsel acknowledged that Xinboda's arguments in this case are framed to parallel the plaintiff's arguments before the Court of International Trade and the Court of Appeals in <u>Since Hardware</u>.  Plaintiffs in both cases are represented by the same counsel.

(instead of monthly average normal values), Union Steel does not apply.  *See* Pl.'s Brief at 42-43; *see also* Pl.'s Reply Brief at 10-14; Since Hardware, 38 CIT at ____, 37 F. Supp. 3d at 1362.  And like the plaintiff in Since Hardware, Xinboda concludes that zeroing in administrative reviews involving non-market economy countries "tends to artificially drive some sales below fair value and others above fair value" and "unfairly disadvantages NME [non-market economy] respondents."  *See* Pl.'s Brief at 43; Since Hardware, 38 CIT at ____, 37 F. Supp. 3d at 1362; *see also* Pl.'s Reply Brief at 10-14.  *But see* Def.'s Brief at 33-41; Def.-Int.'s Brief at 35.

The Government's brief cites the Court of International Trade's decision in Since Hardware, which had recently issued and which found no merit in the zeroing claims of the plaintiff there.  *See* Def.'s Brief at 37, 40-41; Since Hardware, 38 CIT at ____, 37 F. Supp. 3d at 1361-63.  As the Government observed here, "Xinboda's arguments [in this case] are the same arguments that the Court [of International Trade] rejected in Since Hardware."  *See* Def.'s Brief at 37.  In its Reply Brief, Xinboda sought to minimize the significance of that opinion, emphasizing that it was "not a final court decision."  Pl.'s Reply Brief at 12.  Xinboda's statement was correct at the time that Xinboda made it, but it is no longer true.

The plaintiff in Since Hardware appealed the zeroing issue, and the Court of Appeals affirmed the decision of the Court of International Trade dismissing Since Hardware's zeroing claims.  *See* Since Hardware, 636 F. App'x 800.  The same result must obtain here.  Xinboda's challenge to  Commerce's use of zeroing in the administrative review at issue here therefore must be rejected.

## IV.  <u>Conclusion</u>

For all the reasons set forth above, the Final Results of Redetermination Pursuant to Remand must be sustained as to Commerce's determination on the surrogate value for labor, as well as Commerce's application of zeroing in this administrative review.  This matter is again remanded to Commerce for further consideration of the surrogate value for whole raw garlic bulbs and the selection of surrogate financial statements for use in calculating surrogate financial ratios.

A separate order will enter accordingly.

_____/s/ Delissa A. Ridgway_____
Delissa A. Ridgway
Judge

Dated:  December 15, 2017
        New York, New York