Slip Op. 19-16

UNITED STATES COURT OF INTERNATIONAL TRADE

SHENZHEN XINBODA INDUSTRIAL CO., LTD.,  :

                     *Plaintiff*,          :

      v.                        :

UNITED STATES,             :

              *Defendant*,      :      Court No. 11-00267

       and                  :

FRESH GARLIC PRODUCERS ASSOCIATION,  :
CHRISTOPHER RANCH, L.L.C., THE
GARLIC COMPANY, VALLEY GARLIC,     :
and VESSEY AND COMPANY, INC.,

                            :

           *Defendant-Intervenors.*

[Sustaining Second Remand Results]

Dated:  January 30, 2019

    Gregory S. Menegaz, Judith L. Holdsworth, Alexandra H. Salzman, and J. Kevin Horgan, deKieffer & Horgan, PLLC, of Washington, D.C., appeared for Plaintiff.

    Richard P. Schroeder, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., appeared for Defendant, joined by Chad A. Readler, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch.  Of counsel was Emma T. Hunter, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

    Michael J. Coursey, Kelley Drye & Warren LLP, of Washington, D.C., appeared for Defendant-Intervenors, joined by John M. Herrmann.

# OPINION

RIDGWAY, Judge:

Plaintiff Shenzhen Xinboda Industrial Co., Ltd. ("Xinboda") – a Chinese exporter of fresh garlic – commenced this action to contest the Final Determination in the U.S. Department of Commerce's fifteenth administrative review of the antidumping duty order covering fresh garlic from the People's Republic of China.  *See* Fresh Garlic from the People's Republic of China: Final Results and Final Rescission, in Part, of the 2008-2009 Antidumping Duty Administrative Review, 76 Fed. Reg. 37, 321 (June 27, 2011) ("Final Determination"); Issues and Decision Memorandum for the Final Results of the 15th Administrative Review of Fresh Garlic from the People's Republic of China (June 20, 2011) (AR Pub. Doc. No. 176) ("Issues & Decision Memorandum"); *see generally* Shenzhen Xinboda Industrial Co. v. United States, 38 CIT ____, 976 F. Supp 2d 1333 (2014) ("Shenzhen Xinboda I"); Shenzhen Xinboda Industrial Co. v. United States, 41 CIT ____, 279 F. Supp. 3d 1265 (2017) ("Shenzhen Xinboda II").[1]  In its Complaint, Xinboda challenged Commerce's decisions in its Final Determination as to the surrogate financial statements used to

---

[1]Because this action has been remanded to Commerce twice, there are three administrative records – the initial administrative record (comprised of the information on which the agency's Final Determination was based) ("AR"), the supplemental administrative record compiled during the course of the first remand ("SAR"), and the second supplemental administrative record compiled during the most recent (second) remand ("SSAR").

Each of the three administrative records includes confidential (*i.e.*, business proprietary) information.  Therefore, there are two versions of each of the records – a public version and a confidential version.  The public versions of all three records consist of copies of all public documents in the record, as well as public versions of confidential documents with all confidential information redacted.  The confidential versions consist of complete, un-redacted copies of documents on the record that include confidential information.  The number of the public version of a document is different than the number of the confidential version of the same document.

All citations to the three administrative records herein are to the public versions.  These public documents are cited as "AR Pub. Doc. No. ____," "SAR Pub. Doc. No. ____," and "SSAR Pub. Doc. No. ____," respectively.

derive surrogate financial ratios, the surrogate value for labor (*i.e.*, the surrogate wage rate), and the surrogate value for fresh whole raw garlic bulbs, as well as the agency's application of its "zeroing" methodology in calculating Xinboda's dumping margin.  *See generally* Complaint; *see also* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp 2d at 1345-46.

Ruling on Xinboda's Motion for Judgment on the Agency Record, Shenzhen Xinboda I remanded this matter to Commerce for further consideration of all four issues, including a voluntary remand on the surrogate value for labor.  *See generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp 2d at 1388.  Shenzhen Xinboda II sustained Commerce's remand determination as to the surrogate value for labor and the agency's application of zeroing, but remanded the matter for a second time to permit Commerce to further consider the surrogate value for garlic bulbs and the selection of financial statements.  *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1265 *et seq*.; Final Results of Redetermination Pursuant to Remand (SAR Pub. Doc. No. 7) ("First Remand Results").

Now pending are Commerce's Second Remand Results, which have been filed under protest as to the surrogate value for garlic bulbs.  *See generally* Final Results of Redetermination Pursuant to Remand ("Second Remand Results").  Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[2]  For the reasons set forth below, the Second Remand Results must be sustained.

## I. Background

---

[2]Except as otherwise indicated, all citations to statutes herein are to the 2006 edition of the United States Code.  Similarly, the pertinent statutory text remained the same at all relevant times, except as otherwise indicated.

Shenzhen Xinboda I set forth the relevant statutory scheme, including statutory citations and other pertinent authorities.  *See* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp 2d at 1338-45.  That explanation, together with other relevant background, was summarized in Shenzhen Xinboda II, in the interests of convenience and completeness.  *See*  Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1269-76.  The discussion below is largely limited to the two issues addressed in the Second Remand Results – the surrogate value for garlic bulbs and the selection of surrogate financial statements.

Commerce's Surrogate Value for Garlic Bulbs.   In the course of the underlying administrative review, Commerce compiled voluminous information on Xinboda and its operations, particularly the company's exports of garlic to the U.S. from China.  Commerce similarly compiled detailed information on Zhenzhou Dadi Garlic Industry Co., Ltd. ("Dadi"), the affiliated processor/producer that supplied Xinboda with garlic products that Dadi produced from the fresh whole raw garlic bulbs that Dadi purchased from local Chinese garlic farmers.  Dadi processed the whole raw garlic bulbs that it purchased – which had diameters of between 50 mm and 65 mm – into whole garlic bulbs and peeled garlic cloves for Xinboda.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1271.

To produce whole fresh garlic, Chinese garlic farmers delivered to Dadi whole raw garlic bulbs, sorted by size, in large mesh bags.  Dadi workers sitting at tables in a simple warehouse then rub off the outer skins of the whole raw garlic bulbs (to give the bulbs a clean white appearance), cut or trim the roots and stems, place the bulbs into small mesh bags (typically holding three to five bulbs, depending on the customer), and affix the customer's labels to seal the bags.  Bags are then packed into cartons, ready for shipping.  Dadi's process for the production of

peeled garlic cloves is similarly simple and straightforward.  *See* <u>Shenzhen Xinboda II</u>, 41 CIT at

____, 279 F. Supp. 3d at 1271.

As a surrogate value for the whole raw garlic bulbs that Chinese farmers delivered to Dadi,

Commerce's Final Determination relied on size-specific prices for garlic bulbs sold at a large

produce market in India (the surrogate market economy country in this case).  Specifically,

Commerce used the prices for bulbs sold at the Azadpur Market (located near Delhi), as published

in the Azadpur Market Information Bulletin.  Commerce rejected the other potential sources of

data on the record based on Commerce's determination that those sources do not specify the size

of the garlic bulbs that were priced.  *See* <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at

1272.[3]

To value the raw garlic bulbs delivered to Dadi that had a diameter of greater than 55 mm,

the Final Determination relied on non-contemporaneous Azadpur Market prices for garlic bulbs

classified as "grade S.A." (or "Super-A"), which Commerce then indexed (inflated) to be

contemporaneous with the dates of the period of review.  Commerce used non-contemporaneous

prices to value this larger-bulb garlic because the Azadpur Market Bulletin ceased publishing

prices for grade S.A. garlic some months before the period of review.  *See* <u>Shenzhen Xinboda II</u>,

41 CIT at ____, 279 F. Supp. 3d at 1272.

_____

[3]In addition to the Azadpur Market prices, other potential sources of data on the record
include the prices for whole raw garlic bulbs included in the financial statements of Garlico
Industries, Indian World Trade Atlas import statistics, Indian export statistics, Indian domestic
market data from government sources (including data from India's National Horticultural Board
and data from the Indian Spices Board), and data from the Indian Agricultural Marketing
Information Network ("AGMARKNET"), a database maintained by India's Ministry of
Agriculture.  Xinboda has favored use of the Garlico prices.  *See* <u>Shenzhen Xinboda II</u>, 41 CIT at
____ n.5, 279 F. Supp. 3d at 1272 n.5.

To value the garlic bulbs delivered to Dadi that were somewhat smaller (with a diameter of between 50 mm and 55 mm), the Final Determination averaged the non-contemporaneous but indexed Azadpur Market prices for grade S.A. bulbs (described above) together with contemporaneous Azadpur Market prices for "grade A" garlic (*i.e.*, prices for grade A garlic from within the period of review). *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1272.

Xinboda has contested Commerce's use of the Azadpur Market prices, asserting three different claims – that Commerce's calculations are (in effect) tainted by "double-counting" because the garlic bulbs delivered to Dadi are less highly processed than those sold at the Azadpur Market; that the Azadpur Market prices include substantial "intermediary" expenses that Dadi did not incur; and that Commerce should exclude prices for grade S.A. garlic from its calculations because the prices for grade A garlic already include the larger-bulb garlic that was previously sold as grade S.A. Commerce has rejected each of the three claims. *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1274-75; First Remand Results at 3-14, 44-47; Issues & Decision Memorandum at 10-15 (Comment 3).

The Selection of Surrogate Financial Statements. Valuing the various direct inputs that are used to produce goods does not capture certain costs that must be factored into prices – specifically, manufacturing/factory overhead, selling, general and administrative expenses ("SG&A"), and profit. Commerce calculates surrogate values for those three items using surrogate financial ratios that it derives from the financial statements of one or more companies that produce the same or comparable merchandise in the surrogate market economy country. In its Final Determination here, Commerce derived Xinboda's surrogate financial ratios from the unconsolidated financial statements of Tata Global Beverages Limited (specifically, Tata Tea), an Indian company that

grows, processes, and sells coffee and tea products.  *See* Shenzhen Xinboda II, 41 CIT at ____,

279 F. Supp. 3d at 1273.

Because Congress directed Commerce to disregard a company's data (whenever possible)

where the agency has "reason to believe or suspect" that the company may have received subsidies,

Commerce selected the financial statements of Tata Tea over the other sets of financial statements

on the record based on, *inter alia*, Commerce's determination that all but one of the other five had

received subsidies that the agency had previously determined to be countervailable.  *See* Omnibus

Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No.

100-576 at 590-91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24) (stating that, in

determining surrogate values for factors of production, "Commerce shall avoid using any prices

which it has reason to believe or suspect may be dumped or subsidized prices"); Shenzhen Xinboda

II, 41 CIT at ____, 279 F. Supp. 3d at 1273-74.  Xinboda maintains that there is evidence on the

record that gives "reason to believe or suspect" that Tata Tea "may" have received subsidies, such

that its financial statements also should be disregarded.  However, Commerce has rejected that

position.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1273-74; First Remand

Results at 14-21, 48-52; Issues & Decision Memorandum at 18-22 (Comment 6).[4]

---

[4]In addition to the financial statements of Tata Global/Tata Tea, other financial statements
on the record include the statements of Garlico, Limtex (India) Limited, LT Foods Ltd., ADF
Foods Ltd., and REI Agro Limited.  Xinboda has favored the use of Garlico's financial statements.
Although Commerce found no indication that Garlico has received subsidies, Commerce
concluded that Garlico's operations are not sufficiently similar to those of Xinboda.  *See* Shenzhen
Xinboda II, 41 CIT at ____ & n.7, 279 F. Supp. 3d at 1273 & n.7.

Issuance of the Final Determination and Subsequent Proceedings.   In its Final Determination, Commerce assigned Xinboda a weighted-average dumping margin of $0.06 per kilogram.  *See* Final Determination, 76 Fed. Reg. at 37,326; Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1274.

Xinboda challenged the Final Determination, commencing this litigation and raising four issues in its Complaint – Commerce's selection of financial statements for use in calculating surrogate financial ratios, the surrogate wage rate, the surrogate value for garlic bulbs, and Commerce's application of its "zeroing" methodology in calculating Xinboda's dumping margin. *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1274-75.  Ruling on Xinboda's Motion for Judgment on the Agency Record, Shenzhen Xinboda I remanded this matter to Commerce for further consideration of all four issues, including a voluntary remand on the surrogate value for labor (*i.e.*, the surrogate wage rate) at Commerce's request.  *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1275.

In the First Remand Results, Commerce revised Xinboda's dumping margin to $0.02 per kilogram.  *See* First Remand Results at 1, 3, 57.  Commerce revised the surrogate value for labor to be consistent with the agency's Revised Labor Methodology and based that value exclusively on labor data for India.  In addition, the First Remand Results continued to apply Commerce's zeroing methodology, but provided a more expansive explanation of the bases for its application. *See generally* Shenzhen Xinboda II, 41 CIT at ____, ____, 279 F. Supp. 3d at 1275, 1277-78 (discussing surrogate value for labor); *id*. at 1275-76, 1315-17 (discussing zeroing); First Remand Results at 3, 29, 57 (discussing surrogate value for labor); *id*. at 29-44, 55-57 (discussing zeroing). Shenzhen Xinboda II sustained the First Remand Results as to these two issues.  *See* Shenzhen

Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1277-78 (discussing surrogate value for labor); *id.*

at 1315-17 (discussing zeroing).

     As to the surrogate value for garlic bulbs, the First Remand Results continued to rely on

the Azadpur Market prices (as in the Final Determination), with one adjustment to Commerce's

calculations to account for freight costs for the transportation of garlic from Indian farms to the

Azadpur Market.  Similarly, the First Remand Results continued to use the financial statements of

Tata Tea to derive surrogate financial ratios, with a minor adjustment for the costs associated with

tea leaf grown by Tata Tea for its own consumption.  *See generally* Shenzhen Xinboda II, 41 CIT

at ____, 279 F. Supp. 3d at 1275, 1278-1305 (discussing surrogate value for garlic bulbs); *id.*, 41

CIT at ____, 279 F. Supp. 3d at 1275, 1305-15 (discussing selection of financial statements); First

Remand Results at 3-14, 44-47, 57 (discussing surrogate value for garlic bulbs); *id.* at 14-28, 48-

52 (discussing selection of financial statements).  Shenzhen Xinboda II remanded this matter to

Commerce once again, to permit Commerce to further consider these two remaining issues.  *See*

Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1278-1305 (analyzing First Remand

Results as to surrogate value for garlic bulbs and remanding issue for second time); *id.* at 1305-15

(analyzing First Remand Results as to selection of financial statements and remanding issue for

second time).

     In the Second Remand Results, Commerce has continued to base the surrogate value for

garlic bulbs on the Azadpur Market prices.  *See* Second Remand Results at 1-2, 5, 16, 35.

However, as detailed below, Commerce has made certain revisions to its calculations, under

protest, that are responsive to Xinboda's claims.  Specifically, Commerce has made an adjustment

to avoid double-counting and account for differences in the condition (the extent of processing) of

the garlic bulbs that are delivered to Dadi and the bulbs that are sold at the Azadpur Market.  *See id*. at 5, 16-17, 35.   Further, Commerce has made an adjustment to account for intermediary expenses that Dadi does not incur, but which are reflected in the prices of garlic bulbs sold at the Azadpur Market.  *See id*.  In addition, Commerce has excluded prices for grade S.A. garlic bulbs from its calculations, basing its revised surrogate value solely on price data for grade A bulbs.  *See id*. at 1-2, 5, 6, 35.

To calculate surrogate financial ratios, the Second Remand Results continue to rely on the financial statements of Tata Tea.  *See* Second Remand Results at 2, 5, 28, 36.  Commerce explains that the "reason to believe or suspect" standard has been supplanted by a new standard, which – according to Commerce – applies here.  *See id*. at 17-20, 22-23, 25-26, 28, 30-33, 36.  Commerce further states that the evidence that Xinboda has submitted as proof of potential subsidies is insufficient to cause Commerce to disregard the Tata Tea's statements, no matter which standard applies.  *See id*. at 24, 26-28, 33-35, 36.

The Second Remand Results revise Xinboda's dumping margin to $0.00 per kilogram.  *See* Second Remand Results at 2, 36.

## II.  <u>Standard of Review</u>

In reviewing a remand determination by Commerce in an antidumping duty case, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* <u>Maverick Tube Corp. v. United States</u>, 857 F.3d 1353, 1359 (Fed. Cir. 2017); <u>CS Wind Vietnam Co. v. United States</u>, 832 F.3d 1367, 1376 (Fed. Cir. 2016).  Substantial

evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); *see also* Dongtai Peak Honey Industry Co. v. United States, 777 F.3d 1343, 1349 (Fed. Cir. 2015) (same).

Moreover, any determination as to the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); *see also* CS Wind Vietnam Co., 832 F.3d at 1373. That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence. Dongtai Peak Honey Industry Co., 777 F.3d at 1349 (citing Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966)).

In addition, a remand determination is reviewed for compliance with the court's remand order. *See*, *e.g.*, Zhaoqing Tifo New Fibre Co. v. United States, 42 CIT ____, ____, 2018 WL 6311775 * 10 (2018) ("Zhaoqing Tifo III"); Since Hardware (Guangzhou) Co. v. United States, 39 CIT ____, ____, 49 F. Supp. 3d 1268, 1272 (2015); *cf.* Changzhou Wujin Fine Chemical Factory Co. v. United States, 701 F.3d 1367, 1374-75 (analyzing on review whether Commerce's remand results were "within the scope of the Court of International Trade's remand order").

Further, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009). Commerce's rationale nevertheless must address the parties' principal arguments; and,

more generally, "the path of Commerce's decision must be reasonably discernable" in order to support judicial review. *Id.* (citing <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co.</u>, 463 U.S. 29, 43 (1983)); 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties"); *see generally* <u>CS Wind Vietnam Co.</u>, 832 F.3d at 1375-81 (highlighting agency's "obligation to set forth a comprehensible and satisfactory justification for its [determination] as a reasonable implementation of statutory directives supported by substantial evidence," and analyzing that obligation in depth).

Lastly, under the familiar <u>Chevron</u> framework, Commerce's statutory interpretations are reviewed using a two-step analysis, examining first "whether Congress has directly spoken to the precise question at issue." <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Council</u>, 467 U.S. 837, 842 (1984). If so, the court "must give effect to the unambiguously expressed intent of Congress." *Id.*, 467 U.S. at 842-43. On the other hand, "if the statute is silent or ambiguous with respect to the specific issue," the analysis proceeds to the second step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*, 467 U.S. at 843.

### III.  <u>Analysis</u>

As discussed below, the Second Remand Results address the two issues remanded to Commerce in <u>Shenzhen Xinboda II</u> – the surrogate value for the garlic bulbs delivered to Dadi and the selection of financial statements for use in deriving surrogate financial ratios.

### A.  <u>The Surrogate Value for Fresh Whole Raw Garlic Bulbs</u>

Shenzhen Xinboda II remanded to Commerce Xinboda's claim contesting Commerce's use of the Azadpur Market price data for grade A and grade S.A. garlic as a surrogate for the raw garlic bulbs that were delivered to Dadi (which then processed them to produce garlic products for Xinboda). *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1278-1305.

The Second Remand Results address each of the three issues that were remanded – *i.e.*, Xinboda's argument that there are significant differences between the condition (stage of processing) of the garlic bulbs delivered to Dadi compared to those sold at the Azadpur Market, and that Commerce's calculations essentially reflect "double counting"; Xinboda's argument that Commerce has not accounted for significant "intermediary expenses" that are reflected in the Azadpur Market prices but which are not incurred by Dadi; and Xinboda's argument that Commerce's use of prices for grade S.A. garlic bulbs is not justified because garlic bulbs of the size previously classified as grade S.A. are included in the price data for garlic bulbs classified as grade A. *See* Second Remand Results at 5, 16-17 (addressing differences in the conditions of the garlic bulbs); *id*. at 5, 17 (addressing "intermediary expenses"); *id*. at 5-6 (addressing use of grade S.A. garlic bulbs in calculating surrogate value for garlic bubs).

In the Second Remand Results, Commerce makes certain adjustments to its calculations in response to each of the three issues. However, Commerce does so under protest. Each of the three issues is reviewed *seriatim* below.

## 1.  Adjustments to Avoid Double-Counting
and to Account For Conditions of Garlic Bulbs

Shenzhen Xinboda II explained that Commerce's Final Determination, as well as the First Remand Results, relied on the Azadpur Market price data in calculating the surrogate value for fresh whole raw garlic bulbs, essentially equating the condition of the garlic bulbs that are sold at the Azadpur Market with the condition of the garlic bulbs that are procured by, and delivered to, Dadi.   However, as Shenzhen Xinboda II noted, that equivalency is squarely at odds with the existing administrative record.  See Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1279-94.

### a.  The Condition of the Garlic Bulbs Sold at the Azadpur Market

Shenzhen Xinboda II explained that neither Commerce nor the Domestic Producers placed on the administrative record any evidence to establish the basic condition of the garlic bulbs sold at the Azadpur Market.  See Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1280-81 & n.15.   In the First Remand Results, Commerce candidly admitted that the record is devoid of evidence "indicating the exact nature of the Azadpur surrogate input," apart from the Researcher Declaration proffered by Xinboda.  See, e.g., Shenzhen Xinboda II, 41 CIT at ____ n.12, 279 F. Supp. 3d at 1279 n.12 (quoting First Remand Results at 46-47).

In the Researcher Declaration (the sole record evidence that speaks directly to the condition of the garlic sold at the Azadpur Market), a research consultant based in India attests, under oath, to his first-hand findings and observations based on a visit that he made to the Azadpur Market. See generally Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1280-89 (discussing Declaration of Xinboda Research Consultant," "Survey of Garlic Offerings – Azadpur Market, New Delhi ("Researcher Declaration") (Pub. Doc. No. 138)).

According to the Researcher Declaration, the garlic bulbs that are sold at the Azadpur

Market are in a "ready to be consumed" condition – *i.e.*, "the outside dirty layers" of the garlic

bulbs have already been removed, giving the bulbs "a fresh white appearance"; any "long stems"

have already been cut; and the bulbs have been "packaged in a mesh bag" for sale.  Researcher

Declaration ¶ 9.  Neither Commerce nor the Domestic Producers point to any record evidence to

the contrary.  Nor – on the existing evidentiary record – could they do so.  *See*, *e.g.*, Shenzhen

Xinboda II, 41 CIT at _____ & n.15, 279 F. Supp. 3d at 1281 & n.15.[5]  On remand, Commerce

---

[5]Shenzhen Xinboda II emphasized that "this is not a situation where Commerce is
confronted with two [different pieces of evidence] that address the same point but take positions
that are diametrically opposite," leaving Commerce to weigh their relative merits and decide which
is more reliable or probative.  Shenzhen Xinboda II, 41 CIT at _____ n.17, 279 F. Supp. 3d at 1284
n.17.  Rather, here "there is nothing anywhere in the administrative record that contradicts the
Researcher Declaration's statements."  *Id.*

Fundamental fairness and longstanding agency practice require that the party advocating
for the use of a particular surrogate value bear the burden of establishing what that value represents.
Here, it is Commerce and the Domestic Producers that have advocated for use of the Azadpur
Market prices for garlic.  Yet the Domestic Producers have adduced no affirmative evidence as to
what the Azadpur Market prices represent – *i.e.*, no affirmative evidence at all as to the basic
condition of the garlic that is sold at the market.  *See generally* Shenzhen Xinboda II, 41 CIT at
_____ n.15, 279 F. Supp. 3d at 1281 n.15.

Moreover, Shenzhen Xinboda II observed that, as a practical matter, apart from any legal
obligation to proffer evidence as to the condition of the garlic sold at the Azadpur Market, the
Domestic Producers (and Commerce), as the proponents of the Azadpur Market prices, have an
obvious incentive to place on the record *affirmative evidence* to refute the statements in the
Researcher Declaration, if those statements are in any way incorrect.  It is telling that the Domestic
Producers (and Commerce) have never done so.  *See* Shenzhen Xinboda II, 41 CIT at _____ n.15,
279 F. Supp. 3d at 1281 n.15.  Neither Commerce nor the Domestic Producers have ever asserted
that the factual statements in the Researcher Declaration are untrue.

Instead, the Domestic Producers (and Commerce) have contented themselves with
challenging the reliability of the Researcher Declaration – the only record evidence on point – on
technical, evidentiary grounds.  *See* Shenzhen Xinboda II, 41 CIT at _____ n.15, 279 F. Supp. 3d
at 1281 n.15.  It is worth noting that Commerce and the Domestic Producers did not dispute the

reliability of the Researcher Declaration in the underlying administrative review. Commerce didn't even mention the Researcher Declaration in the Issues & Decision Memorandum that the agency released with its Final Determination. *See* Issues & Decision Memorandum at 10-15 (discussing surrogate value for garlic bulbs with no reference whatsoever to Researcher Declaration).

Shenzhen Xinboda II undertook a rigorous, point-by-point review of the criticisms of the Researcher Declaration leveled by Commerce and the Domestic Producers, and concluded that the criticisms were "largely without merit" and that Commerce's "sweeping wholesale dismissal" of the Declaration in the First Remand Results was "unwarranted." *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1289; *see generally id.*, 41 CIT at ____, 279 F. Supp. 3d at 1281-89 (analyzing in detail the criticisms of the Researcher Declaration that Commerce and Domestic Producers have asserted).

Even so, of course, Shenzhen Xinboda II did not *require* Commerce to *credit* the Researcher Declaration – except to the extent that the Declaration was the sole record evidence as to the condition of the garlic sold at the Azadpur Market (the surrogate value on which Commerce chose to rely). Following Shenzhen Xinboda II (as well as Shenzhen Xinboda I), Commerce was entirely free on remand to reopen the administrative record to receive evidence contradicting the statements in the Researcher Declaration, assuming that such evidence exists (and, assuming that its explanation were reasonable, Commerce then could have relied on such new evidence over the statements in the Researcher Declaration). Significantly, however, Commerce elected not to reopen the record.

Lastly, as underscored in Shenzhen Xinboda II, Commerce must have substantial record evidence to support its determinations, including the surrogate values on which it chooses to rely. Because the Researcher Declaration is the only evidence on this record that goes to the condition (*i.e.*, the stage of processing) of the garlic sold at the Azadpur Market, it is unlikely that Commerce's use of the Azadpur Market prices as the surrogate value for the garlic bulbs delivered to Dadi could be sustained if the Researcher Declaration were to be disregarded. *See* Shenzhen Xinboda II, 41 CIT at ____ n.24, 279 F. Supp. 3d at 1289 n.24; *see also, e.g.*, Taian Ziyang Food Co. v. United States, 35 CIT 863, 908, 783 F. Supp. 2d 1292, 1331 (2011) ("Taian II") (highlighting, *inter alia*, Commerce obligation to ensure that surrogate value that the agency chooses is "anchored by substantial evidence in the administrative record"); *id.*, 35 CIT at 905 n.40, 783 F. Supp. 2d at 1329 n.40 (quoting Hebei Metals for proposition that "Commerce has certain core investigatory duties which cannot be avoided," such that, where the existing administrative record does not provide the requisite support for the surrogate value selected by the agency, that surrogate value cannot be sustained and Commerce must "further develop the record – by, for example, supplementing [it] with data from another source, if necessary"); Hebei Metals & Minerals Import & Export Corp. v. United States, 29 CIT 288, 295-96 & n.3, 366 F. Supp. 2d 1264, 1270-71 & n.3 (2005) (rejecting notion that Commerce is permitted to rely on a surrogate value that has "an unexplained relation" to the input (factor of production) for which it serves as a

could have reopened the administrative record to receive evidence to contradict the Researcher

Declaration, assuming that such evidence exists.  However, Commerce chose not to do so.

### b.  The Condition of the Garlic Bulbs Delivered to Dadi

As outlined above, the sole record evidence concerning the condition (stage of processing)

of the garlic bulbs sold at the Azadpur Market indicates that the "the outside dirty layers" of those

bulbs have already been removed, leaving the bulbs with "a fresh white appearance," and that any

"long stems" have already been cut.  *See* Researcher Declaration ¶ 9.  As Shenzhen Xinboda II

explained, the undisputed record evidence establishes that the garlic bulbs that were delivered to

---

proxy, and ruling that "Commerce was required to obtain adequate evidence for the [surrogate]
value it selected"); Jacobi Carbons AB v. United States, 42 CIT ____, ____n.27, 313 F. Supp. 3d
1344, 1359 n.27 (2018) (quoting Taian II for proposition that "Commerce must 'obtain adequate
evidence' for its surrogate values"); Jinan Yipin Corp. v. United States, 35 CIT 1254, 1299, 800
F. Supp. 2d 1226, 1265 (2011) (ruling that "Commerce is required to support the surrogate value
that it selects with substantial evidence," and quoting Hebei Metals for proposition that Commerce
is obligated "to obtain adequate evidence for the value [the agency] selects"); *id.*, 35 CIT at 295
n.93, 800 F. Supp. 2d at 1303 n.93 (quoting Hebei Metals for proposition that "Commerce has
certain core investigatory duties, which cannot be avoided," and explaining that, accordingly, "if
the record in a case is such that none of the data sources on record is sufficient to permit Commerce
to *reasonably* rely on it, Commerce is not permitted to choose 'the lesser of the evils'"; quoting
Hebei Metals as stating that the statute "'does not permit Commerce to choose between two
*unreasonable* choices, *i.e.*, two surrogate . . . values that have an unexplained relation' to the input
that the agency is valuing") (latter emphasis added); Taian Ziyang Food Co. v. United States, 33
CIT 828, 890, 637 F. Supp. 2d 1093, 1147 (2009) ("Taian I") (quoting Hebei Metals for
proposition that "'best available information' standard . . . does not permit Commerce to choose
between two unreasonable choices, *i.e.*, two surrogate coal values that have an unexplained relation
to the coal used by [the respondent] . . . Commerce [is] required to obtain adequate evidence for
the value it selected"); Zhengzhou Harmoni Spice Co. v. United States, 33 CIT 453, 491, 617 F.
Supp. 2d 1281, 1315 (2009) (quoting Hebei Metals for proposition that "Commerce [is] required
to obtain adequate evidence for the [surrogate] value it selected") (emphasis omitted).

This point was never addressed by Commerce, the Government, or the Domestic
Producers.

Dadi were, by contrast, relatively unprocessed.  *See generally* <u>Shenzhen Xinboda II</u>, 41 CIT at

____, 279 F. Supp. 3d at 1289-94.

Specifically, undisputed record evidence establishes that, *after* garlic bulbs were delivered

to Dadi, the workers at Dadi's processing facilities peeled away the garlic bulbs' outer layers, and

the workers cut the bulbs' roots and stems.  In the agency's Verification Report, Commerce staffers

noted their own first-hand, eyewitness observations to that effect: "[Dadi's] production process

includes peeling off [the garlic bulbs'] outer skins" and "cutting root[s] and stem[s]."  *See*

Verification of the Sales and Factors Responses of Shenzhen Xinboda Industrial Co., Ltd. in the

Administrative Review of Fresh Garlic from the People's Republic of China at 9 ("Verification

Report") (AR Pub. Doc. No. 151).

Neither Commerce nor the Domestic Producers cite any record evidence to controvert the

findings in the Verification Report.  Nor – on the existing administrative record – could they do

so.  *See*, *e.g.*, <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1293.[6]  On remand,

---

[6]As with the record on the condition (stage of processing) of the garlic bulbs sold at the Azadpur Market (*see supra* n.5), so too the record on the condition of the garlic bulbs delivered to Dadi is not a situation where Commerce is confronted with contradictory evidence and must use its expert judgment to decide which evidence to credit as more reliable or more probative.  Here, there is nothing in the administrative record that contradicts the Commerce staffers' findings that Dadi's workers strip away the outside layers of the garlic bulbs, and cut the roots and stems, after the garlic bulbs are delivered to Dadi.

Further, quite apart from any legal obligation that they may have had to proffer evidence in support of their position on the condition of the garlic bulbs delivered to Dadi (whatever that position may be), it is also the case that – as a practical matter – the Domestic Producers (and Commerce) have a clear incentive to place on the record evidence to refute the relevant statements in Commerce's Verification Report, if those statements are in any way untrue.  They never did so. *See* <u>Shenzhen Xinboda II</u>, 41 CIT at ____ n.15, 279 F. Supp. 3d at 1281 n.15.

Commerce could have reopened the administrative record to receive evidence to contradict the Verification Report on this point, assuming that such evidence exists. But Commerce elected not to do so.

### c.   Commerce's Second Remand Results

As a matter of basic logic, because Dadi's workers peeled off the outer skins of the garlic bulbs that were delivered to Dadi, and cut their roots and stems, the garlic bulbs delivered to Dadi were – by definition – less highly processed than the garlic bulbs sold at the Azadpur Market. As detailed above, the "long stems" of the garlic bulbs sold at the Azadpur Market already had been cut off and the "outside dirty layers" of the bulbs already had been removed. As such, the undisputed record evidence compels the conclusion that – contrary to Commerce's findings in the Final Determination and in the First Remand Results – the condition of the garlic bulbs delivered to Dadi cannot be equated with the condition of the garlic bulbs sold at the Azadpur Market; Commerce's calculations reflect double-counting; and Commerce cannot use the Azadpur Market prices as the surrogate value for the cost of the garlic bulbs delivered to Dadi, at least not without appropriate adjustments. *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1294.

For purposes of the Second Remand Results, Commerce "reviewed the record evidence and adjusted Xinboda's margin to avoid overcounting of processing expenses," ensuring that any expenses relating to "further processing . . . [that are] embedded in the Azadpur bulb prices would not also be added to Xinboda's margin calculation." Second Remand Results at 17. The Second Remand Results state that Commerce has made those adjustments "under respectful protest." *See, e.g.*, *id.* at 1.

To be clear, however, Commerce has nothing to protest.  The foregoing analysis comparing

the condition of the garlic bulbs sold at the Azadpur Market and the condition of the garlic bulbs

delivered to Dadi was spelled out at some length in <u>Shenzhen Xinboda II</u> and has not been

contested – not by Commerce, not by the Government, and not by the Domestic Producers.  *See*

*generally* <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1279-94.  Further, no party

has pointed to even a scintilla of record evidence to controvert the evidence discussed in the

analysis – not in this litigation, not in the course of either of the two remands, and not in the course

of the underlying administrative review.  To the extent that Commerce or the Domestic Producers

believed the existing record evidence to be inaccurate, Commerce could have reopened the

administrative record to receive additional evidence; but Commerce never did so.

Moreover, contrary to Commerce's implication, <u>Shenzhen Xinboda II</u> did not require

Commerce to make any adjustments at all to its calculations,[7] except to the extent that Commerce

---

[7]Indeed, not only did <u>Shenzhen Xinboda II</u> not require Commerce to make any particular adjustments to the Azadpur Market prices, but, in fact, <u>Shenzhen Xinboda II</u> did not even require Commerce to use the Azadpur Market prices.  *See* <u>Shenzhen Xinboda II</u>, 41 CIT at ____ & n.28, 279 F. Supp. 3d at 1294 & n.28 (remanding to allow the agency to once again "reconsider its selection of a surrogate value" and noting, *inter alia*, that it was at least possible that, on remand, "Commerce [would] select the Garlico prices" as the surrogate value for garlic bulbs); *id.*, 41 CIT at ____, 279 F. Supp. 3d at 1302 (remanding "intermediary expenses" issue and indicating that, on remand, Commerce should "make any necessary adjustments to the Azadpur Market prices (or whatever other surrogate value Commerce may choose)").

On remand, Commerce conceivably could have even reopened the administrative record to receive some new set of data for possible use in calculating the surrogate value for the garlic bulbs at issue.  *See generally*, *e.g.*, <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1294 (referring to "all *existing* record evidence") (emphasis added); *id.*, 41 CIT at ____ n.28, 279 F. Supp. 3d at 1294 n.28 (noting that, in reevaluating its choice of surrogate value on remand, Commerce should consider not only "the strengths and weaknesses of the data sources on the record," but also "any other data that Commerce may deem appropriate") *id.*, 41 CIT at ____, 279 F. Supp. 3d at 1297 (noting that the proposition that the condition of the garlic bulbs delivered to

on remand found such adjustments to be "necessary in order to avoid the double-counting of expenses and to otherwise calculate [Xinboda's] dumping margin as accurately as possible." *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1294; *see also id.*, 41 CIT at ____ n.28, 279 F. Supp. 3d at 1294 n.28 (stating that, "if Commerce continues to rely on the Azadpur Market prices on remand, Commerce must make such further adjustments to those prices *as may be necessary*") (emphasis added).[8]  If Commerce had concluded on remand that no such adjustments were necessary, Commerce could have set forth in the Second Remand Results its rationale for concluding that its calculations did not reflect double-counting, supporting  that explanation with appropriate references to the record.  Commerce did not do so.

Instead, based on the Second Remand Results, it appears that Commerce concluded that the adjustments that it made in the course of the second remand are necessary to avoid double-counting and to calculate Xinboda's dumping margin as accurately as possible.  As summarized

---

Dadi was the same as the condition of the garlic bulbs sold at the Azadpur Market had been "debunked, at least for the present and *on the existing record*") (emphasis added).

[8]Commerce can hardly be heard to object to these caveats.  It is Commerce's longstanding, well-founded policy to avoid double counting.  *See, e.g.*, Steel Wire Garment Hangers From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 2014–2015, 82 Fed. Reg. 18,115 (April 17, 2017) and accompanying Issues and Decision Memorandum at Comment 2 (justifying Commerce's selection of certain financial statements which included breakouts of energy costs, citing "[*Commerce's*] *practice to avoid double counting*, which could occur when [Commerce] uses surrogate values for a respondent's energy [factors of production] and also uses financial statements that include energy, where the energy cannot be broken out to avoid double counting energy expenses") (emphasis added); Zhaoqing Tifo New Fibre Co. v. United States, 39 CIT ____, ____ n.6, 60 F. Supp. 3d 1328, 1333 n.6 (2015) ("Zhaoqing Tifo I") (and authorities cited there).   And Commerce is obligated to calculate dumping margins as accurately as possible.  *See, e.g.*, Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) (explaining that statutory purpose "is to facilitate the determination of dumping margins as accurately as possible")..

above, and as discussed at length in <u>Shenzhen Xinboda II</u>, all record evidence on point – including

Commerce's own Verification Report – indicates that the garlic bulbs sold at the Azadpur Market

are (to use Commerce's terminology) at "a higher level of trade" (*i.e.*, at a more advanced stage of

processing) than the garlic bulbs delivered to Dadi.  Accordingly, the adjustments that Commerce

made to its calculations on remand to account for differences in the condition of the garlic bulbs

delivered to Dadi *versus* the bulbs sold at the Azadpur Market, and to avoid double-counting, are

supported by substantial evidence.  They therefore must be sustained.

## 2.  Adjustments to Account for Intermediary Expenses

In addition to Xinboda's double-counting claim based on the respective conditions of the

garlic bulbs at issue (discussed above), Xinboda also contends that the Azadpur Market prices

include substantial "intermediary expenses" that Dadi did not incur – *i.e.*, sums that are paid to

"middle men" and "intermediaries," including "commission agents, wholesalers and retailers to

cover transportation, loading, unloading, storage, overhead, profits, etc."  *See* <u>Shenzhen Xinboda</u>

<u>II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1295 (citations omitted).   In its Issues & Decision

Memorandum, Commerce took note of Xinboda's claim concerning such intermediary expenses.

*See* Issues & Decision Memorandum at 15.   Inexplicably, however, the Issues & Decision

Memorandum asserted that Xinboda had submitted no evidence to back up the claim.  *Id.*  Quite

to the contrary, as <u>Shenzhen Xinboda I</u> observed, Xinboda proffered "significant documentation to substantiate its claims." <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1350-51.[9]

In reaching its Final Determination, Commerce thus failed even to acknowledge, much less consider, the evidence of intermediary expenses that Xinboda placed on the administrative record. Commerce for the first time addressed Xinboda's evidence in the First Remand Results. *See*, *e.g.*, First Remand Results at 9-11.  Again, however, Commerce failed to give the evidence its due.  As <u>Shenzhen Xinboda II</u> explained, "[r]ather than carefully reviewing and evaluating each of the numerous articles and other pieces of evidence that Xinboda cites . . . , the [First] Remand Results attempt to sweep it all away by cherry-picking several of the articles [submitted by Xinboda] for comment, giving those articles treatment that is superficial at best, and turning a blind eye to everything else." <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1298; *see*, *e.g.*, <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 985 (Fed. Cir. 1994) (stating that any determination as to the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn") (quoting <u>Universal Camera Corp.</u>, 340 U.S. at 487-88; <u>CS Wind Vietnam Co.</u>, 832 F.3d at 1373 (similar); *see also* <u>NMB Singapore Ltd. v. United States</u>, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (explaining, *inter alia*, that Commerce's rationale must address the parties' principal arguments and evidence, and, more

---

[9]Much of Xinboda's evidence of intermediary expenses is catalogued and briefly discussed in <u>Shenzhen Xinboda I</u> and <u>Shenzhen Xinboda II</u>. *See* <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d. at 1351-52; <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1296.

pán

generally, that "the path of Commerce's decision must be reasonably discernable" in order to support judicial review).

Shenzhen Xinboda II therefore remanded the issue to Commerce once again, instructing Commerce to "rigorously review the proof of intermediary expenses that Xinboda has proffered and . . . [to] make any necessary adjustments to the Azadpur Market prices (or whatever other surrogate value Commerce may choose) so as to exclude all intermediary expenses that do not reflect the experience of Xinboda (including that of Dadi)." Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302.[10]

In the Second Remand Results, Commerce has adjusted its calculations to "increase[] commission expenses from 7 to 60 percent." Second Remand Results at 17.   Commerce's treatment of the issue is cursory at best:

> [W]e have considered the record evidence regarding . . . intermediary expenses, including the Researcher Declaration and the December 29, 2010 article published in The Economic Times.  As indicated by this article, "[s]tudies have shown that nearly 60-80% of the price consumers pay goes to commission agents, wholesalers and retailers to cover transportation, loading, unloading, storage, overheads, profits, etc."  In addition, the Researcher Declaration indicates that Azadpur Market sellers must pay a market fee.  Accordingly, Commerce has increased the commission

---

[10]In full, Shenzhen Xinboda II stated:  "On remand, Commerce shall rigorously review the proof of intermediary expenses that Xinboda has proffered and shall give full, fair, and balanced consideration to all relevant arguments and record evidence.  Commerce shall make any necessary adjustments to the Azadpur Market prices (or whatever other surrogate value Commerce may choose) so as to exclude all intermediary expenses that do not reflect the experience of Xinboda (including that of Dadi) and thus to calculate Xinboda's dumping margin as accurately as possible." Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302; see also id., 41 CIT at ____ n.38, 279 F. Supp. 3d at 1302 n.38 (stating that "[i]f the evidence demonstrates that intermediary expenses that Dadi does not incur are reflected in the Azadpur Market prices, Commerce must make an appropriate adjustment or select a different data source as the basis for calculating the surrogate value for the garlic bulbs delivered to Dadi").

> expenses from 7 to 60 percent to account for the intermediary expenses associated
> with Indian produce markets.

Second Remand Results at 17.  The text quoted above is the sum total of Commerce's analysis.

Although it is not entirely clear, the Second Remand Results seem to indicate that Commerce has adjusted its calculations to reflect intermediary expenses "under respectful protest."[11]  Again, however, Commerce has nothing to protest.  The evidence of intermediary expenses proffered by Xinboda was summarized in Shenzhen Xinboda I and Shenzhen Xinboda II and has not been contested on the merits – not by Commerce, not by the Government, and not by the Domestic Producers.  No party has pointed to one iota of evidence that contradicts the evidence of administrative expenses adduced by Xinboda – not in this litigation, not in the course of either of the two remands, and not in the course of the underlying administrative review.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1295-1302; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1350-53.  To the extent that Commerce or the Domestic Producers believed the existing record evidence to be inaccurate, Commerce could have reopened the

---

[11] *See, e.g.*, Second Remand Results at 5 (asserting that Shenzhen Xinboda II "directed" Commerce to "adjust[] the surrogate bulb value in order to reflect the expenses associated with intermediaries"); *id*. at 35 (stating that Commerce "adjusted Xinboda's margin" to reflect intermediary expenses "*in accordance with*" Shenzhen Xinboda II) (emphasis added); *see also id*. at 1-2 (stating generally that "Commerce has, under respectful protest, further considered the surrogate value data on the record for valuing fresh raw garlic bulbs").  *But see* Second Remand Results at 4 (correctly noting that Shenzhen Xinboda II required only that Commerce "rigorously review the 'proof' of intermediary expenses proffered by Xinboda and adequately address each piece of record evidence on that point," tacitly acknowledging that no specific changes to its calculations were mandated, other than any adjustments that the agency deemed necessary based on its review of the evidence); *id*. at 16 (same).

administrative record to receive additional evidence (assuming that evidence conflicting with Xinboda's evidence exists).  But Commerce never did so.

Moreover, Commerce's implication notwithstanding, Shenzhen Xinboda II did not "direct[]" Commerce to "adjust[] the surrogate bulb value in order to reflect the expenses associated with intermediaries."  *See* Second Remand Results at 5.[12]  At two different places in the Second Remand Results, Commerce accurately states that Shenzhen Xinboda II required only that Commerce "rigorously review the 'proof' of intermediary expenses proffered by Xinboda and adequately address each piece of record evidence on that point."  Second Remand Results at 4; *see also id*. at 16-17 (same); Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302.  If, on remand, Commerce had concluded that no adjustments to its calculations were necessary – based on a review of *all* of the evidence on intermediary expenses (without taking excerpts out of context and fairly taking into account all evidence (including the evidence contradicting its conclusion) – Commerce could have set forth in the Second Remand Results its rationale for that conclusion, in lieu of making any adjustments.  Commerce did not do so.  *See, e.g.*, Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302 (remanding "intermediary expenses" issue and indicating that, on remand, Commerce should "make *any necessary adjustments* to the Azadpur Market prices (or whatever other surrogate value Commerce may choose)") (emphasis added).

---

[12]As noted above, not only did Shenzhen Xinboda II not require Commerce to make any particular adjustments to the Azadpur Market prices, but, in fact, Shenzhen Xinboda II did not even require Commerce to use the Azadpur Market prices.  *See supra* n.7; Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302 (remanding "intermediary expenses" issue and indicating that, on remand, Commerce should "make any necessary adjustments to the Azadpur Market prices (or *whatever other surrogate value Commerce may choose*)") (emphasis added).

Instead, based on the Second Remand Results, it appears that Commerce concluded that the adjustments that it made in the course of the second remand are necessary to account for "intermediary expenses associated with Indian produce markets," so as to "calculate Xinboda's dumping margin as accurately as possible." *See* Second Remand Results at 17; Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302.  As summarized above, and as discussed at length in Shenzhen Xinboda II, the record evidence on point (virtually all of which is uncontested) strongly supports Xinboda's contention that the garlic bulbs sold at the Azadpur Market reflect significant sums paid to intermediaries, above and beyond any such sums which Dadi pays to its suppliers. Accordingly, the adjustments that Commerce made to its calculations on remand to account for intermediary expenses are supported by substantial evidence and must be sustained.

### 3.  Adjustments to Exclude Prices for "Super-A" Grade Garlic

Xinboda's remaining challenge to the surrogate value for the garlic bulbs that were delivered to Dadi contests Commerce's inclusion of pricing data for so-called grade "Super-A" (or "S.A.") bulbs.  *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1302-05; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1353-56.  No party disputes that the garlic bulbs that were delivered to Dadi ranged from 50 mm to 65 mm in diameter.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1271; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1341.  No party disputes that, before the period of review, the Azadpur Market price data separately listed prices for larger-sized garlic bulbs (greater than 55 mm in diameter), which were identified on price lists as grade S.A. bulbs.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1272; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343.  Similarly, no

party disputes that, shortly before the period of review, the Azadpur Market discontinued that

listing. *See* Shenzhen Xinboda II, 41 CIT at \_\_\_\_, \_\_\_\_, 279 F. Supp. 3d at 1272, 1303; Shenzhen

Xinboda I, 38 CIT at \_\_\_\_, 976 F. Supp. 2d at 1343.

Xinboda maintains that the Azadpur Market stopped listing prices for grade S.A. bulbs

because the larger-bulb garlic that had been previously classified as grade S.A. was "subsumed"

into the grade A classification. Specifically, according to Xinboda, the garlic bulbs that were sold

as grade A during the period of review included not only bulbs with a diameter of 40 mm to 55

mm, but also bulbs with a diameter of 55 mm or more (which had been previously sold as grade

S.A.). *See generally* Shenzhen Xinboda II, 41 CIT at \_\_\_\_, 279 F. Supp. 3d at 1303; Shenzhen

Xinboda I, 38 CIT at \_\_\_\_, 976 F. Supp. 2d at 1353.

The Researcher Declaration that Xinboda placed on the administrative record directly

supports Xinboda's claim. In the Declaration, the research consultant attests under oath that

Azadpur Market vendors were selling garlic bulbs with diameters as great as 65 mm under the

classification grade A. *See* Researcher Declaration ¶¶ 6-7; *see generally* Shenzhen Xinboda II, 41

CIT at \_\_\_\_, 279 F. Supp. 3d at 1303-04; Shenzhen Xinboda I, 38 CIT at \_\_\_\_, 976 F. Supp. 2d

at 1354. Because Commerce calculated its surrogate value for garlic bulbs by combining price

data for grade A garlic bulbs from the period of review (which Xinboda contends already includes

bulbs that previously would have been classified as grade S.A.) together with price data for grade

S.A. bulbs from prior to the period of review,[13] Xinboda argues that larger-bulb garlic is over-

---

[13]Because the Azadpur Market discontinued separately listing prices for grade S.A. garlic
bulbs prior to the period of review at issue here, Commerce used non-contemporaneous prices for

represented in the surrogate value and that the surrogate value is therefore distorted. *See generally* Shenzhen Xinboda II, 41 CIT at ____, ____, 279 F. Supp. 3d at 1272, 1303; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1353-54.

In the Final Determination, Commerce dismissed Xinboda's concerns, stating that there was no record evidence "which clearly explains *why*" the Azadpur Market data for the period of review does not list prices for grade S.A. garlic bulbs. *See* Issues & Decision Memorandum at 13 (emphasis added). Commerce further stated that, under the circumstances, the agency could not simply "*assume* that grade super-A prices have been subsumed under grade A prices." *See id.* (emphasis added). However, the Final Determination made no mention of the Researcher Declaration. *See id.*

Shenzhen Xinboda I remanded this issue to Commerce, noting that it is "of no real import" exactly *why* the Azadpur Market ceased use of the grade S.A. classification prior to the period of review and, more importantly, that – in light of the Researcher Declaration, the sole record evidence on point – Commerce need not "assume" anything. *See generally* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1354-56. Shenzhen Xinboda I pointed out that the Researcher Declaration supports Xinboda's contention that, during the period of review, the garlic bulbs that were classified and sold at the Azadpur Market as grade A bulbs included the larger-bulb garlic

---

grade S.A. bulbs (*i.e.*, prices from prior to the period of review) in calculating the surrogate value for garlic bulbs. Commerce "indexed" (inflated) those prices to be contemporaneous with the period of review. *See generally* Shenzhen Xinboda II, 41 CIT at ____, ____, 279 F. Supp. 3d at 1272, 1302-04; Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp. 2d at 1343.

that previously would have been classified as grade S.A. *See id.*, 38 CIT at _____, 976 F. Supp. 2d at 1355; Researcher Declaration ¶¶ 6-7.

Commerce addressed the Researcher Declaration for the first time in the First Remand Results. Much as the First Remand Results sought to dismiss the Researcher Declaration as "unreliable" evidence that the garlic bulbs sold at the Azadpur Market were more highly processed than the bulbs that were delivered to Dadi, so too the First Remand Results sought to dismiss the Declaration as "unreliable" evidence that the grade A garlic bulbs sold at the Azadpur Market during the period of review included the larger-bulb garlic that had previously been sold as grade S.A. *See* First Remand Results at 12; *compare* First Remand Results at 4-5, 46 (addressing Researcher Declaration as evidence on extent of processing of garlic bulbs) *with id.* at 12, 45 (addressing Researcher Declaration as evidence on size of garlic bulbs sold as grade A at Azadpur Market during period of review).

As a possible explanation for the fact that the Azadpur Market price data for the period of review includes no listing for grade S.A. bulbs, Commerce and the Domestic Producers have theorized that, prior to the period of review, Indian farmers had begun to export all larger-bulb garlic instead of selling it domestically through the Azadpur Market and other markets in India's domestic market system. *See* First Remand Results at 13. The First Remand Results concluded that, in calculating the surrogate value for the garlic bulbs that were delivered to Dadi, the Final Determination properly included the separate price data for grade S.A. garlic sold at the Azadpur Market prior to the period of review. *See id.* at 14; *see generally id.* at 12-14, 45.

Shenzhen Xinboda II reiterated that the Researcher Declaration remains the only record evidence that speaks to whether the grade A garlic bulbs sold at the Azadpur Market during the period of review included the larger-bulb garlic that had previously been classified as grade S.A., and, further, noted that Commerce's grounds for dismissing the Declaration out-of-hand were not well-taken. *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1303-04; *see also id*., 41 CIT at ____, 279 F. Supp. 3d at 1280-89 (analyzing Commerce's rationale for dismissing the Researcher Declaration's statements as to the condition (*i.e.*, extent of processing) of the garlic bulbs sold at the Azadpur Market, finding the agency's reasons to be "largely without merit," and concluding that any "sweeping, wholesale dismissal of the Declaration is unwarranted").

Even more to the point, Shenzhen Xinboda II emphasized that the First Remand Results include Commerce's striking admission that "there is *no evidence* on the record" to support the hypothesis that separate prices for grade S.A. garlic are missing from the Azadpur Market data for the period of review because – according to Commerce and the Domestic Producers – shortly before the period of review, Indian garlic farmers had begun to export the larger-bulb garlic that had previously been sold as grade S.A. (rather than selling it on the Indian domestic market). *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1304 (quoting First Remand Results at 13 (emphasis added)).[14]

---

[14]Again, this is not a situation where the record includes both evidence which would support one position and also evidence which would support the opposite position. In other words, this is not a situation in which there are two conflicting conclusions which could reasonably be drawn from the record and Commerce must use its expertise and must exercise its discretion to decide which evidence to credit. The only record evidence that is on point here, the Researcher Declaration, supports only one conclusion – that the grade A garlic bulbs sold at the Azadpur

Shenzhen Xinboda II explained that "Commerce's determinations must be based on actual evidence" and that "[t]heory will not suffice." Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1304-05.[15] Shenzhen Xinboda II therefore remanded the issue of Commerce's use of the Azadpur Market prices for grade S.A. garlic bulbs for a second time, for Commerce's further consideration. See Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1305.

In the pending Second Remand Results, Commerce has calculated the surrogate value for the garlic bulbs delivered to Dadi using only the Azadpur Market price data for grade A garlic bulbs, excluding the data for grade S.A. bulbs "under respectful protest." See Second Remand Results at 1 (stating generally that, in the Second Remand Results, "Commerce has, under

---

Market during the period of review included the larger-bulb garlic which previously would have been classified as grade S.A. There is no record evidence to support the theory, advanced by Commerce and the Domestic Producers, that the larger-bulb garlic which had previously been sold as grade S.A. is not listed in the price data for the Azadpur Market for the period of review because (according to Commerce and the Domestic Producers) the larger-bulb garlic was being exported directly rather than sold through the Indian domestic market system. Nor is there record evidence to indicate, more generally, that the Azadpur Market price data for grade A garlic bulbs during this period of review covered only garlic bulbs with diameters of 40 mm to 55 mm, as Commerce and the Domestic Producers here contend.

[15]The Court of Appeals has stated that "[i]t is well established that speculation does not constitute 'substantial evidence.'" Novosteel SA v. United States, 284 F.3d 1261, 1276 (Fed. Cir. 2002). The Court of Appeals continued: "As the Supreme Court noted in Bowen v. American Hospital Ass'n, agency deference has not come so far that agency action is upheld whenever it possible to conceive a basis for administrative action." Id.; see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (noting that Commerce determinations cannot be based on "mere conjecture or supposition").

respectful protest, further considered the surrogate value data on the record for valuing fresh raw

garlic bulbs").[16]   Once more, however, there is nothing for Commerce to protest.

Commerce has strained to discount the Researcher Declaration.  *See* Second Remand

Results at 3-4; *see also* First Remand Results at 12, 45.  But the pivotal fact set forth in the

Declaration, *i.e.*, that the grade A garlic bulbs sold at the Azadpur Market during the period of

review included the larger-bulb garlic that previously would have been classified as grade S.A.,

has never been affirmatively refuted – not by Commerce, not by the Government, and not by the

Domestic Producers.   Notably, no party has pointed to a shred of evidence to controvert the

evidence placed on the record by Xinboda – not in this litigation, not in the course of either of the

two remands, and not in the course of the underlying administrative review.  *See* Shenzhen

Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1303-05; Shenzhen Xinboda I, 38 CIT at ____ &

n.27, 976 F. Supp. 2d at 1355 & n.27.

Moreover, Commerce fundamentally mischaracterizes Shenzhen Xinboda II to the extent

that Commerce asserts that Shenzhen Xinboda II mandated that Commerce calculate the surrogate

---

[16]*See also, e.g.,* Second Remand Results at 1-2 (asserting that, "in accordance with" Shenzhen Xinboda II, the Second Remand Results "use[] only the Azadpur grade A bulb data" to calculate the surrogate value for garlic bulbs); *id.* at 4-5 (asserting that Shenzhen Xinboda II "directed that[[,] if Commerce continued to use Azadpur data" in the Second Remand Results, Commerce was required to "base its calculations exclusively on the . . . grade A bulb prices"); *id.* at 5 (stating that Shenzhen Xinboda II "requir[ed]" that Commerce "use exclusively the grade A bub data" if the Second Remand Results "use Azadpur data" in calculating the surrogate value for garlic bulbs); *id.* at 6 (asserting that Shenzhen Xinboda II "directed Commerce to exclude the grade S.A. bulb prices from its surrogate value calculation should it continue to rely on the Azadpur market data" in the Second Remand Results); *id.* at 35 (asserting that, in calculating the surrogate value for garlic bulbs, the Second Remand Results "remov[ed] the grade S.A. bulb prices," "[p]er the . . . instructions" in Shenzhen Xinboda II).

value for garlic bulbs using solely the Azadpur Market data for grade A garlic bulbs.  Even

Commerce acknowledges, as it must, that Shenzhen Xinboda II contemplated that the agency

might use one of the data sets on the existing record other than the Azadpur Market prices for

purposes of the second remand.  *See, e.g.*, Second Remand Results at 6-16; *see also* Shenzhen

Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1305 (implicitly recognizing that, on remand,

Commerce might decide to use one of the data sets that is "on the existing record" other than the

Azadpur Market prices).[17]  And even if Commerce concluded on remand that all of the other data

sets on the existing record were inferior to the Azadpur Market price data, as Commerce apparently

did, Commerce had options other than using only the Azadpur Market prices for grade A garlic

bulbs (excluding the prices for grade S.A. bulbs).  For example, Commerce could have reopened

---

[17]As noted above, not only did Shenzhen Xinboda II not require Commerce to make any particular adjustments to the Azadpur Market prices, but, in fact, Shenzhen Xinboda II did not even require Commerce to use the Azadpur Market prices.  *See supra* n.7; Shenzhen Xinboda II, 41 CIT at ____ & n.28, 279 F. Supp. 3d at 1294 & n.28 (remanding to allow the agency to once again "reconsider its selection of a surrogate value" and noting, *inter alia*, that it was at least possible that, on remand, "Commerce [would] select the Garlico prices" as the surrogate value for garlic bulbs); *id.*, 41 CIT at ____, 279 F. Supp. 3d at 1302 (remanding "intermediary expenses" issue and indicating that, on remand, Commerce should "make any necessary adjustments to the Azadpur Market prices (or *whatever other surrogate value Commerce may choose*)") (emphasis added).

the administrative record to seek out some other set of data for its use in calculating the surrogate value for garlic bulbs.[18]  But Commerce did not do so.[19]

Further, even assuming that Commerce decided to continue to rely on the Azadpur Market data (rather than using some other data set), Commerce could have calculated the surrogate value for garlic bulbs using the price data for grade S.A. bulbs (as well as the data for grade A bulbs), provided that the agency supported its use of the grade S.A. data with evidence on the record.  In other words, Shenzhen Xinboda II required Commerce to exclude the grade S.A. prices from its calculations only if Commerce continued to use the Azadpur Market data and, in addition, only if Commerce relied "on the existing record."  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1305 (ruling that, "if Commerce, *on the existing record*, continues on remand to rely on the Azadpur Market prices . . . , Commerce shall base its calculations exclusively on the . . . prices for bulbs classified as grade A") (emphasis added).

Commerce plainly was not confined to the existing record.  To the extent that Commerce or the Domestic Producers believed the Researcher Declaration to be inaccurate – and assuming that such evidence exists – Commerce obviously could have reopened the administrative record to

---

[18]Presumably Commerce would have sought a set of data that included size-specific prices. *See generally*, *e.g.*, Issues & Decision Memorandum at 11 (stating that "it [is] clear that size and quality are important characteristics" in pricing garlic bulbs, such that "[Commerce's] preference has been to use, whenever possible, prices for the garlic bulb input based on size").

[19]*See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1305; *see also*, *e.g.*, *id.*, 41 CIT at ____ n.28, 279 F. Supp. 3d at 1294 n.28 (noting that, in reevaluating its choice of surrogate value on remand, Commerce should consider not only "the data sources on the record," but also "any other data that Commerce may deem appropriate").

receive evidence that the grade A garlic bulbs sold at the Azadpur Market during the period of

review did not include the larger-bulb garlic that the Azadpur Market data had previously listed as

grade S.A.[20]  Despite two remands, however, Commerce never did so.  The record is thus devoid

of any evidence to indicate that the Azadpur Market price data for grade A garlic bulbs during this

period of review covered only garlic bulbs with diameters of 40 mm to 55 mm, as Commerce and

the Domestic Producers contend.[21]

If, on remand, Commerce had reopened the record, and if evidence had been submitted that

the grade A garlic bulbs sold at the Azadpur Market during the period of review did not include

the larger-bulb garlic previously sold as grade S.A., Commerce could have cited such evidence

and set forth in the Second Remand Results its rationale for including the price data for grade S.A.

garlic in calculating the surrogate value for garlic bulbs.  But, again, Commerce did not do so.

---

[20]Assuming that it exists, Commerce or the Domestic Producers also could have placed on the record evidence seeking to prove their hypothesis that, at the time of the period of review, Indian garlic famers had begun to export their larger-bulb garlic, rather than selling it on the domestic Indian market.  Logically, however, such evidence might not necessarily refute the statement in the Researcher Declaration that the grade A garlic bulbs being sold at the Azadpur Market during the period of review included bulbs that previously would have been classified as grade S.A.

[21]As discussed above, Commerce must have substantial record evidence to support its determinations, including the surrogate values on which it chooses to rely.  Because the Researcher Declaration is the only evidence on this administrative record that goes directly to the size of the garlic bulbs sold as grade A bulbs at the Azadpur Market during the period of review (and, specifically, the only evidence that goes directly to whether those bulbs included the larger-sized bulbs previously sold as grade S.A. or whether they included only bulbs with a diameter of 40 mm to 55 mm), it is unlikely that Commerce's use of the Azadpur Market prices for grade S.A. garlic bulbs could be sustained even if the Researcher Declaration were to be disregarded.  *See* Shenzhen Xinboda II, 41 CIT at _____ n.24, 279 F. Supp. 3d at 1289 n.24; *see also supra* n.5 (and authorities cited there).

In remanding this issue to Commerce for a second time, Shenzhen Xinboda II stated: "The sole record evidence that is on point [*i.e.*, the Researcher Declaration] substantiates Xinboda's claim that garlic bulbs with a diameter of 55 mm to 65 mm – garlic bulbs that once would have been classified as grade S.A. – were classified and sold as grade A bulbs during the period of review." *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1305.  That statement is as true now as it was at the time Shenzhen Xinboda II issued.  Accordingly, the adjustments that Commerce made on remand to exclude price data for grade S.A. garlic bulbs from its calculation of the surrogate value for garlic bulbs are supported by substantial evidence and must be sustained.

### B.  Commerce's Selection of Financial Statements

In addition to the surrogate value for garlic bulbs (discussed above), Shenzhen Xinboda II also remanded to Commerce Xinboda's claim that Commerce erred in using the financial statements of Tata Tea to derive surrogate financial ratios, because, according to Xinboda, there is "reason to believe or suspect" that Tata Tea's financial statements may be tainted by subsidies. *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at1314-15.  Commerce has consistently taken the position that the documentation submitted by Xinboda does not meet the "reason to believe or suspect" standard.  *See* Issues & Decision Memorandum at 19-20; First Remand Results at 18-21, 53-55; Second Remand Results at 17-35.

Commerce's treatment of this issue in the Second Remand Results is addressed below.

### 1.  The Applicable Standard

Shenzhen Xinboda II reviewed both Commerce's interpretation and its application of the "reason to believe or suspect" standard and concluded that Commerce has given no meaning to

the phrase "reason to . . . suspect."  The issue of Commerce's selection of financial statements was remanded to allow the agency the opportunity to Commerce to clearly formulate and to fully explain the meaning of the "reason to believe or suspect" standard as set forth by Congress, and to permit Commerce to apply that interpretation to the evidence that Xinboda maintains gives "reason to believe or suspect" that Tata Tea may have received subsidies.  *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1314-15; Omnibus Trade & Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No. 100-576 at 590-91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24.

In the Second Remand Results, Commerce's principal argument is that the "reason to believe or suspect" standard that was applied in the Final Determination and the First Remand Results has been superseded by section 505(b) of the Trade Preferences Extension Act of 2015 ("TPEA"), which establishes a new standard.  *See* Second Remand Results at 17-19, 22-23, 26-27, 29-33; Pub. L. No. 114-27, 129 Stat. 362 at 385-86 (2015).  Commerce contends that, because the agency issued the Second Remand Results after the effective date set forth in the agency's implementing regulation, the new standard governs the Second Remand Results.  *See id*. Second Remand Results at 30-33; Dates of Application of Amendments to the Antidumping & Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Aug. 6, 2015) (stating that Commerce will apply TPEA § 505(b) "to determinations made on or after August 6, 2015).  According to Commerce, under the new standard, Commerce properly concluded that the evidence submitted by Xinboda does not require Commerce to disregard Tata Tea's financial statements.  *See* Second Remand Results at 17-35.

However, the well-reasoned opinion in <u>FGPA</u> squarely rejects the application of a parallel provision of the TPEA to remand determinations in situations such as this, where the Commerce determination that is being litigated predates the new TPEA standard.  *See generally* <u>Fresh Garlic Producers Ass'n v. United States</u>, 39 CIT ____, ____, 121 F. Supp. 3d 1313, 1328-33 (2015).  In a thoughtful analysis, <u>FGPA</u> reasons (1) that the relevant section of the TPEA is not intended to have retroactive effect and (2) that Commerce's application of that section of the TPEA in the remand results in that case would constitute impermissible retroactive application of the new TPEA standard.  *See id.*, 39 CIT at ____, 121 F. Supp. 3d at 1329-31 (concluding that "§ 502 [of the TPEA] is not intended to have retroactive effect"); *id.*, 39 CIT at ____, 121 F. Supp. 3d at 1331-33 (concluding that "[t]o apply § 502 on remand would be in effect to apply the law retroactively by applying it to a determination that occurred before the new law became effective"). <u>FGPA</u> therefore instructed Commerce not to apply the new standard (set forth in § 502 of the TPEA) to the remand results in that case.  *Id.*, 39 CIT at ____, 121 F. Supp. 3d at 1333; *see also* <u>Shenzhen Xinboda Industrial Co. v. United States</u>, 40 CIT ____, ____ n.14, 180 F. Supp. 3d 1305, 1317 n.14 (2016) (hereinafter "<u>Shenzhen Xinboda Industrial Co.</u>") (same); <u>Itochu Building Products Co. v. United States</u>, 41 CIT ____, ____ n.33, 2017 WL 2703810 * 16 n.33 (2017) (same).[22]

---

[22]Although Commerce filed its remand results in <u>FGPA</u>, <u>Shenzhen Xinboda Industrial Co.</u>, and <u>Itochu</u> under protest, Commerce did not appeal the issue.

The same result must obtain here.[23]  As in <u>FGPA</u>, Commerce's argument in this case is lacking in merit.  The TPEA has no application in this matter, because Commerce reached the determination that is the subject of this litigation prior to the effective date of the TPEA provision in question.

Commerce argues in the alternative that, even if the "reason to believe or suspect" standard applies, the agency correctly determined that the documentation proffered by Xinboda does not meet that standard.  *See* Second Remand Results at 19-28.  However, as detailed in <u>Shenzhen Xinboda I</u> and <u>Shenzhen Xinboda II</u>, Commerce's interpretation of the "reason to believe or suspect" standard is fundamentally flawed because it fails to give any meaning to the phrase "reason to . . . suspect" and also ignores other key language in the legislative history.  *See generally* <u>Shenzhen Xinboda II</u>, 41 CIT at ____, 279 F. Supp. 3d at 1305-15; <u>Shenzhen Xinboda I</u>, 38 CIT at ____, 976 F. Supp. 2d at 1372-76.

The Second Remand Results do not respond to the majority of the concerns raised in <u>Shenzhen Xinboda II</u> and provide no further explanation of Commerce's interpretation of the "reason to believe or suspect" standard beyond that provided in the First Remand Results.  In fact, the Second Remand Results omit some of the arguments that Commerce made in the First Remand

---

[23]It is true that the relevant provision of the TPEA here is section 505, while <u>FGPA</u>, <u>Shenzhen Xinboda Industrial Co</u>., and <u>Itochu</u> all involved section 502.  However, there is no apparent reason to differentiate between the two provisions for purposes of a retroactivity analysis. No party here has suggested otherwise.

Results, and, as to the arguments that are recycled in the Second Remand Results, a number are

repeated virtually *verbatim* as they appeared in the First Remand Results.

For example, in the Second Remand Results, Commerce states that, under its interpretation

of the "reason to believe or suspect" standard, Commerce excludes a set of financial statements

only "[i]f the [financial statements] contain[] a reference to a specific subsidy program [that

Commerce has previously] found to be countervailable in a formal CVD [countervailing duty]

determination."   Second Remand Results at 21-22; *see also* First Remand Results at 18.

Commerce reiterates that "[i]f the [financial statements] contain[] only a mere mention that a

subsidy was received" and "there is no additional information as to the specific nature of the

subsidy," the financial statements are not excluded from Commerce's consideration.   Second

Remand Results at 21-22; *see also* First Remand Results at 18.  Amplifying its point, Commerce

states that it disregards a set of financial statements only (1) "if a specific subsidy program [is]

referenced or identified within a company's financial statements" and (2) the financial statements

specifically set forth "a dollar amount *received*" and (3) the same subsidy program that is identified

in the financial statements previously "ha[s] been determined to be countervailable."   Second

Remand Results at 22 (emphasis added); *see also* First Remand Results at 18.   According to

Commerce, "mere mention of a subsidy [in a company's financial statements], without information

that the company *actually received the subsidy*" does not suffice to meet even the "reason to . . .

suspect" standard and therefore does not suffice to warrant exclusion of those financial statements.

Second Remand Results at 22 (emphasis added); *see also* First Remand Results at 18.

In an effort to support its interpretation, Commerce emphasizes that Congress specifically stated that – in determining whether there is "reason to believe or suspect" that a proposed surrogate value reflects dumping or subsidies – Commerce need not conduct an investigation and instead should base its decision on the information generally available to the agency at the time. Second Remand Results at 19; *see also* First Remand Results at 18.   Similarly, Commerce emphasizes "Congress' evident concern with expediency and the ability of Commerce to make . . . decisions [as to whether or not to use a particular surrogate value] quickly."  Second Remand Results at 21; *see also* First Remand Results at 17.   Commerce maintains – in effect – that this language reflects an intent on the part of Congress to have Commerce *err on the side of using a surrogate value* absent essentially definitive proof that the surrogate value actually is in fact tainted by dumping or subsidies.

But this argument does nothing to advance Commerce's cause.  As Shenzhen Xinboda II explained, the language from the legislative history that Commerce highlights can just as easily be read as a manifestation of Congress' intent that Commerce should *err on the side of disregarding a surrogate value* if there is any evidence that gives even some "reason to . . . *suspect*" that the surrogate value "*may be*" tainted.  *See* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at 1313-14.  Indeed, Shenzhen Xinboda II pointed out that only the latter reading would seem to be consistent with both of Congress' two main goals: (1) avoiding the use of tainted surrogate values (the paramount goal) and (2) allowing Commerce to make quick determinations without initiating a formal countervailing duty investigation. *Id*., 41 CIT at ____, 279 F. Supp. 3d at 1314.  Nowhere in the Remand Results has Commerce explained how its interpretation (which errs on the side of

using a surrogate value absent definitive proof that the surrogate value is in fact tainted) is consistent with Congress' overarching goal of avoiding the use of distorted values in calculating dumping margins.  Nor has Commerce otherwise sought to respond to <u>Shenzhen Xinboda II</u>'s analysis on this point.

In a related attempt to defend its interpretation of the "reason to believe or suspect" standard, Commerce argues that, in <u>DuPont Teijin</u>, the Court "found that it is within Commerce's discretion to accept and use financial statements that mention a subsidy without providing the actual dollar amount received."  *See* Second Remand Results at 23-24 (citing <u>DuPont Teijin Films v. United States</u>, 37 CIT ____, ____, 896 F. Supp. 2d 1302, 1312-13 (2013)); *see also* First Remand Results.  This argument too is unavailing.  The question of statutory interpretation that is presented in this case was not presented in <u>DuPont Teijin</u>; and, in any event, contrary to Commerce's implication, a court decision cannot override a Congressional mandate in circumstances such as these.

Commerce also argues that its restrictive interpretation of "reason to believe or suspect" is necessitated by policy considerations of administrative convenience.  Specifically, Commerce argues that, at least in some cases, the effect of any less stringent interpretation of "reason to believe or suspect" would be that "Commerce would have . . . no financial statements on the record

. . . from which to derive surrogate financial ratios." *See* Second Remand Results at 24-25; *see*

*also* First Remand Results a 16-18.[24]  This is alarmist hyperbole.[25]

As a factual matter, Commerce itself has previously stated that it relies on financial

statements that are tainted by subsidies where it has no other choice. *See*, *e.g.*, Tianjin Magnesium

Int'l Co. v. United States, 34 CIT 980, 997-98, 722 F. Supp. 2d 1322, 1340 (2010) (emphasizing

that, for purposes of deriving surrogate financial ratios, Commerce generally disregards the

financial statements of a company "where there is evidence that the company received

countervailable subsidies," but that, nevertheless, "when the circumstances warrant, Commerce

has employed financial statements exhibiting receipt of subsidies") (reviewing Issues and Decision

Memorandum for the Final Results of the 2006-2007 Administrative Review of Pure Magnesium

from the People's Republic of China (Dec. 8, 2008) at Comment 6.C).[26]  As such, under

---

[24]Commerce further hypothesizes that, even if a less stringent interpretation of the "reason to believe or suspect" did not result in a total absence of financial statements on which Commerce could rely, Commerce might have to "resort to a less desirable financial statement which may lead to inaccuracies in calculating surrogate financial ratios." *See* Second Remand Results at 24-25. But, again, Congress has mandated that financial statements are to be disregarded where there is even a "reason to . . . suspect" that the statements "may be" tainted.  In other words, Congress has already done this calculus.  Congress has determined that financial statements are "unreliable" (or at least not to be deemed "reliable") if there is any "reason to . . . suspect" that the statements "may be" tainted.  And Congress' decision was driven by its concerns about the need to avoid the very kinds of "inaccuracies" to which Commerce here refers.  It is not for Commerce to second-guess Congress on such matters.

[25]*See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d at ____ (analyzing Commerce's various administrative convenience arguments and pointing out that administrative convenience was not Commerce's primary concern; rather, Commerce's primary concern was avoiding the use of tainted surrogate values in order to avoid distortion by)..

[26]*See also*, *e.g.*, Issues and Decision Memorandum for the Final Results of the 2006-2007 Administrative Review of Pure Magnesium from the People's Republic of China (Dec. 8, 2008)

----

at Comment 6.C (responding to, *inter alia*, petitioner's point that Commerce "has repeatedly determined that in certain circumstances the financial statements of companies that received countervailable subsidies constitute the best information available" for use in deriving surrogate financial ratios, and citing other instances where Commerce has relied on the financial statements of companies that have received countervailable subsidies; conceding generally that, in calculating surrogate financial ratios, "some" of the financial statements used by Commerce "may contain evidence of subsidization"; acknowledging that Commerce "has used financial statements with some evidence of subsidies when the circumstances of the particular case warranted," citing a specific case as an example; and stating that Commerce has relied on financial statements even though "there is evidence that the company received countervailable subsidies" when there are no other "sufficient reliable and representative data on the record"); Jiaxing Brother Fastener Co. v. United States, 34 CIT 1455, 1461, 751 F. Supp. 2d 1345, 1352 (2010) (explaining that "Commerce's established practice is 'to disregard financial statements where [the agency has] reason to suspect that the company has received actionable subsidies," provided that "*there is other usable data on the record*'") (quoting Issues and Decision Memorandum) (emphasis added), *reviewing* Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value in Certain Steel Threaded Rod from the People's Republic of China (Feb. 20, 2009) at Comment 1 n.18 (same as Issues and Decision Memorandum in Pure Magnesium from the People's Republic of China); Jiaxing Brother, 34 CIT at 1462, 751 F. Supp. 2d at 1353 (noting that "Commerce's stated practice is to exclude 'financial statements where there is evidence that the company received countervailable subsidies," but only if "'*there are other sufficient reliable and representative data on the record*'") (citation omitted) (emphasis added),

*Cf.* Issues and Decision Memorandum for the Final Determination of Carbazole Violet Pigment 23 from the People's Republic of China (Nov. 8, 2004) at Comment 1 (relying on set of financial statements, notwithstanding Commerce's affirmative countervailing duty determination), *followed by* Final Results of Redetermination Pursuant to United States Court of International Trade Remand Order (Oct. 18, 2006) at 5-7, *filed in* Goldlink Industries Co. v. United States, Court No. 05-00060 (explaining basis for Commerce's reliance on set of financial statements notwithstanding affirmative countervailing duty determination, concluding that "there is no indication that the financial ratios . . .[were]  significantly distorted by the presence of [the] subsidies" in question); Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Steel Concrete Reinforcing Bars from the People's Republic of China (June 22, 2001) at Comment 8 (stating that a company's financial statements may be used to derive surrogate financial ratios even though the company "has been preliminarily determined to be receiving government subsidies" because that fact "does not necessarily mean that its financial ratios are skewed to the point of being unusable").

Commerce's policy and practice, the assertedly dire predicament that Commerce postulates would not come to pass.[27]   Moreover, as a matter of law, considerations of administrative convenience come into play only where statutory language is ambiguous.   There is no ambiguity here. Commerce's argument amounts to an assertion that Congress could not possibly have meant what Congress plainly said.  Such a claim is untenable.

Under Chevron, where "Congress has directly spoken to the precise question at issue," the court "must give effect to [Congress'] unambiguously expressed intent."  Chevron, 467 U.S. at 842-43.  Here, Congress unambiguously stated that Commerce "shall avoid" surrogate values (including financial statements) not only where there is "reason to believe" that subsidies in fact actually have been received, but also where there is some "reason to . . . *suspect*" that subsidies *may have* been received.

The long and the short of it is that, as detailed at length in Shenzhen Xinboda II, Commerce's interpretation (and application) of the "reason to believe or suspect" standard cannot be reconciled with Congress' intent as manifest in the relevant text.  *See generally* Shenzhen Xinboda II, 41 CIT at ____, 279 F. Supp. 3d a 1305-15; *see also* Shenzhen Xinboda I, 38 CIT at ____, 976 F. Supp 2d at 372-76.  On the existing record, it is not possible to state specifically what the "reason to believe or suspect" standard means.  However, it is possible to state what that

---

[27]In yet another way Commerce overstates the case in implying that a Commerce finding of "reason to . . . suspect" would necessarily result in the exclusion of a set of financial statements. It is at least possible that, where Commerce makes a finding of "reason to . . . suspect" that a set of financial statements is tainted by subsidies, a party advocating for Commerce's use of those statements could rebut the finding by submitting evidence to establish that, in fact, the company did not receive subsidies.

standard does not mean.  Contrary to Commerce's assertions, the "reason to believe or suspect" standard cannot be read to require Commerce to disregard a company's financial statements (or, for that matter, any other surrogate value) only where the evidence establishes that a subsidy was, in fact, received.  To be sustained, any interpretation must give effect to Congress' use of the phrase "reason to . . . suspect" and other similar language.  Commerce's interpretation fails to do so.

2. The Documentation Proffered by Xinboda as Evidence
Giving "Reason to Believe or Suspect" That Tata Tea May Have Received Subsidies

Because – despite multiple opportunities – Commerce still has not provided an interpretation of the "reason to believe or suspect" standard that is consistent with Congress' intent, it is not possible to definitively evaluate Commerce's conclusion that the documentation that Xinboda has proffered is not sufficient to meet the "reason to believe or suspect" standard.  As discussed below, however, whatever that standard may mean, the documentation that Xinboda has placed on the record must at least arguably give "reason to . . . suspect" that Tata Tea "may have" received subsidies.

To support its claim that there is, at the very least, "reason to . . . suspect" that Tata Tea may have received subsidies, Xinboda submitted to Commerce three sets of documents (including official forms, deeds and letters) which establish that Tata Tea entered into arrangements with three separate Indian banks ("Hypothecation Agreements").  *See* Xinboda Surrogate Value Submission for the Final Results at Exh. 48 (AR Pub. Doc. No. 133), Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (AR Pub. Doc. No. 138); Xinboda Case Brief (AR Pub. Doc. No.

155) at 66; Pl.'s Brief at 27-28; Pl.'s Comments on Remand Redetermination at 21-25; First

Remand Results at 18-20, 49-50; Def.'s Response to Comments Regarding the Remand

Redetermination at 24. Each of these arrangements provide for pre-shipment export financing,

described as "packing credits." "Packing credits" are loans collateralized (or "hypothecated") by

packed finished goods. Xinboda Case Brief (AR Pub. Doc. No. 155) at 66. Such loans are provided

to exporters or sellers to finance the acquisition, manufacture or packing of goods before shipment.

*See* Commodity Matchbooks from India: Final Affirmative Countervailing Duty Determination,

74 Fed. Reg. 54,547 (Oct. 22, 2009) and accompanying Issues and Decision Memorandum at

Section III.A.3. Such "packing credits" have previously been countervailed by Commerce. *See*

Issues & Decision Memorandum at Comment 6 n.70.[28]   Commerce has conceded that it has found

at least one of the specific packing credit programs identified in the Hypothecation Agreements to

have been previously countervailed. *See* First Remand Results at 19 n.50; Second Remand Results

at 28 n.98.[29]

---

[28]In Commodity Matchbooks from India, Commerce concluded that "packing credits" are countervailable because "(1) the provision of the export financing constitutes a financial contribution, pursuant to section 771(5)(D)(i) of the Act, as a direct transfer of funds in the form of loans; (2) the provision of the export financing confers benefits on the respondents under section 771(5)(E)(ii) of the Act to the extent that the interest rates provided under these programs are lower than commercially available interest rates; and (3) these programs are specific under sections 771(5A)(A) and (B) of the Act because they are contingent upon export performance." Issues and Decision Memorandum Accompanying Commodity Matchbooks from India: Final Affirmative Countervailing Duty Determination, 74 Fed. Reg. 54,547 (Oct. 22, 2009) at Section IV.A.3. Commerce also noted that the "benefit conferred by the 'packing credits' for pre-shipment financing and discounted trade bills for post-shipment export financing, is the difference between the amount of interest the company paid on the government loans and the amount of interest it would have paid on comparable commercial loans." *Id*.

[29]In the underlying administrative review, Commerce rejected the financial statements of REI Agro and ADF Foods based on the agency's finding that the companies' financial statements

Xinboda argues that the Hypothecation Agreements at a minimum provide "reason to . . . suspect" that Tata Tea may have received subsidies in the form of "packing credits." Pl.'s Brief at 27-28. Commerce concedes that the Hypothecation Agreements establish that Tata Tea was "eligible" for "packing credits" during the period of review. However, according to Commerce, mere "eligibility" for subsidies does not suffice to establish "reason to . . suspect" that a company actually received them. First Remand Results at 49-50 (stating that Commerce "concluded that this information [submitted by Xinboda] indicated that Tata Tea was eligible to eventually receive these subsidies but did not indicate that Tata Tea received subsidies during the [period of review]").

Commerce's position is unconvincing, for several reasons. First, Commerce's statement that "eligibility, alone, is not sufficient to meet the 'reason to believe or suspect standard'" is based on an assumption that unless there is direct evidence that a company made use of subsidies to which it was eligible, there is no "reason to… suspect" that company may have benefited from those subsidies. Second Remand Results at 28. This reasoning is in sharp conflict with Commerce's previously stated view that a company "will not leave money on the table" when a benefit is available to the company. *See* Gold East Paper (Jiangsu) Co. v. United States, 39 CIT ____, 61 F. Supp. 3d 1289 (2015), Final Results of Redetermination Pursuant to Court Remand (filed by Commerce in Court No. 10–00371 on July 10, 2015) at 17 (stating that "simply because one company in an unrelated industry…did not use a particular program, it does not mean that as a general matter Thai exporters would not take advantage of available export subsidies"); *see also*

---

reflect receipt of "packing credits." *See* Issues & Decision Memorandum at Comment 6 nn.70, 73.

<u>Shenzhen Xinboda II</u>, 41 CIT at _____ n.52, 279 F. Supp. 3d at 1311-12 n.52 (noting that "[t]he

fact that Commerce will not disregard financial statements absent concrete proof that a subsidy in

fact actually 'was received,' including a specification of the precise 'dollar amount received,'

would appear to be at least somewhat at odds with the agency's pragmatic presumption (in a related

context) that a company that is eligible for a subsidy will take advantage of that subsidy *i.e.*, that

a company in a competitive market economy 'will not leave money on the table.'").

      Commerce's position that mere "eligibility" is always insufficient to establish "reason to

… suspect" is also inconsistent with common sense. The word "eligibility" in the context of

subsidies is imprecise and could be used to indicate significantly different degrees of proximity

that a company has to a particular subsidy. For example, all exporting companies with plants or

offices physically located in a special economic zone of a particular country may be *eligible* for

subsidies under government regulation. However, a company may also be *eligible* for subsidies as

a result of actively entering into a range of specific contracts for the purpose of accessing certain

subsidies, and incurring legal fees and placing security over assets to do so. The present situation

is the latter, and raises the question of why a company would leave "money on the table" when

subsidies are available to it.

      Leading on from that point, the second issue with Commerce's position is that Commerce

discounts the fact that Tata Tea clearly took a range of affirmative steps to avail itself of its

"eligibility" for "packing credits." Tata Tea negotiated and entered into a series of binding

arrangements, pledging its assets as security with three different banks for the purpose of having

access to "packing credits." The documentation is different for each of these banks (being the State Bank of India, Baroda Bank, and Axis Bank).

In relation to the State Bank of India, Xinboda submitted a "Supplemental Agreement of Hypothecation of Goods and Assets for Increase in Overall Limit" dated December 16, 2008, and a "Letter Regarding the Grant of Individual Limits Within the Overall Limit" dated January 28, 2008. *See* Xinboda Surrogate Value Submission for the Final Results at Exh. 48 (AR Pub. Doc. No. 133). There is also a "Form 8" (an official form filed with the Indian government documenting the "[p]articulars for creation or modification" of a pledge of assets as security) recording the relevant terms of the deed and letter. Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (AR Pub. Doc. No. 138). These documents establish that arrangements were in place for Tata Tea to access "pre-shipment . . . credits" up to a limit of "Rs. 50,00,00,000.00 Crores." There are two earlier "Form 8"s which include the key terms from another arrangement originating with an "Agreement of Hypothecation of Goods and Assets" dated December 14, 1994. These two additional "Form 8"s document a prior arrangement for "Export packing credits." *See* Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (AR Pub. Doc. No. 138).

For Axis Bank, Xinboda submitted a "Deed of Hypothecation of Current Assets (Stock and Book Debts)" dated October 30, 2009, and an associated "Form 8." *See* Xinboda Surrogate Value Submission for the Final Results at Exh. 48 (AR Pub. Doc. No. 133); Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (AR Pub. Doc. No. 138). These documents evidence that Axis Bank provided Tata Tea a "[c]redit facility in the form of . . . Export packing credit / pre shipment credit in foreign currency" in the amount of "Rs. 14,00,00,000/-".

Lastly, as to the Bank of Baroda, Xinboda submitted an "Unattested Deed of Hypothecation" dated October 30, 2009, and an associated "Form 8." *See* Xinboda Surrogate Value Submission for the Final Results at Exh. 48 (Public Doc. No. 133); Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (Public Doc. No. 138). The "Unattested Deed of Hypothecation" states that "[t]he Bank has, at the request of the Borrower, agreed to grant the Borrower Cash Credit-cum-Packing Credit facility up to the limit of Rs,14,00,00,00,000/- Rs, 14,00,00,000."[30]

As a practical matter, Tata Tea would have had no reason to enter into three separate financing arrangements concerning "packing credits" or to renew and increase its credit limits over time, if the company had not made use of them. *See* Pl.'s Comments on First Remand Results at 24 (stating that "Tata Tea would hardly have continued to pledge and convey its property, incurring bank fees, registration fees, and publication of its credit transactions, if over all of the years from 1995 through 2009, the company never used the credit that it was granted," and arguing that Tata would not have needed to raise its credit limit with the Bank of India from Rs 55 Crore to Rs 105 Crore "if the company had never used the credit that it had previously received").

Commerce has not responded directly to this point, but has made several attempts to water down the significance of the Hypothecation Agreements. Commerce first sought to dismiss the

---

[30] Commerce raises concerns about the legibility of both the deeds associated with Axis Bank and the Bank of Baroda. *See* First Remand Results at 19 n.50; *id*. at 20 n.52 *id*. at 50 n.126. However, as to Axis Bank, it appears that Commerce is referring to an earlier, illegible version, as the version of the deed filed on February 3, 2011, is clearly legible. *See* Pl.'s Comments on Remand Redetermination at 22; Xinboda's Surrogate Value Rebuttal Submission at Exh. 2 (AR Pub. Doc. No. 138). Further, as to the deeds for Axis Bank and Bank of Baroda, the terms of the deeds are legibly contained in the associated "Form 8"s, making it unclear what information exactly Commerce is concerned is affected by the legibility of the deeds.

agreements as mere "pledges of security as a prerequisite to Tata Tea receiving packing credits or to increasing the limit of packing credits that are or may become available to Tata Tea." First Remand Results at 19. Commerce analogizes this to an application for a credit card, which "does not automatically guarantee that credit is available to the applicant" and that similarly "completing what is likely one of many steps in the application for 'packing credits' does not guarantee approval or the disbursement of credits." First Remand Results at 19 n.51. Thus, according to Commerce, Tata Tea's affirmative action would have been established only as to an application which does not "guarantee approval or disbursement of credits." *Id*. The short answer to this attempt to minimize the impact of the Hypothecation Agreements is that it is inconsistent with Commerce's own concession that they are more than just applications, rather that they establish that Tata Tea was "eligible" for "packing credits" (*i.e.*, that the applications had been approved). First Remand Results at 49-50.

The third issue with Commerce's position is that there is evidence which appears to provide at least some "reason to . . . suspect" that Tata Tea availed itself of these "packing credits." Commerce maintains that the "packing credits" are not reflected in Tata Tea's financial statements and that there is no other evidence that the "packing credits" were ever received. Issues & Decision Memorandum at 20; Remand Results 19-21, Def.'s Response to Comments Regarding the remand Redetermination at 24.[31] Commerce does concede that "'packing credits' could conceivably be listed" in Tata Tea's financial statements under a section titled "working capital facilities."

---

[31]Of course, as explained above, the "reason to believe or suspect" standard may be satisfied by evidence that is short of proof of a company's *actual receipt* of a subsidy.

Regardless, Commerce asserts that there is no way to connect the amounts maintains listed under "working capital facilities" with "packing credits" as "no item in Schedule 3 mentions 'packing credits,' 'export credit,' 'pre-shipment financing,' or anything else indicating the receipt of countervailable subsidies." First Remand Results at 21.

However, the amounts under "working capital facilities" in Tata Tea's financial statements are linked to the Hypothecation Agreements. This is because those amounts are described as "[s]ecured by way of hypothecation of raw materials, finished products, stores and spares, crop, book debts and movable assets other than plant and machinery and furniture." Pl.'s Brief at 28 (citing Tata Annual Report at 73, Exh. 1 to Pet. Surr. Values (AR Pub. Doc. No. 132). This description is consistent with Hypothecation Agreements, all of which hypothecate (*i.e.*, place a charge over) such assets. These amounts appear to correlate with the Hypothecation Agreements because Xinboda has provided all documentation containing secured loans relating to the period of review. That is, there is a closed universe of loan agreements from which the amounts listed under "[s]ecured by way of hypothecation" can come. That closed universe is constituted entirely by the Hypothecation Agreements, and all of those agreements provide for "packing credits."[32]

---

[32]Xinboda makes this claim through reference to Section 124-145 of India's Companies Act 1956, which required Tata Tea to register all security charges on its book debts, movable assets, and stock-in-trade with the Indian government. *See* Companies Act, No. 1 of 1956, § 124-125, India Code.  Xinboda argues that the only such agreements registered by Tata Tea with the Indian government are the Hypothecation Agreements, and that consequently the amounts described under "working capital facilities" in Schedule 3 of Tata Tea's financial statements must come from the Hypothecation Agreements. Pl.'s Comments on First Remand Results at 24-25 (arguing "[s]ince Tata Tea was required to register security charges on its book debts, movable assets, and stock-in-trade with the Indian Ministry of Corporate Affairs and the Offices of Registrar of Companies, and Tata Tea's Schedule 3 of its 2009-2010 financial statements clearly indicates that the Company received secured loans, and Xinboda put on the record of this case all of Tata Tea's secured loan agreements relevant for the POR, which were retrieved from India's Ministry

Xinboda's evidence thus connects the amounts in Tata Tea's financial statement described as "[s]ecured by way of hypothecation" with the "packing credits" contained in the Hypothecation Agreements. Pl.'s Comments on First Remand Results at 24-25. It must be noted that the Hypothecation Agreements in fact provide for "packing credits" as well as a variety of other forms of loans. As such, Xinboda's argument that the amounts described in Tata Tea's financial statements under "working capital facilities" relate to the Hypothecation Agreements indicates, at a minimum, that money was received under an agreement that provides for "packing credits" as well as other financial arrangements. Commerce failed to respond to the substance of Xinboda's arguments connecting Tata Tea's financial statements with the Hypothecation Agreements.

In sum, Xinboda has provided significant evidence documenting Tata Tea's access to "packing credits" from a number of Indian financial institution, as well as evidence connecting amounts in the Tata Tea's financial statements with these "packing credits." From a common sense perspective, Xinboda's evidence would appear to give at least some "reason to … suspect" that Tata Tea may have received subsidies – whatever that standard may mean.

Under different circumstances, the analysis above would warrant a third remand to Commerce as to both Commerce's interpretation of the "reason to believe or suspect" standard and Commerce's application of that standard to the documentation submitted by Xinboda. However, although Xinboda contested Commerce's selection of Tata Tea's financial statements in its comments on the draft of the Second Remand Results, Xinboda has not pursued the claim in

---

of Corporate Affairs and the Offices of Registrar of Companies, and these loan agreements and deeds of hypothecation clearly involve the grant of countervailable export "packing credits" from banks, then the evidence is incontrovertible that Tata Tea received and used a total of Rs 12036.03 Lakhs in 2009 and Rs 17144.50 Lakhs in 2010 in countervailable export "packing credits.").

this forum.  A third remand therefore is not warranted and there is no reason not to enter judgment

in this matter.

## IV.  <u>Conclusion</u>

For the reasons set forth above, the Second Remand Results must be sustained.  Judgment

will enter accordingly.

<u>/s/ Delissa A. Ridgway</u>
Delissa A. Ridgway
Judge

Decided:  January 30, 2019
          New York, New York